## GERDAU MACSTEEL, INC. & AFFILIATED SUBSIDIARIES, PETITIONERS *v*. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 12642–01.          Filed August 30, 2012.

Q and its subsidiaries are an affiliated group (Ps). During Ps' taxable year ended Oct. 31, 1997 (TYE 1997), Ps actively pursued Q's making of two sales expected to result in millions of dollars in taxable capital gains for TYE 1997 and TYE 1998. Ps' outside accountants (D), mindful of the expected gains, approached Ps with an idea that D promoted to create a multimillion-dollar tax loss to shelter the gains for Federal income tax purposes. Q has a group benefits plan under which Q provides health and welfare benefits to its eligible employees and their dependents. Q's subsidiaries included two inactive corporations, QS and QW. In order to report a desired tax loss of approximately $38 million to shelter Ps' taxable gains from Federal income tax, Ps entered into a series of interrelated transactions in late October 1997 that included, among others, a recapitalization of QW (renamed QHMC), and Q's transfer to QS (and then QS' transfer to QHMC in exchange for newly issued class C stock) of $38 million and the assumption of certain contingent liabilities (i.e., Q's obligations to pay medical plan benefits (MPBs) under Q's benefits plan) which Ps valued at $37,989,000. Ps reported that the transfers qualified for nonrecognition under I.R.C. sec. 351(a) and that QS' basis in the class C stock was determined by taking into account the $38 million transferred to QHMC but not the value of the MPBs. Each share of class C stock was entitled to receive annual dividends of $9.50 and was not allowed to receive any other dividend. Upon the class C stock's redemption, which QHMC and the class C shareholders could respectively cause five and seven years after the stock's issuance, the class C shareholders were entitled to receive for each share the greater of $125 or an amount equal to the lesser of a percent of any cumulative cost savings in MPBs or of QHMC's book net equity. The transactions were structured in such a way that it was highly likely when the

class C stock was issued that the class C stock would be redeemed within the five- and seven-year periods and that the redemption payment would be $125 per share. Shortly after the transfer to QHMC, QS sold its class C stock to a former employee of a Q subsidiary for $11,000 (the difference between $38 million and $37,989,000). Ps claimed that QS realized a $37,989,000 short-term capital loss on the sale, and Ps used that loss to offset Ps' unrelated capital gains totaling a similar amount. After the transactions, Q continued to process claims for MPBs, and Q's handling of the claims transferred to QHMC was the same as the handling of claims with respect to individuals whose MPBs were not transferred to QHMC. QHMC's reimbursements to Q for claims were made through intercompany entries recorded on Q's books as a receivable due from QHMC and on QHMC's books as a payable. QHMC lent the $38 million to a subsidiary of Ps, and QHMC eventually reimbursed Q for the MPBs when QHMC received payments on the loan. *Held*: The class C stock is nonqualified preferred stock under I.R.C. sec. 351(g) because it "does not participate in corporate growth to any significant extent" within the meaning of I.R.C. sec. 351(g)(3)(A). Accordingly, pursuant to the agreement of the parties, Ps are not entitled to deduct the claimed capital loss. *Held*, *further*, the transactions underlying the claimed capital loss lacked economic substance. Accordingly, $352,251 in fees incurred to effect the transactions is not deductible as an ordinary and necessary business expense under I.R.C. sec. 162. *Held*, *further*, in accordance with *Heasley v. Commissioner*, 902 F.2d 380 (5th Cir. 1990), *rev'g* T.C. Memo. 1988–408, and *Todd v. Commissioner*, 862 F.2d 540 (5th Cir. 1988), *aff'g* 89 T.C. 912 (1987), which we follow under *Golsen v. Commissioner*, 54 T.C. 742, 757 (1970), *aff'd*, 445 F.2d 985 (10th Cir. 1971), Ps are not liable for the 40% accuracy-related penalty under I.R.C. sec. 6662(h) that R determined applied to any underpayment of tax attributable to the disallowed claimed capital loss. *Held*, *further*, Ps are liable for the 20% accuracy-related penalty under I.R.C. sec. 6662(a) to the extent of the underpayment of tax attributable to the disallowed claimed capital loss, and Ps are liable for that 20% accuracy-related penalty to the extent of the underpayment of tax attributable to the disallowed deduction for the fees.

*Jasper G. Taylor III*, *Lawrence Kalinec*, *Richard L. Hunn*, *Shawn R. O'Brien*, and *Stephen M. Feldhaus*, for petitioners. *Dennis M. Kelly* and *Jill A. Frisch*, for respondent.

CONTENTS

FINDINGS OF FACT ................................................................... 74

  I.  Preliminary Matters ................................................... 74

  II.  Quanex ....................................................................... 74

  III.  Petitioners' Expectation of Realizing Millions of Dollars in Taxable Capital Gains During TYE 1997 and TYE 1998 ... 75

  IV.  The Plan ..................................................................... 76

    A.  Background .......................................................... 76
    B.  Health Care Offerings ......................................... 76
    C.  Health Care Cost Management Strategies ........... 77
      1.  Background ...................................................... 77
      2.  CS ................................................................... 77
        a.  Background ................................................ 77
        b.  Quanex's Introduction to CS ..................... 78
        c.  CS Fee Arrangements ................................ 79

  V.  D&T ............................................................................ 79

  VI.  Other Quanex Employees/Officers ........................... 80

    A.  Rose ..................................................................... 80
    B.  Parikh .................................................................. 80
    C.  Royce ................................................................... 81

  VII.  Liability Management Companies ........................... 81

    A.  Overview ............................................................. 81
    B.  Rev. Rul. 95–74 .................................................. 82
    C.  D&T's Matrix ...................................................... 82
      1.  Background ...................................................... 82
      2.  DDCL ............................................................. 82
      3.  Singer Promotes DDCL-Type Transaction to Quanex ....... 85

  VIII.  Sales of LaSalle and Tube Group ........................... 85

    A.  LaSalle Sale ........................................................ 85
    B.  Tube Group Sale ................................................. 86

  IX.  Engaging D&T To Structure QHMC Transactions .................. 87

  X.  Developing QHMC Transactions ............................... 89

    A.  Quanex's First Proposal to CS ............................ 89
    B.  D&T's First Outline of Proposed Joint Venture Transactions ......... 91
    C.  WW ....................................................................... 92
      1.  In General ....................................................... 92
      2.  FASB 106 ........................................................ 92
      3.  WW's First Present Value Calculation of Quanex's Health Care Benefits ......... 93
    D.  D&T's Revisions to Proposed Transaction ............. 95

1. August 6–7, 1997, Revisions ................................................. 95
2. August 13, 1997, Revisions and Cashflow Analysis .......... 97
3. August 22, 1997, Revisions ................................................. 99
E. Quanex's Negotiations With CS .............................................. 99
F. WW's Present Value Calculation Revisions .......................... 103
G. Patrick Wannell ...................................................................... 105
1. Background ......................................................................... 105
2. Wannell and Health Care Costs at LaSalle ....................... 105
3. Quanex's Offer to Wannell ............................................... 106
H. D&T's Revised Cashflow Model .............................................. 107

XI.   Executing QHMC Transactions ............................................... 110

A. Quanex's October 21–22, 1997, Board Meeting .................... 110
B. October 23, 1997 ..................................................................... 113
1. QW Recapitalization ......................................................... 113
2. Amendment and Restatement of QW's Certificate of
   Incorporation .................................................................... 113
   a. Background ................................................................... 113
   b. Dividend Rights ........................................................... 114
   c. Preferences Upon Liquidation .................................... 114
   d. Voting Rights ............................................................... 116
   e. Call Rights ................................................................... 116
   f. Put Rights .................................................................... 116
3. Quanex's Transfer of QW Stock and Cash to QHMC in
   Exchange for Class A and Class B Stocks and Elec-
   tion of Directors ................................................................ 117
4. Quanex's Transfer of Cash and MPB Obligations to QS
   in Exchange for QS Stock ................................................. 117
C. October 24, 1997 ..................................................................... 118
1. Consulting Agreement Between Quanex and CS .............. 118
2. CS' Transfer of Cash to Quanex in Exchange for Class B
   Stock .................................................................................. 119
3. Class B Directors .............................................................. 121
D. October 25, 1997 ..................................................................... 121
1. CS' Transfer of Cash to QHMC in Exchange for Class C
   Stock .................................................................................. 121
2. QS' Transfer of Cash and MPBs to QHMC in Exchange
   for Class C Stock .............................................................. 121
3. MPB Selection ................................................................... 122
4. Class C Director ............................................................... 123
E. October 28, 1997: QHMC's Transfer of Cash to Piper in
   Exchange for Promissory Note .......................................... 123
F. October 30, 1997: QS' Transfer of Class C Stock to
   Wannell in Exchange for Cash .......................................... 124

XII.  Posttransaction Activities ....................................................... 125

A. D&T's Draft Opinion ............................................................... 125
B. 1997 Return ............................................................................. 127
1. Background ......................................................................... 127
2. Income ............................................................................... 127

  3.  Enclosed Statements ............................................................. 128
    a.  Overview ....................................................................... 128
    b.  Statement 20 .................................................................. 128
    c.  Statement 22 .................................................................. 129
    d.  Statement 23 .................................................................. 129
    e.  Statement 24 .................................................................. 129
  4.  Deduction of Fees ................................................................ 129
C.  WW's 1999 Valuations ............................................................. 130
D.  D&T's 1999 Cashflow Model ....................................................... 134
E.  QHMC Operations ................................................................... 140
  1.  QHMC's Officers and Directors ................................................ 140
    a.  QHMC's Board Meetings and Shareholders Meetings ... 141
    b.  Parikh as Director and Officer ........................................ 141
    c.  Peery as Director and Officer ......................................... 141
  2.  Bank Accounts ..................................................................... 141
  3.  Processing and Paying MPB-Related Expenses ................. 142
  4.  Shareholder Efforts To Manage MPB Obligations ............ 145
    a.  CS' Efforts .................................................................... 145
      i.  Background ............................................................... 145
      ii.  PPO Project ............................................................. 146
      iii.  Union Negotiations ................................................ 147
      iv.  CS' Consulting Bills ............................................... 148
    b.  Wannell's Efforts ......................................................... 149
  5.  Dividend Payments ............................................................... 150
  6.  Return on Investment Projections ....................................... 150
  7.  QHMC's Tax Returns ............................................................ 151
  8.  Financial Statements ........................................................... 152
F.  Notice of Deficiency .................................................................. 152

OPINION ........................................................................................... 154

I.  Burden of Proof ............................................................................ 154

II.  Witness Testimony ..................................................................... 155

A.  Background ............................................................................... 155
B.  Fact Witnesses .......................................................................... 156
C.  Expert Witnesses ...................................................................... 156
  1.  Background ........................................................................... 156
    a.  Overview ....................................................................... 156
    b.  Strombom ..................................................................... 157
    c.  Ross .............................................................................. 157
    d.  Eisenstadt .................................................................... 157
  2.  Analysis ................................................................................ 158

III.  Net Short-Term Capital Loss .................................................... 158

A.  Overview ................................................................................... 158
B.  Section 351(g) ........................................................................... 159
C.  Economic Substance Doctrine ................................................. 167
  1.  Overview ............................................................................... 167
  2.  Standard of Analysis ............................................................ 168
  3.  QHMC Transactions ............................................................ 171

    a.  Objective Economic Substance  ......................................... 171
        i.  Background  ...................................................... 171
        ii.  Lack of Substantive Changes as a Result of QHMC
             Transactions  ............................................... 172
        iii.  Lack of Reasonable Expectation of Nontax Benefits
              on Petitioners' Part  ................................... 174
    b.  Subjective Business Purpose  ........................................... 175
        i.  Background  ...................................................... 175
        ii.  Petitioners' Entering Into QHMC Transactions
             Solely as Means To Generate Artificial Capital
             Loss To Offset Capital Gains  .................................... 176
        iii.  Petitioners' Selection of Transferred MPBs Without
              Regard to Effective Medical Cost Management  ...... 179
        iv.  Equity Interest in QHMC Granted to CS and
             Wannell as Meaningless Incentive to Reduce
             Health Care Costs  ..................................... 180
        v.  Unnecessary Assumption of MPB Obligations by
            QHMC  ........................................................ 181
    c.  Conclusion  ........................................................... 182

IV.  Fees Incurred in Furtherance of QHMC Transactions  ........... 182

V.  Accuracy-Related Penalties  ........................................ 183

    A.  Background  ....................................................... 183
    B.  Gross Valuation Misstatement  ................................. 183
    C.  Negligence  ....................................................... 186
    D.  Substantial Understatement  ................................... 188
    E.  Section 6664(c) Reasonable Cause Exception  ........................ 191
        1.  Overview  .................................................... 191
        2.  Analysis  .................................................... 193

VI.  Conclusion  .......................................................... 197

MARVEL, *Judge*: Quanex Corporation (Quanex)[1] and its affiliated subsidiary corporations (collectively, petitioners) petitioned the Court to redetermine respondent's determination as to petitioners' taxable year ended October 31, 1997 (TYE 1997). Respondent determined a $9,561,458 deficiency in petitioners' Federal income tax and a $3,799,926 accuracy-related penalty under section 6662(a), (b), and (h).[2] The parties dispute three issues relating to respondent's determination, and they agree that certain subissues and arguments

---

[1] After the petition was filed, Quanex changed its name to Gerdau Macsteel, Inc., and became and remains the agent of the affiliated group for TYE 1997. *See* sec. 1.1502–77A(a), Income Tax Regs. We hereinafter refer to Gerdau Macsteel, Inc., as Quanex.

[2] Unless indicated otherwise, section references are to the applicable versions of the Internal Revenue Code (Code), and Rule references are to the Tax Court Rules of Practice and Procedure.

underlie a decision regarding those issues. The three issues are:

1. whether petitioners may deduct a $37,989,000 net short-term capital loss from the sale of stock of Quanex Health Management Co., Inc. (QHMC). The sale was part of a series of transactions (QHMC transactions) that occurred in October 1997 between and among Quanex, certain of Quanex's affiliated subsidiaries, and two independent (yet loyal) facilitators. Petitioners claimed a $37,989,000 loss deduction on the sale and applied $26,966,201 of the claimed loss to TYE 1997 and the balance to TYE 1998. Respondent disallowed the claimed loss deduction in full. We hold that petitioners are not entitled to deduct any of the claimed loss;

2. whether petitioners may deduct $352,251 of transaction costs incurred to effect the QHMC transactions as ordinary and necessary business expenses under section 162(a). Petitioners claimed the $352,251 as a deduction for TYE 1997, and respondent disallowed the claimed deduction in full. We hold that petitioners are not entitled to deduct any of this amount;

3. whether petitioners are liable for the 40% accuracy-related penalty that respondent determined under section 6662(a) and (h) (or alternatively, the 20% accuracy-related penalty that respondent determined under section 6662(a) and (b)) with respect to the underpayment of tax attributable to the disallowed capital loss deduction, and whether petitioners are liable for the 20% accuracy-related penalty that respondent determined under section 6662(a) and (b) with respect to the underpayment of tax attributable to the disallowed transaction costs deduction. We hold in accordance with *Heasley v. Commissioner*, 902 F.2d 380 (5th Cir. 1990), *rev'g* T.C. Memo. 1988–408, and *Todd v. Commissioner*, 862 F.2d 540 (5th Cir. 1988), *aff'g* 89 T.C. 912 (1987), which we follow under *Golsen v. Commissioner*, 54 T.C. 742 (1970), *aff'd*, 445 F.2d 985 (10th Cir. 1971), that petitioners are not liable for the 40% accuracy-related penalty. We also hold that petitioners are liable for the 20% accuracy-related penalty under section 6662(a) to the extent of the underpayment of tax attributable to the disallowed capital loss deduction and to the disallowed deduction for the transaction costs.

FINDINGS OF FACT

I. *Preliminary Matters*

The parties have stipulated many facts. Some stipulations note a party's objection to the admissibility of the stipulated fact(s), and we have sustained some of those objections. We incorporate herein the stipulated facts to the extent we have not sustained an objection to their admissibility, and the stipulated facts are so found (except to the extent we sustained an objection to their admissibility). Quanex's principal office and principal place of business were in Texas when the petition was filed.

II. *Quanex*

Quanex is a Delaware corporation whose common stock is publicly traded on the New York Stock Exchange. Quanex was organized in 1927, and its principal activity is manufacturing specialized metal products made from carbon and alloy steel and aluminum. From at least 1995 through October 31, 1997, Quanex's main operating groups consisted of a hot and cold finish steel bar business, a hot and cold finish tubing business, and an aluminum building products business.

Quanex is the common parent of petitioners' "affiliated group" (as that term is defined in section 1504(a)). On July 14, 1998, petitioners filed a consolidated corporate Federal income tax return for TYE 1997 (1997 return). Petitioners reported in the 1997 return that Quanex was the common parent of the affiliated group and that its subsidiaries and their principal business activities were as follows:

| Subsidiaries | Principal business activities |
| --- | --- |
| Michigan Seamless Tube Co. | Manufacturing |
| LaSalle Steel Co. | Manufacturing |
| Piper Impact, Inc. | Manufacturing |
| Quanex Wire, Inc. | Investments |
| Quanex Bar, Inc. | Investments |
| Quanex Solutions, Inc. | Investments |
| Quanex Mfg., Inc. | Investments |
| Quanex Steel, Inc. | Investments |
| Quanex Enters., Inc. | Inactive |

| Subsidiaries | Principal business activities |
|---|---|
| Quanex Tech. Inc. | Inactive |
| Quanex Metals, Inc. | Inactive |
| Nichols-Homeshield, Inc. | Inactive |

For TYE 1997 through TYE 2001 petitioners had an annual accounting period ending on October 31, and they each maintained books and records using an accrual method of accounting. As of October 31, 1997, petitioners had 13 manufacturing plants throughout the United States and 1 plant in the Netherlands. Also as of that date, petitioners had 3,771 employees, approximately 1,000 of whom were covered by collective bargaining agreements.

III. *Petitioners' Expectation of Realizing Millions of Dollars in Taxable Capital Gains During TYE 1997 and TYE 1998*

During TYE 1997 Quanex was actively pursuing the sales of two subsidiaries. Those sales were expected to generate millions of dollars in taxable capital gains during TYE 1997 and TYE 1998. The first sale involved Quanex's wholly owned subsidiary LaSalle Steel Co. (LaSalle). Quanex's board of directors (Quanex's board) resolved on February 27, 1997, to make that sale, and the sale closed shortly thereafter in TYE 1997. For TYE 1997, petitioners reported as to that sale (and to a minor extent the sale of other business property) that they realized a capital gain of $26,966,201 and ordinary income of $21,374,634. The second sale involved Quanex's decision to sell a portion of its tubing operations (Tube Group).[3] In or before September 1997 Quanex began negotiating that sale, and the sale occurred on December 3, 1997. For TYE 1998 petitioners reported as to that sale that they realized a net capital gain of $12,458,171 and ordinary income of $8,090,766.

Contemporaneous with petitioners' activities with respect to the two sales, and with knowledge of petitioners' intent to make those sales, petitioners' outside accounting firm,

---

[3] The Tube Group included Michigan Seamless Tube Co. (MST), Gulf States Tube Division (GST), and the Tube Group administrative office. The Tube Group also included Quanex's Heat Treating and Nitro Steel Divisions, but Quanex retained those divisions, and they were still a part of Quanex as of the time of trial.

Deloitte & Touche, LLP (D&T), through one of its tax partners, Steven Singer, approached petitioners and promoted an idea for a multistep transaction that, if artfully structured to comply literally with the Code and certain interpretations thereunder, could create for petitioners a multimillion-dollar tax loss to shelter the gains from the unrelated sales for Federal income tax purposes. Quanex entered into the QHMC transactions as a result of that promotion, and Quanex claimed that it realized a $37,989,000 capital loss on one of the steps in the QHMC transactions that effectively offset the amount of gains on the unrelated sales. The QHMC transactions were ostensibly structured around the Quanex Corporation Group Benefits Plan (plan) with an aim towards generating an artificial multimillion-dollar tax loss that would offset the large gains on the sales and would appear to be generated from Quanex's business activities.

IV. *The Plan*

A. *Background*

Effective September 1, 1949, Quanex established the plan to provide certain health, welfare, and other similar benefits for eligible Quanex employees and their dependents. Quanex reserved the right to amend the plan at any time and reserved the right, without an authorizing resolution from Quanex's board, to reduce or completely eliminate any coverage provided under the plan for current and/or former employees and their beneficiaries. Quanex also could terminate the plan at any time by a written resolution of Quanex's board.

B. *Health Care Offerings*

Pursuant to the plan, Quanex offered both its nonunion and union employees a choice of medical plans, which were generally indemnity and health maintenance organization (HMO) plans. In the early 1990s Quanex also instituted cafeteria benefits with respect to its indemnity plan offerings. Under the plan, Quanex was required to appoint a committee to perform any administrative function with respect to the plan that the respective insurer or HMO was not required to perform.

Effective January 1, 1995, Quanex amended and restated the plan, and the plan remained in effect for TYE 1997.[4] From 1995 through the end of TYE 1997, Quanex provided group medical benefits to its employees under the plan, and Quanex deducted the costs of those benefits as they were incurred as ordinary and necessary business expenses.

### C. *Health Care Cost Management Strategies*

#### 1. *Background*

The cost of providing health care is influenced by numerous factors, e.g., an employee's age, number of dependents, and geographic location. Other less predictable components, such as political pressures, also can influence health care costs. From at least 1985 Quanex experienced a rise in the cost of providing health care to its employees. As early as 1985 Quanex began to look at ways to reduce its overhead and streamline its benefits, including its health care costs, pensions, and medical benefits for both active and retired employees.

#### 2. *CS*

##### a. *Background*

ChapmanSchewe, Inc. (CS), is a health care management firm that Doug Schewe and Harry Chapman organized on July 1, 1992.[5] As of the time of trial CS had 12 subcompanies, all of which were devoted to health care, and its employee benefits practice managed health benefits for approximately 9 million individuals throughout the United States. During TYE 1997 Chapman was CS' chairman and chief executive officer, and he owned approximately 37% of CS' stock. Chapman has a bachelor's degree and a master's degree in public administration, and as of the time of trial he had 23 years of experience in the health care industry.

---

[4] As of October 31, 1997, petitioners provided health care benefits to their nonunion employees through either an indemnity (self-insurance) medical plan or a managed care program.

[5] While CS was apparently formed under a different name, we refer to CS and any of its predecessors as CS.

b. *Quanex's Introduction to CS*

Ron Howard joined CS in 1994 as an associate/benefits consultant. Howard was a former financial portfolio manager with a master of business administration (M.B.A.) degree and 10 years of experience in banking. During his previous career in banking, Howard had formed relationships with members of Quanex's senior management, including Quanex's then chief financial officer (CFO), Wayne Rose. Howard contacted Quanex shortly after he joined CS to persuade his Quanex contacts to let CS negotiate Quanex's HMO contracts and to pursue a working relationship with Quanex.

On April 7, 1994, CS representatives met with Quanex representatives. During the April 7 meeting, Howard and Chapman gave a sales presentation to Joseph Peery. Peery has a bachelor's degree in business administration and 34 years of experience in human resources, and he was Quanex's vice president of human resources from 1984 until he retired in April 1998. Shortly after the April 7 meeting, Quanex gave CS the opportunity to reduce Quanex's health care costs through HMO negotiations.

In CS' first project, Howard negotiated a fee for Quanex with one HMO, which saved Quanex money. Quanex then expanded its involvement with CS but still limited CS to HMO work. The substance of CS' work consisted of negotiating Quanex's premium amounts with HMOs and of analyzing HMO cost structures.

Howard was the CS executive in charge of the Quanex account during TYE 1997, and sometime before 1998 he attempted to negotiate rate guaranties for Quanex. Howard had previously informed Quanex that CS could negotiate multiyear rate guaranties and performance guaranties with HMOs.

Before the QHMC transactions, Chapman participated in the negotiation of Quanex's HMO contracts. Chapman tried to achieve the best results possible from the negotiations, and Chapman used the negotiations to speak more frequently with Quanex's human resources department and to sell Quanex additional health care consulting services.

c. *CS Fee Arrangements*

CS offered flexibility to its clients through different payment arrangements (e.g., CS' fee might be a percentage of the expense saved, or it might be calculated on the basis of a percentage of revenue). Before the QHMC transactions, CS informed Quanex that CS' compensation was performance based; i.e., CS would be compensated only if, and to the extent, CS saved Quanex money. Before the QHMC transactions, CS and Quanex did not have a written consulting agreement,[6] but CS acted as a broker to secure medical coverage for Quanex's employees through HMOs, and the HMOs (or Quanex in one or two instances) paid CS a brokerage commission for its services.

## V. *D&T*

Quanex first engaged D&T (or one of its predecessors) as early as 1978 for external auditing, tax, and consulting services. The consulting services related to, among other things, debt restructuring, potential bankruptcy filings, and the purchases and sales of assets and subsidiaries. During TYE 1997 D&T certified petitioners' consolidated financial statements and reviewed petitioners' consolidated Federal income tax returns, in addition to providing petitioners with other professional services.

Singer is an attorney and a certified public accountant (C.P.A.), and he has practiced in the field of taxation for over three decades. He joined D&T in 1981, and he became a partner in D&T's tax practice one year later. He became the D&T partner in charge of the Quanex account in 1989. Singer was based in D&T's office in Houston, Texas, during TYE 1997, and he remained in charge of D&T's Quanex account as of the time of trial.

From 1989 through the end of TYE 1997, Singer consulted with Quanex regarding its current and prospective purchases, and he reviewed and signed Quanex's corporate returns as a paid preparer. From 1995 through the end of TYE 1997, Singer had intimate, first-hand knowledge of Quanex and its business, acquired mainly from his supervising and managing D&T's Quanex account since 1989, his

[6] It was not unusual for CS to forgo a consulting agreement with a client.

visits to some of Quanex's facilities, his participation in Quanex's financial statement audits, and his conversations with Quanex's senior management.

## VI. *Other Quanex Employees/Officers*

### A. *Rose*

Rose is a C.P.A. with a bachelor's degree and an M.B.A. degree, and he was Quanex's CFO from 1986 through 1998. He was Quanex's controller before 1986 (and before that, he worked for a large national public accounting firm for six years), he was the president of Quanex's engineered products group from the end of 1998 until 2001, and he was Quanex's vice president of special assignments from June 2000 through March 2001.

When Quanex bought or sold a substantial asset, Rose, as CFO, and his department were responsible for projecting the results of that transaction. Rose generally knew what tax results he wanted going into purchase or sales negotiations, and he preferred to buy net assets and to sell subsidiaries. During his tenure as Quanex's CFO, Rose knew the importance of tax basis and the effect that liabilities had on a determination of Quanex's bases in its subsidiaries.

### B. *Parikh*

Viren Parikh is a C.P.A. with a bachelor's degree and a master's degree, both in accounting, and he was Quanex's controller from 1993 through December 2002. He left Quanex on December 31, 2002.

As Quanex's controller, Parikh was responsible for Quanex's accounting department; its duties included financial reporting, corporate accounting, and tax return preparation. Parikh, as controller, also (with Thomas Royce and Rose) was responsible for reviewing Quanex's asset sales and projecting their results. If Quanex sold a significant asset, Parikh decided how the transaction would be recorded on Quanex's financial statements, and he was involved in deciding how any tax implication would be reported. He and his department also, while negotiations for Quanex's potential sales were ongoing, would project gains and losses on those potential sales for purposes of financial reporting,

periodically updating the projections as the negotiations drew to a close.

### C. *Royce*

Royce is a C.P.A. with a bachelor's degree in business administration (majoring in accounting), and he was Quanex's tax director. Beginning in TYE 1997, Royce also was Quanex's director/manager of financial benefits administration (FBA manager). Royce reported to Parikh during TYE 1997, and Royce remained Quanex's tax director and FBA manager as of the time of trial.

As tax director, Royce was responsible for Quanex's consolidated Federal income tax returns and any subsidiary returns, for all tax planning, for tax audits, for employee benefit returns, and for all State income and franchise tax returns. As FBA manager, Royce was responsible for the accounting of the employee benefits in Quanex's pension and section 401(k) plans, for audit preparation, for the filing of employee benefit information returns, and for working with welfare benefit plans and third-party administrators for both pension and section 401(k) plans.

Royce, as tax director and eventually also FBA manager, also reviewed Quanex's sales and made corresponding projections. When Quanex negotiated the sale of a substantial asset, Royce projected the potential Federal income tax ramifications from the sale during the negotiations.[7] If a sale was concluded, Quanex would usually at the end of the year calculate the actual Federal income tax consequences of the sale. Parikh would review the overall tax provision that had been made for the sale for financial statement purposes, but Parikh would not review Royce's estimates of the potential income tax consequences.

## VII. *Liability Management Companies*

### A. *Overview*

As of the end of TYE 1996, Quanex had a potential liability for medical plan benefits (MPBs) that might be provided under the plan. Quanex also faced a potential environmental

---

[7] Royce testified that when Quanex negotiated the sale of a significant asset, neither he nor anyone else at Quanex projected what tax benefits and detriments would result from the sale. We do not find Royce's testimony on this point to be credible, and we decline to rely upon it.

liability of $15 million to $20 million. Quanex assumed the potential environmental liability in 1996 when Quanex acquired Piper Impact, Inc. (Piper). As part of that acquisition, the seller established an escrow to cover this exposure.

B. *Rev. Rul. 95–74*

Singer, Parikh, Royce, and Rose attended a Quanex quarterly meeting in 1996, in or before the summer of that year. During that meeting, Singer informed the Quanex representatives that the Internal Revenue Service (IRS) had issued a ruling, Rev. Rul. 95–74, 1995–2 C.B. 36 (revenue ruling), which Singer believed allowed Quanex to achieve tax benefits by transferring either its environmental liabilities or its MPB obligations to a liability management company in a joint venture. In the revenue ruling the IRS ruled that certain contingent environmental liabilities that a transferee assumed in a section 351 exchange were not liabilities for purposes of sections 357(c)(1) and 358(d) and that the transferee, in accordance with its method of accounting, could, as appropriate, either deduct the liabilities as business expenses under section 162 or capitalize the liabilities as capital expenditures under section 263.

C. *D&T's Matrix*

1. *Background*

D&T maintained an electronic repository of tax ideas that D&T professionals could discuss with D&T clients to increase D&T's business with those clients and generate additional revenue for D&T. Various D&T professionals contributed ideas in their areas of expertise to the repository (referred to as D&T's client service matrix (matrix)), and D&T envisioned that D&T might provide the client with a tax opinion on any transaction described in the matrix which a client entered into. The matrix was for internal use only, and D&T believed it would be at a competitive disadvantage if competitors gained access to the ideas in the matrix.

2. *DDCL*

Singer occasionally consulted the matrix to obtain ideas to present to D&T clients. In the summer of 1996, after Singer learned of the revenue ruling, he read an undated section of

the matrix referenced as "Double Deducting Environmental and Other Contingent Liabilities" (DDCL). Singer was not responsible for the ideas in the DDCL, and he believed the DDCL was the only section of the matrix referencing the revenue ruling.[8]

The DDCL proposed a transaction for accrual method taxpayers whom the accrual method prevented from deducting accruals on their balance sheets for estimated future environmental liabilities. The DDCL concluded that, in the setting of a consolidated group, a transaction could be structured to allow such a taxpayer to immediately deduct a capital loss equal to the amount of the environmental reserve and to claim an additional deduction when the accrued liability was paid. The DDCL stated that the "proper structuring" of the transaction revolved around the use of an environmental management company and the sale outside the group of some of the company's stock at a price equal to the stock's fair market value. The DDCL summarized the transaction as follows:

SUMMARY OF TRANSACTION

Parent Corporation (Parent) is a parent corporation in a consolidated group, which includes Environmental Management Company (EMCo) and several other operating companies. EMCo is a newly established, wholly-owned subsidiary of Parent. Parent also owns S1, and S1 owns S2. Parent now desires to use EMCo to strategically manage the groups [sic] environmental liabilities and clean-up efforts. S1 has a reserve for environmental liabilities on its books in the amount of $10x, which has not been deducted for income tax purposes. S1 also has an intercompany receivable account with S2 in excess of $10x.

First, S2 pays off a portion of its intercompany debt to S1 by issuing a 10-year promissory note for $10x. S1 then contributes this note receivable, and its $10x environmental reserve, to EMCo in exchange for 100 shares of new, voting Class B stock. These shares may be either preferred or common. These shares have only a nominal value, as the net book value of the contributed property is nominal. (S1 remains legally liable for the environmental costs if EMCo is unable to pay them.) These shares should be designated as being entitled to a limited percentage of dividends and distributions paid to all classes of stock (for example, 15%). The percentage must be established so that at least 80% of the vote and value of all stock remains with the Class A (common) stock.

---

[8] After the QHMC transactions were completed, D&T added to the matrix another idea dealing with a contingent liability transaction.

S1 then sells the Class B shares of EMCo to EMCos [sic] officers for their fair market value, a nominal amount. As the tax basis in this stock is $10x, S1 recognizes a capital loss of $10x on the sale. As EMCo makes expenditures on the environmental reserve, it also has a deduction for these payments.

The DDCL noted that "it is clear that a business purpose is required for the transaction" and listed the following business purposes for the transaction: (1) better management of S1's environmental liabilities through EMCo's devotion of its resources solely to environmental projects, (2) the ability to provide incentives more easily for the better management of the environmental liabilities by creating a separate company, and (3) improvement of S1's credit arrangements and banking relationships by taking its environmental liabilities off its balance sheet and transferring them to another of P's subsidiaries. The DDCL described the business purposes regarding incentives (No. (2) above) as follows:

S1 will sell Class B stock in EMCo to the EMCo officers in order to give these individuals an ownership interest in EMCo. S1 also then agrees to repurchase each officers [sic] shares, once the environmental liabilities have been settled or the officer leaves the employment of EMCo, at the greater of their cost to the officer * * * or the per share book value of EMCo. If the environmental liabilities are satisfied for less than the amount originally estimated, the book value of EMCo will increase, providing the individual officers with a gain when their shares are sold back to S1.

The DDCL acknowledged that the transaction referenced therein presented risks and could be subject to antiavoidance provisions such as section 269 or section 1.1502–20, Income Tax Regs. The DDCL envisioned that its substance could be adapted for use with a variety of contingent liabilities and reserves, including medical claims. D&T structured the transaction described in the DDCL to offer to its qualifying clients a deductible capital loss equal to the amount of contingent liabilities transferred in the transactions. The appeal of the DDCL transaction (or a variation thereof) was to minimize a taxpayer's Federal income tax liability by accelerating the deduction of and double deducting environmental or other contingent liabilities.

### 3. *Singer Promotes DDCL-Type Transaction to Quanex*

Singer decided to approach Quanex to promote to Quanex the transaction described in the DDCL, or a variation thereof. While the DDCL referenced a consolidated setting, Singer preferred implementing the transaction described therein in a deconsolidated setting because he was concerned about rules under which the loss could be disallowed in the consolidated setting.

Before discussing the DDCL and the revenue ruling with Quanex, Singer read some of the cases mentioned in the ruling. He had developed an understanding of the revenue ruling and its implications, and he had previously discussed a contingent liability transaction with at least one other client. Singer took the position that an implication of the revenue ruling was that a taxpayer could use a liability management company to create a capital loss which, in turn, could reduce the taxpayer's Federal income tax liability.

In February 1997 at Quanex's quarterly review meeting with D&T, Singer advised Rose, Parikh, and Royce that D&T could structure a contingent liability transaction for Quanex to generate a tax loss for Quanex. At that time, Singer knew that Quanex was selling LaSalle and would have a significant gain on the sale.

### VIII. *Sales of LaSalle and Tube Group*

#### A. *LaSalle Sale*

On February 27, 1997, Quanex's board resolved to sell all of Quanex's stock in LaSalle to a third party. The LaSalle sale closed on April 18, 1997. Singer knew at least as early as the 1996 quarterly meeting that this sale was probable, and he understood in or before March 1997 that Quanex hoped to close the sale by April 1997. Singer and Rose also both knew that the sale was expected to generate a significant gain.

On January 13, 1998, petitioners filed their Form 10–K, Annual Report Pursuant to Section 13 or 15(D) of the Securities Exchange Act of 1934, for TYE 1997 (1997 Form 10–K). Petitioners reported in the 1997 Form 10–K that they completed the LaSalle sale for approximately $65 million. In their 1997 return petitioners reported that they realized a

$28,697,957 capital gain and a $20,721,360 ordinary gain on the sale. Petitioners' 1997 return included their section 338(h)(10) election regarding the sale of LaSalle. From April 18, 1997 (the date of the LaSalle sale), through July 14, 1998 (the date petitioners filed their 1997 return), LaSalle's buyer tried to renegotiate a lower purchase price, and the buyer and Quanex disagreed on purchase price allocation issues related to the section 338(h)(10) election. In or before that period Quanex made several estimates of the income tax ramifications of the sale.[9] Royce, in particular, performed rough calculations comparing the results of completing the sale as a stock sale rather than an assets sale under section 338(h)(10). Royce shared his calculations with Parikh.

Singer knew during April 1997 that petitioners would realize millions of dollars of ordinary income and capital gain on the LaSalle sale.[10] Over the next five months, he devoted a substantial portion of his time to determining the tax implications of the sale, including the amount of ordinary income and capital gain to be generated from the sale.[11] Before the QHMC transactions closed, Singer and Royce discussed the anticipated amount of capital gain on the LaSalle sale.

B. *Tube Group Sale*

The Tube Group sale involved the sale of both stock and assets. The first closing occurred on December 3, 1997. Petitioners reported on their 1997 Form 10–K that the Tube Group sale was completed for approximately $30 million, and they reported a $12,458,171 capital gain and $8,090,766 of ordinary income from the Tube Group sale on their Federal income tax return for TYE 1998 (1998 return).

---

[9] Contrary to other testimony, Royce testified that Quanex did not consider the tax consequences during the negotiations because the buyer and Quanex had agreed to the sec. 338(h)(10) election, that the tax consequences of the LaSalle sale were not important to Quanex before the April 1997 closing, and that the tax consequences were irrelevant for purposes of negotiating LaSalle's sale price. We do not find Royce's testimony on this matter to be credible, and we decline to rely upon it.

[10] Singer testified that he knew by April 18, 1997, that Quanex had an economic gain on the sale but that he did not know the exact amount of the capital gain on the sale until approximately a week or two before he finalized petitioners' 1997 return. We do not find this testimony to be credible, and we decline to rely upon it.

[11] For June 29 through September 20, 1997, D&T billed Quanex $22,190 for 60.5 hours of "Consultations regarding the sale of LaSalle" by Singer and other D&T professionals.

IX. *Engaging D&T To Structure QHMC Transactions*

Over several months, at a time when D&T and Quanex were already aware of petitioners' expected multimillion-dollar sales, D&T and Quanex discussed the possibility of Quanex's engaging in a series of transactions similar to those in the DDCL and the revenue ruling. During some of these discussions, D&T gave presentations either through Singer alone or through Singer and one of his Houston-based tax partners, Mark Schneider. Singer asked Schneider during 1997 to help him structure a contingent liability transaction for Quanex, and they discussed the potential tax implications of the transaction. When Singer initially discussed the DDCL and the revenue ruling with Quanex, he informed Quanex about potential issues with section 1.1502–20, Income Tax Regs., and similar loss limitation rules that applied to consolidated groups. Singer advised Quanex that its liability management company (QHMC), if deconsolidated from petitioners' affiliated group, could be reconsolidated with the group if puts and calls were exercised in relation to the company's stock. [12] Singer advised Quanex that it needed a business purpose for the QHMC transactions.

On the basis of the discussions between D&T and Quanex, Rose believed that D&T's structuring of a joint venture to manage petitioners' liabilities could result in a capital tax loss that petitioners could use to shelter the anticipated unrelated gains. Singer advised Quanex from the outset, however, that he did not know whether D&T could actually structure such a joint venture. Nevertheless, at some time on or before March 24, 1997, Rose asked D&T for an engagement letter concerning the structuring of a series of transactions between Quanex, some of Quanex's affiliates, and a third-party liability management consulting firm (what became the QHMC transactions). [13] Singer wanted the engagement letter so that he could be certain that D&T would be paid for its time whether or not the transactions were completed.

---

[12] As discussed *infra*, Quanex characterized QHMC, formerly know as Quanex Wire, Inc. (QW), a wholly owned inactive subsidiary of Quanex, as its liability management company to effect the QHMC transactions.

[13] Rose directed Royce and Parikh to help complete the QHMC transactions. Parikh, however, did not make decisions about the details of the transaction's structure.

Quanex and D&T entered into an agreement that was set out in an engagement letter dated March 24, 1997 (engagement letter). The engagement letter was signed by Singer on D&T's behalf, and it was executed by Rose on Quanex's behalf on June 30, 1997. Through the engagement letter, which was prepared by or under the direction of Singer, Quanex asked D&T to provide Quanex with—

assistance in considering the federal income tax consequences associated with a series of prospective transactions between Quanex Corporation and several of its affiliates * * * an independent third party management consulting firm specializing in either employee benefits and medical insurance matters, or in environmental matters,* * * [14] as well as with a form of the prospective transaction that additionally or alternatively may contemplate an independent third party investor.

The engagement letter notes that "the form and content of this prospective transaction is [sic] somewhat fluid at present" and that D&T would participate in meetings and discussions related to the structuring of the transaction. Singer informed Rose that the transaction contemplated by the engagement letter was a recent development, and Singer did not represent that he had experience with the type of transaction described. The engagement letter stated that D&T's professional fees would be calculated on the basis of its standard hourly charges, but if the transaction were completed, the fees would be approximately $400,000 plus an estimated additional $10,000 for out-of-pocket expenses.

D&T and Quanex contemplated under the engagement letter that D&T's assistance and advice would "culminate in the delivery to Quanex of a tax opinion letter * * * limited solely to the specific federal income tax consequences to Quanex" and that the opinion letter would be "based upon all the facts of the transactions and representations made to * * * [D&T] in a Letter of Representation provided by Quanex." The engagement letter stated that D&T could not confirm the conclusions it reached until it signed its opinion letter, although it might "informally indicate prior to that point whether or not * * * [D&T] anticipate[d] that a position taken by Quanex should be sustained on its merits if challenged by the IRS", and conditioned D&T's agreement to

---

[14] Although Rose had previously rejected Singer's suggestion to use a liability management company to control Quanex's environmental liabilities, Singer referenced those liabilities in case Rose changed his mind.

provide a tax opinion on D&T's "ability to satisfy ourselves that all of our professional standards for the conduct of this work and the issuance of our opinion have been met." D&T required as a condition of the engagement that Quanex agree in the engagement letter that D&T's liability for any damages arising out of the services that D&T provided in the engagement be limited to the fees paid to D&T for its services giving rise to the liability. D&T required as a condition of the engagement that Quanex agree in the engagement letter that it would indemnify D&T from any liability, cost, or expense (including attorney's fees and expenses) stemming from the engagement, absent D&T's bad faith or willful misconduct. When Singer signed the engagement letter, he contemplated that D&T would provide Quanex with a tax opinion letter if a transaction were completed and Quanex wanted such a letter.

D&T assisted Quanex with the QHMC transactions, and the process of developing the transactions (including the discussions before the engagement letter) extended from approximately February through October 1997. Petitioners conducted no independent investigation of the tax consequences of the QHMC transactions.

## X. *Developing QHMC Transactions*

### A. *Quanex's First Proposal to CS*

On several occasions in 1997, Rose met with Quanex's management group and Singer to form an initial proposal to tender to CS as to its participation in the QHMC transactions. By letter dated July 21, 1997, Peery contacted Chapman to determine CS' interest in the proposal for the "somewhat unique arrangement we are seeking" to "manage[ ] our corporation's non-union medical expenses, including both HMO and indemnity plan coverage for active employees and retirees." Rose and Peery drafted this letter together, and they showed the letter to Singer before Peery sent it.

The July 21 letter described Quanex's proposal as an opportunity for an employee benefits firm to enter into a partnering arrangement with Quanex for a term of approximately 7 to 15 years to assume responsibility for and management of ongoing health care costs. The letter stated that the management responsibilities would include meeting

the insured health care needs of certain nonunion Quanex employees at care levels comparable to those already in place, but with more efficient service delivery to Quanex's employees and an ultimate result of reduced costs to Quanex. The letter explained that the management firm would acquire a class of stock in a medical management subsidiary of Quanex, the subsidiary would hold a 7- to 15-year promissory note issued by a Quanex entity, and the subsidiary would use the interest and principal payments on that note to reimburse the insured health care costs of the covered nonunion Quanex employees.

The July 21 letter further explained that although CS would be paid, in part, for contract services on a periodic basis, Quanex was seeking an arrangement where CS' performance premium for economic savings under the contract would be partially realized by efficiencies and cost savings. According to the letter, Quanex anticipated that these savings would lead to an accretion in the value of a designated class of the subsidiary's stock and that the premium for performance would be shared through equity holdings in the subsidiary. The letter stated that Quanex designed this arrangement because "The senior management of Quanex is committed to delivering above market returns to our equity shareholders, and as such, has increasingly focused on reconfiguring certain central business relationships into a shared ownership or joint venturing mode." [15]

Because Quanex was a good customer for CS and CS wanted to retain its relationship with Quanex in any way it could, CS agreed to meet with Quanex to discuss the proposal. CS and Quanex met during the summer of 1997, and Quanex informed CS that Quanex wanted to create a medical management business unit that would focus on self-insured, indemnified contracts. [16]

---

[15] As of then, Rose had not considered using a consulting agreement, rather than a separate corporate structure, to provide incentives to reduce the health care costs.

[16] Chapman also attended a meeting where Singer made a presentation about the proposed transactions. The record is not clear regarding whether this presentation occurred during this initial meeting.

B. *D&T's First Outline of Proposed Joint Venture Transactions*

Sometime on or before July 30, 1997, but at a time when Quanex knew it would have substantial gains from the LaSalle and Tube Group sales, Quanex requested that D&T prepare an outline of the first draft of the proposed QHMC transactions. Singer and Schneider prepared the outline. Schneider reviewed the outline before it left D&T, and by letter dated July 30, 1997 (July 30 outline), he sent the outline to Parikh, Rose, and Peery. [17]

The July 30 outline stated that Quanex wished to broaden the scope of CS' HMO evaluation services to include review of Quanex's indemnity medical plan and other medical cost and quality matters. The outline reiterated that CS' compensation with regard to the additional scope of services would be paid pursuant to a consulting agreement that provided for either hourly or performance-based compensation and for "additional long term incentive equity". The outline proposed that (1) Quanex or QHMC have the option of purchasing the incentive equity after five years for cash, (2) CS have the option of selling the same to Quanex or QHMC after seven years for cash, and (3) the purchase or sales price be the greater of $12,500 or a formula value based, in part, on QHMC's expectations for its medical claim expenses.

The capital loss deduction generated through the QHMC transactions would be approximately equal to the amount of the MPBs that were transferred in those transactions, and the amount of the MPBs Quanex would transfer in the QHMC transactions would be based on the amount of the capital gains Quanex wanted to offset. Under the proposal set forth in the outline, all actuarial calculations for the QHMC transactions, including calculations of the present values of the MPBs to be transferred, would be done by the actuarial firm of Watson Wyatt & Co. (WW) or another Quanex designee. WW was Quanex's then-current consultant on pension plans and retiree health care plans. Sometime before June 30, 1997, Royce asked WW to compute the present value of

---

[17] Although Peery was included on some of the correspondence relating to the structuring of the transaction, Peery did not have any discussions with D&T about the structure of QHMC. Peery also did not participate in any decisions or make any recommendations with respect to how QHMC would be structured.

Quanex's future health care benefits for active and retired Quanex employees. Royce did so because he wanted Quanex to know the amount of its outstanding MPBs as it analyzed the structure of the proposed transactions.

### C. *WW*

#### 1. *In General*

As part of WW's consulting services provided to Quanex, WW prepared Quanex's report (FASB 106 report) required by Financial Accounting Standards Board Statement No. 106 (FASB 106). The FASB 106 report includes a calculation of a liability for the balance sheet and an annual expense for the income statement as to an organization's retiree health care plans and other retiree welfare plans. An FASB 106 liability is a liability for financial statement purposes. The MPB obligation, i.e., the future health care costs for active employees of Quanex, is not an FASB 106 liability. [18]

#### 2. *FASB 106*

FASB 106 sets forth standards for determining the present value of an employer's future retiree health care payments owed to currently retired individuals and current employees who will retire in the future and ratably accruing that present value on the employer's financial statement over each employee's career in an effort to match the benefits paid to employees to their service as they earn the benefits. FASB 106 requires the making of certain actuarial assumptions on matters such as the average cost of health care per person, the projection of increases in future average costs, and a discounting of projected future costs to calculate present value. (An assumption relating to increases in health care costs into the future is referred to as health care cost inflation or a health care cost trend.) Other assumptions relate to employee demographics, including mortality, job turnover, retirement age, and the likelihood of electing coverage under the employer's plan upon retirement.

Different types of trends exist for short-term and long-term calculations. For purposes of FASB 106, the timeframe for

---

[18] As discussed *infra*, the transferred MPB obligations had not been incurred by Quanex as of October 31, 1997, and when those obligations were assumed by QHMC, they were not reported as a liability on Quanex's financial statements.

short-term calculations is typically from 4 to 10 years. Commonly, for a valuation under FASB 106, after a trend rate is determined for the first year of the calculation (initial trend rate), the initial trend rate gradually changes over the years to an ultimate health care inflation rate (ultimate trend rate). From the initial year of the calculation until the ultimate trend starts, the ultimate trend rate can be adjusted and is generally not the same number for all 4 to 10 years. The initial trend rate may be either greater or less than the ultimate trend rate.

3. *WW's First Present Value Calculation of Quanex's Health Care Benefits*

WW had the information to perform the present value calculations requested on or before June 30, 1997, because it had prepared Quanex's FASB 106 report for TYE 1996.[19] By letter dated June 30, 1997, Michael Ringuette, a WW actuary, sent Royce (in his capacity as Quanex's tax manager) the requested calculations for FASB 106 (June 30 calculations). The letter stated that the calculations applied only to people employed by or retired from Quanex as of November 1, 1996, and that WW did not include any additional amounts for employees that might be hired later. The letter was the first written product WW gave Royce as a result of the assignment to compute the present value of the future benefits, and Quanex knew WW's calculations were estimates. Rose decided which groups of employees were included in WW's calculations and the length of the term WW's projections covered. Rose also ratified WW's decisions about what assumptions were included in the calculations.

WW's June 30 calculations were entitled "Present Value of Active Health Care Benefits Provided to Employees Hired as of 11/1/96". The calculations relied on data from Quanex's salaried employees at its Corporate, GST, Heat Treating,

---

[19] Later, WW also prepared Quanex's FASB 106 report for TYE 1997. For the purpose of the FASB 106 reports, WW measured the present value of the annual retiree health care expense as of the first day of the fiscal year; e.g., for Quanex's TYE 1997 report, the expense was measured as of November 1, 1996. In addition, usually in the November right after the close of the fiscal year, WW made a subsequent measurement as of October 31 of the just-closed fiscal year to determine the liabilities to be disclosed on Quanex's yearend financial statements; e.g., for Quanex's TYE 1997 report, the subsequent expense was most likely measured in November 1997. During October 1997, WW knew the assumptions for TYE 1997 that it would make as to the discount and inflation rates because it and Quanex discussed those assumptions during that month.

Macsteel (MS)–Michigan, MS–Arkansas, MS–General Office, MST, and Tube Group Office locations, and from Quanex's hourly employees at its GST, MS–Michigan, MS–Arkansas, and MST locations.[20] The calculations were broken down by the estimated present value of active health care benefits and of retiree health care benefits for active employees, on the one hand, and for retired employees, on the other hand. WW provided the following estimated present values of the active health care benefits:

| Location | Current employees | Estimated P.V. of active health care benefits |
|---|---|---|
| Salaried employees: | | |
| Corporate | 35 | $2,468,146 |
| GST | 55 | 3,741,751 |
| Heat Treating | 27 | 2,148,863 |
| MS–Michigan | 112 | 8,113,866 |
| MS–Arkansas | 120 | 8,976,903 |
| MS–General Office | 30 | 2,044,664 |
| MST | 66 | 4,530,899 |
| Tube Group Office | 51 | 3,471,742 |
| Total | 496 | 35,496,834 |
| Hourly employees: | | |
| GST | 248 | 15,799,142 |
| MS–Michigan | 165 | 11,399,603 |
| MS–Arkansas | 252 | 17,479,494 |
| MST | 222 | 13,164,471 |
| Total | 887 | 57,842,710 |

The June 30 calculations relied on the following assumptions:

| | |
|---|---|
| Aging | 2% |
| Initial trend rate | 9.29% |
| Ultimate trend rate (2004) | 5.5% |
| Average cost per employee (1997 age 40) | $3,500 |
| Interest rate | 7.5% |

The accompanying letter stated that the interest rate and trend rate assumptions for the active employee and retiree health care were the same as those used for WW's "November 1, 1996 FASB valuation (published February 20, 1997)".

---

[20] MS was a division of Quanex.

### D. *D&T's Revisions to Proposed Transaction*

### 1. *August 6–7, 1997, Revisions*

Quanex and D&T revised the terms of the QHMC transactions according to information that Royce gave D&T on how the QHMC transactions could be structured. Upon Quanex's request, by letter dated August 6, 1997, D&T (through Singer and Schneider) provided Quanex with revisions to the July 30 outline (August 6 outline). Singer and Schneider prepared the letter together, and Singer signed the letter and reviewed it before it left D&T. The revisions included an outline of the proposed capitalization and subsequent sale of QHMC and Quanex Steel, Inc. (QS), another wholly owned Quanex subsidiary, which the letter characterized as "part of the overall plan to expand the scope of services of consultants".

The August 6 outline combined the proposed QHMC transactions into five steps. Step 1 provided for the reconfiguration of an inactive Quanex subsidiary (which eventually was QW) through certain substeps that included, among others: (1) renaming the subsidiary QHMC; (2) amending QHMC's articles of incorporation to provide for three classes of stock, to wit, class A voting common stock (class A stock), class B voting preferred stock (class B stock), which the letter termed "Incentive Equity", and class C voting preferred stock (class C stock); (3) providing for voting rights measured in terms of ability to elect directors, and including CS principals or employees on QHMC's board of directors (QHMC's board) and as officers; (4) providing for dividends on the class A stock as declared and dividends of 9.5%, payable quarterly and cumulative, for the class B and class C stocks; (5) allowing for the transfer of stock only with the consent of all shareholders; (6) providing that the class A stock be subject to assessment for capital calls and that the capital call assessment for the class B and class C stocks be limited to an assumed $100 per share investment price; (7) providing Quanex or QHMC with call rights after five years and CS with put rights after seven years; and (8) providing for a liquidation value of the class B and class C stocks at an amount equal to the greater of $125 or a formula value that was based on CS' success in achieving certain performance goals

set by Quanex and on the difference between the value of QHMC's projected and actual MPB expenses.

Step 2 of the August 6 outline addressed the "Determination of Medical Liability and Contribution of Note" and stated that the present value of Quanex's and Piper's medical liabilities had to be determined. The purpose of this step was to determine which groups of employees would have their contingent medical liabilities contributed to QHMC. Under this step, Quanex would contribute $45 million and $44,998,000 worth of contingent liabilities to QS, and Piper would contribute $2 million and $1.99 million of contingent liabilities to QS. As a footnote to Quanex's proposed contributions to QS (footnote), the outline stated that for purposes of the document, "we have assumed that $36 million pertains to LaSalle and $9 million to MST (and possibly GST)."[21] This footnote referred to the anticipated gains on the sales of those assets.

Step 3 provided for CS' purchase of all of the class B stock for $41,700. Step 4 provided for CS to contribute $6,000 to QHMC in exchange for class C stock, and for QS to contribute the cash and liabilities it received from Quanex to QHMC in exchange for class C stock with a net fair market value of $11,000. Step 5 provided for QS to sell some or all of its class C stock for the same price per share that CS "paid" for its class C stock.

Royce gave D&T some comments on the August 6 outline, and those comments were read by Singer, Schneider, and Walt Mooney. Mooney was a recently hired senior tax manager in the D&T tax department in Houston, and he was assigned to the Quanex engagement to work under Singer, assisting him with tasks related to the QHMC transactions but without any authority to make material decisions about the structure of the transactions. Mooney, in consultation with Singer or Schneider, prepared a memorandum (Mooney memorandum) with respect to Royce's comments, and D&T forwarded a copy of the Mooney memorandum to Royce on August 7, 1997. The Mooney memorandum stated that the

---

[21] In addition to providing Quanex with requested revisions in the August 6 outline, D&T provided Quanex with a chart summarizing the updated steps of the transaction. According to the chart, Quanex would contribute $35 million and $34,990,100 of MPBs to QS, and Piper would contribute $10 million and $9,998,900 of MPBs to QS. The chart made no mention of any cash or MPB contributions from LaSalle, MST, or GST.

August 6 outline was incorrect in that QS was to contribute a note to QHMC along with the liabilities rather than cash. The Mooney memorandum stated in response to one of Royce's comments, "Why do we need Quanex Steel?", that QS "creates tax basis in the note."[22] The Mooney memorandum did not state that the footnote in the August 6 outline was incorrect or otherwise address the footnote. The Mooney memorandum also gave no indication that Royce or anyone else had commented on the footnote.

In a letter dated August 7, 1997, D&T provided Quanex (through Parikh, Perry, Rose, and Royce) with revisions that Quanex requested with respect to the August 6 outline. The August 7 letter proposed the same general structure for the QHMC transactions as the August 6 outline, but revised step 4 to propose that QS contribute a $45 million note to QHMC, rather than cash, along with $44,998,000 of contingent liabilities. The August 7 letter retained the proposal that Quanex contribute $45 million and $44,998,000 of contingent liabilities to QS and included a footnote stating that D&T assumed that $36 million pertained to LaSalle and $9 million to MST and GST. Singer reviewed and signed the August 7 letter.

2. *August 13, 1997, Revisions and Cashflow Analysis*

By a fax transmission dated August 13, 1997 (August 13 fax), Singer sent Rose a letter with new versions of the proposed transactions that were designed to overcome what Singer believed was a potential issue with section 1.1502–13(g), Income Tax Regs. The August 13 fax stated that Singer and Schneider had "further refined" the transactions as Quanex had requested and included details with respect to the class C stock.

The primary changes to the transactions as described in the August 13 fax were the deletion of a provision requiring Piper to contribute cash and liabilities to QS and the addition of a provision stating that in no event would the formula value result in the aggregate value of the class B and class C stocks' equaling or exceeding 50% of the total value of all classes of stock. The August 13 fax retained the same five general steps as the previous outlines of the proposed transactions. In addition, the August 13 fax retained the proposed

---

[22] At trial, Singer could not (or would not) explain what this response meant.

Quanex contribution to QS and the accompanying footnote regarding LaSalle, MST, and GST.

By a second fax dated August 13, 1997 (second August 13 fax), D&T provided Quanex with two documents to assist Quanex in its presentations to and negotiations with CS. One document was a checklist entitled "QHMC/QUANEX TRANS-ACTION TASK CHECKLIST FOR CHAPMAN" (checklist). The checklist retained most of the provisions discussed in the August 13 fax, but eliminated those that did not directly address CS' potential role in the transactions. The second document was a discounted cashflow analysis (August 13 cashflow analysis) that D&T used to value all of the proposed classes of QHMC stock as of October 1997. The August 13 cashflow analysis assumed, among other things, that QHMC would hold a $38 million note receivable with a 15-year term and that a $4,714,000 payment, comprising both interest and principal, would be made on the note each year.

The August 13 cashflow analysis projected Quanex's "Cash Flow from Operating and Investing Activities" over a 15-year period. The analysis projected that 576 employees would be covered by QHMC in each year, that interest income from the note receivable would decrease steadily, and that the projected medical costs for the covered employees would increase steadily. The August 13 cashflow analysis projected that the "Cash Flows from Financing Activities (excluding Dividends)" would consist of 15 annual principal payments on the note in amounts that increased from $1,294,000 in year 1 to $4,325,000 in year 15 (for total principal payments of $38 million over the 15-year period) and that positive cashflow would be available to the equity holders for only the first 6 years. The analysis projected increasing net operating losses (NOLs) for years 2 through 7. The relevant specifics of the August 13 projections included the following amounts (in thousands): [23]

| Year | Interest income | Medical costs | Total cashflow from operating and investing | Principal repaid | Cashflow available to equity holders | Cumulative cashflow | NOL |
|---|---|---|---|---|---|---|---|
| 1 | $3,420 | ($3,193) | $227 | $1,294 | $1,521 | $1,521 | $227 |
| 2 | 3,304 | (3,470) | (166) | 1,411 | 1,244 | 2,765 | (166) |
| 3 | 3,177 | (3,748) | (572) | 1,538 | 966 | 3,731 | (738) |
| 4 | 3,038 | (4,026) | (988) | 1,676 | 689 | 4,419 | (1,726) |

---

[23] We note some computational errors in the projections. These errors are not material to our analysis.

| Year | Interest income | Medical costs | Total cashflow from operating and investing | Principal repaid | Cashflow available to equity holders | Cumulative cashflow | NOL |
|------|------|------|------|------|------|------|------|
| 5 | 2,887 | (4,298) | (1,411) | 1,827 | 416 | 4,836 | (3,137) |
| 6 | 2,723 | (4,561) | (1,839) | 1,991 | 153 | 4,988 | (4,975) |
| 7 | 2,544 | (4,812) | (2,269) | 2,171 | (98) | 4,890 | (7,244) |
| 8 | 2,348 | (5,077) | (2,729) | 2,366 | (363) | 4,528 | -0- |
| 9 | 2,135 | (5,356) | (3,221) | 2,579 | (642) | 3,885 | -0- |
| 10 | 1,903 | (5,651) | (3,748) | 2,811 | (937) | 2,949 | -0- |
| 11 | 1,650 | (5,962) | (4,311) | 3,064 | (1,247) | 1,701 | -0- |
| 12 | 1,375 | (6,290) | (4,915) | 3,340 | (1,575) | 126 | -0- |
| 13 | 1,074 | (6,635) | (5,562) | 3,640 | (1,921) | (1,795) | -0- |
| 14 | 746 | (7,000) | (6,254) | 3,968 | (2,286) | (4,081) | -0- |
| 15 | 389 | (7,385) | (6,996) | 4,325 | (2,671) | (6,753) | -0- |
| Total | 32,714 | (77,466) | (44,753) | 38,000 | (6,753) | No D&T total | No D&T total |

### 3. *August 22, 1997, Revisions*

By letter dated August 22, 1997 (August 22 letter), Singer sent Parikh and Royce some documents to assist them in their presentation of the QHMC transactions to CS. These documents included, among other things, a schematic diagram of the capitalization of QHMC (and other transfers related thereto), two examples of CS' potential return on investment, another task checklist for CS (which was nearly identical to the previous CS task checklist), and a proposed Letter of Intent to be executed by Quanex and CS. The diagram proposed the following transactions related to QHMC's capitalization: (1) Quanex transfers $50,000 to QHMC in exchange for class A stock; (2) Quanex transfers $13,000 to QHMC in exchange for class B stock; (3) Quanex transfers class B stock to CS in exchange for $13,000; (4) CS transfers $2,000 to QHMC in exchange for class C stock; (5) QS transfers $38 million and $37,989,000 worth of MPBs to QHMC in exchange for class C stock; and (6) Piper transfers a $38 million affiliated note to QHMC in exchange for $38 million. The $37,989,000 assigned to the MPBs was the present value ultimately assigned to the MPBs that were transferred as a part of the QHMC transactions.

### E. *Quanex's Negotiations With CS*

By letter dated September 3, 1997, Singer provided Royce with a set of documents for WW and a set of documents for CS. Quanex had asked D&T to prepare those documents for Quanex to gauge CS' and WW's interests in becoming med-

ical consultants with QHMC. [24] D&T prepared the documents with input from Quanex, and Singer considered the documents to be part of an effort to present CS with key points of the transaction. [25] The documents contained a PowerPoint presentation of key deal terms (September 3 presentation), a task checklist for the investing medical consultant, and the same capitalization diagram that D&T provided to Quanex in the August 22 letter.

According to the September 3 presentation, CS would provide health management consulting services, including vendor management for both HMO and indemnity plans, continue its HMO consulting agreements, receive service contracts for specific additional projects, and purchase QHMC stock for an equity stake in QHMC. The terms did not differ significantly from those discussed above with respect to the August 6 outline and its subsequent revisions. According to the September 3 presentation, the purpose of the QHMC transactions was to "reduce Quanex's overall medical costs, without compromising quality of care provided to employees." The September 3 presentation contained no reference to the tax aspects of the QHMC transactions or to the role that tax aspects played in structuring the transactions.

The September 3 presentation also included a summary of return-on-investment scenarios which assumed annual savings in medical costs of 5%, on the one hand, and 10%, on the other hand. The example scenarios projected the following net returns for a five-year investment and for a seven-year investment:

|  | *Net return* | | | |
|  | *Annual savings of 5%* | | *Annual savings of 10%* | |
| *Length of investment* | *5 Years* | *7 Years* | *5 Years* | *7 Years* |
| If personnel remain constant | $170,502 | $295,072 | $413,783 | $660,073 |
| If personnel increase 5% per annum for the first 5 years | 182,666 | 313,322 | 438,111 | 696,573 |

--------

[24] Sometime during 1997 Ringuette and Clay Cprek, a WW retirement consultant, attended a meeting in WW's Southfield, Mich., office where Quanex (through Parikh, Royce, and possibly Rose) gave WW the opportunity to invest in what became QHMC. Quanex informed Ringuette and Cprek that the tax aspects of the QHMC transactions were proprietary and declined to explain the details of the tax aspects to WW. WW did not invest in QHMC.

[25] We do not discuss the WW documents separately because they do not differ significantly from the CS documents, and WW did not invest in the transactions.

|  | *Net return* | | | |
| --- | --- | --- | --- | --- |
|  | *Annual savings of 5%* | | *Annual savings of 10%* | |
| *Length of investment* | *5 Years* | *7 Years* | *5 Years* | *7 Years* |
| If personnel decrease 5% per annum for the first 5 years | 158,338 | 276,822 | 389,455 | 623,572 |

Sometime on or before September 10, 1997, Peery again contacted CS about the potential transactions and to inquire into whether CS would be interested in participating in them. On September 10, 1997, Chapman and Howard met with Quanex to discuss the proposal. Quanex proposed all aspects of the structure of the transactions to CS, including that Quanex's MPB obligations be put in a separate corporation, and the substance of Quanex's presentation at the September 10 meeting was the same as at the September 3 presentation. Quanex provided CS with the return on investment example scenarios, but Quanex did not give Chapman any support for the computations. When CS and Quanex representatives discussed Quanex's participation in the QHMC transactions, CS was not represented by counsel, CS was not involved in structuring the relevant corporate entities or transfers, CS did not determine the QHMC stock's issue price, and CS did not select the liabilities that were ultimately transferred to QHMC.

Chapman prepared a memorandum for CS' board of directors and officers dated September 11, 1997 (memo). In the memo, Chapman informed CS' board of the terms of the proposal and stated that, under the proposal, CS and Quanex would enter into a joint venture that would be responsible for the cost of Quanex's benefits program. Chapman also informed CS' board that for a $15,000 investment in QHMC stock, Quanex would guarantee the stock, CS would earn a guaranteed annual dividend of 9.5%, and "when Quanex reacquires the stock it will be based on its actual value but no less than $125 per share." Chapman explained that the stock value would be calculated on the basis of actual savings as compared to actuarial formulas that WW developed. Chapman understood that the only risk CS faced from participating in the QHMC transactions was Quanex's credit risk and that CS, by accepting the proposal, could potentially expand its business relations with Quanex.

In describing the proposed transactions, Chapman explained that the number of Quanex employees that CS served would increase significantly because CS would have responsibility with respect to approximately 600 salaried nonunion employees (whose health benefits were included in the QHMC transactions), in addition to all other employees at Quanex facilities (not included in the QHMC transactions). Chapman also explained that Quanex had 3,900 employees at that time but planned to sell two divisions with a combined total of 900 employees, which in turn, Chapman explained, meant that CS would lose the commission income it was earning on those 900 employees. Chapman stated in the memo that if CS took part in the joint venture, it would have global responsibility for 3,000 employees, with the 600 salaried/nonunion employees being covered by the proposed health care arrangement and the remaining 2,400 by CS' standard commission schedule.[26] Chapman explained that CS would earn an estimated $50,000 in consulting fees for servicing the QHMC population as well as CS' standard earnings formula on the nonunion employees whose MPBs would be transferred to QHMC.

By letter dated September 19, 1997, Parikh informed Chapman that Quanex was pleased with Chapman's interest in the proposal, that Quanex believed "a proven employee benefits firm can offer an expertise in the management of ongoing health costs", and that "Establishing a health management company and allowing your employee benefits firm an opportunity to participate in its ownership can prove to be beneficial to all parties." Parikh also stated that Quanex was still in the process of refining the pool of MPBs that would be transferred to QHMC.

Parikh included a draft set of working documents with the September 19 letter, and he requested that Chapman provide Quanex with his comments to the documents "by Friday, September 26, 1997." Parikh emphasized in the letter that Quanex was on a "tight time schedule" for completing the transactions, as CS already knew. Parikh wanted the transactions completed by October 31, 1997, because he knew that Quanex anticipated a gain from the LaSalle sale and that the

---

[26] CS' HMO arrangement with Quanex would therefore not change because it had always been on a commission basis and remained on a commission basis.

QHMC transactions would result in an artificial capital loss that could offset the gain.

F. *WW's Present Value Calculation Revisions*

Royce was Ringuette's main contact for most aspects of Ringuette's assignments related to present value calculations. Before September 19, 1997, but after receiving the June 30 calculations, Royce directed WW to revise the June 30 calculations without taking into account the Tube Group locations that Quanex intended to sell. Royce gave WW the Quanex companies to use in the calculations. In addition, Quanex gave WW the actual claims activity for the given locations.

WW had further discussions with Quanex relating to present value calculations, and WW gathered more specifics on the claims experience for the Quanex locations and performed additional present value calculations. On September 19, 1997, Ringuette sent Cprek and Maureen Cotter, a WW health care consultant, an email describing a conversation with Royce on September 18, 1997. Ringuette stated that Royce wanted WW to value all Quanex salaried groups (except for the Tube Group) and the MS–Arkansas nonunion hourly group and that "this calculation will be used to determine the amount of the promissory note to be given to the medical management subsidiary."

By letter dated October 13, 1997, that Ringuette prepared and signed, WW provided Royce with the revised calculations of the present value of lifetime health care benefits for certain groups of active Quanex employees. Ringuette stated in the cover letter that the calculations addressed Quanex's corporate, MS–Michigan salaried, MS–Arkansas salaried, MS–Arkansas nonunion hourly, MS–General Office, Heat Treating, and Nitro Steel employees. No retirees were included in the analysis. As Ringuette and Royce had discussed, WW based its calculations on only those employees employed by Quanex as of October 13, 1997, and did not include any amounts for future Quanex hires.

WW determined the number of active employees and their average age using November 1, 1996, employee census data provided for the FASB 106 valuation performed as of that date, and WW assumed the number and average age of

employees in each division from November 1, 1996, to November 1, 1997, would not change. WW also projected the assumed number of employees remaining in future years and their average age using assumptions used for the November 1, 1996, FASB 106 valuation, and WW assumed the average cost of health care would increase in future years in accordance with the following assumptions: "2.0% increase in cost for each/year increase in average age" and "8.75% inflation in 1998, decreasing linearly over time to 5.50% in 2004 and remaining at that level thereafter (same as FASB Statement No. 106 assumption)." The 2% aging assumption was chosen on the basis of data WW had collected on health care costs for many different health care plans and was used, in part, because WW wanted to reflect that some of the groups had a higher average age than others and might have corresponding higher health care costs. Ringuette used the 8.75% initial trend to project the increase in the average health care costs per person from November 1, 1997, through October 31, 1998, to November 1, 1998, through October 31, 1999.

WW also assumed an average health care cost per employee of "$5,877 (1998 Age 40)", which represented the estimated health care cost per employee included in the present value calculation for TYE 1998, adjusted to assume an average age of 40, and a 7.5% interest rate to discount future cashflows to November 1, 1997. WW included with the October 13 letter a chart entitled "Development of Average Health Care Cost Per Active Employee", which showed how WW arrived at its $5,877 assumption.

WW's October 13, 1997, "Present Value of Active Health Care Benefits Provided to Employees Hired as of 11/1/97" calculations were as follows: [27]

| | | | | | Estimated present value retiree health care benefits | | |
| Location | No. of employees today | Avg. attained age | Avg. retirement age | Active health care benefits | Active employees | Retired employees | Grand total |
|---|---|---|---|---|---|---|---|
| Corporate | 35 | 46 | 63 | $3,792,243 | -0- | -0- | $3,792,243 |
| Heat treating | 27 | 35 | 63 | 3,302,078 | -0- | -0- | 3,302,078 |
| MS–Michigan | 112 | 45 | 63 | 12,469,349 | -0- | -0- | 12,469,349 |
| MS–Arkansas | 120 | 42 | 63 | 13,796,098 | -0- | -0- | 13,796,098 |
| MS–General Office | 30 | 47 | 63 | 3,142,329 | -0- | -0- | 3,142,329 |

---

[27] We note that the average attained age is actually 43.5. The discrepancy does not affect our analysis.

| Location | No. of employees today | Avg. attained age | Avg. retirement age | Active health care benefits | Estimated present value retiree health care benefits | | Grand total |
|---|---|---|---|---|---|---|---|
| | | | | | Active employees | Retired employees | |
| Nitro Steel | 13 | 46 | 63 | 1,337,608 | -0- | -0- | 1,337,608 |
| Total | 337 | 43 | 63 | 37,839,705 | -0- | -0- | 37,839,705 |

At various times from approximately a week or two after receiving the October 13 report through early 1999, Royce asked WW to change its present value calculations to, for example, (1) include the MS–Arkansas nonunion hourly information in the present value calculation, (2) change the lifetime until retirement projection to a 15-year projection for estimated present value, and (3) exclude the Heat Treating and Nitro Steel Divisions in the groups of employees.

### G. *Patrick Wannell*

#### 1. *Background*

Patrick Wannell is a chartered engineer and an Institution of Metallurgists fellow. He received his formal education and professional training in England, and he worked for approximately 20 years primarily in technical positions for a large integrated steel company in England. He later joined LaSalle in the summer of 1980 and was given a range of management responsibilities. He became LaSalle's vice president and general manager in May 1991, and he worked in that capacity until he retired in February 1997. After LaSalle was sold in April 1997, Wannell consulted for LaSalle's new owners for approximately one year to help them understand LaSalle's operations, and he performed one other consulting project for Quanex, primarily reviewing documents related to the sale for accuracy. Neither consulting project dealt with medical expenses.

#### 2. *Wannell and Health Care Costs at LaSalle*

While working for LaSalle, Wannell believed that the business was "clearly struggling" because it was breaking even financially. He reviewed the business and concluded that LaSalle's health care costs were high in relation to those of other Quanex divisions and were rising annually by approximately 30%. He formed a two-step approach to reduce LaSalle's health care costs. First, he renegotiated the health

care contract for LaSalle's hourly employees because it did not require an employee payment. Second, he developed a wellness program that looked at the causes of employees' illnesses rather than the employees' symptoms. The wellness program addressed issues (such as weight, diet, exercise, stress, and smoking) through, among other things, annual physicals, exercise facilities, and subsidized health club memberships. When Wannell retired, LaSalle had approximately 450 employees, and LaSalle's health care costs were declining by approximately 10% per year.

### 3. *Quanex's Offer to Wannell*

Rose had known Wannell since 1982 and was familiar with his efforts to control health care costs at LaSalle. By letter dated October 13, 1997, Rose asked Wannell to join QHMC's board as a director. The letter stated:

We are establishing a company to manage our health care benefits and selling a minority interest to a benefits management consulting firm. We believe giving the consulting firm an equity interest will be an extra incentive for them to come up with creative and innovative strategies in health care management. Since this is a new concept we will start small and try this out on Corporate and MACSTEEL salaried employees health benefits only. * * *

Further, the letter stated, Quanex wanted Wannell to join QHMC's board because

We need your knowledge and experience in the areas of labor relations, negotiations, employee management, and morale. This company will manage the health care benefits of employees. We want it to be efficient as possible but also fair to the employees it will effect [sic]. We need an outside director who will bring a balance to the discussion and consider all points of view, not just those of * * * [QHMC] or * * * [CS].

On or about October 20, 1997, after the negotiations between Quanex and CS were completed, Wannell spoke with Rose by telephone. During that call, Rose offered Wannell the opportunity to invest $11,000 in QHMC. Peery, Quanex's vice president of human resources, did not know that Rose was inviting Wannell to participate in QHMC, and Peery was not asked for his advice or recommendation on individuals who might be interested in participating.

Wannell expressed concern that he would have to incur travel and hotel costs for QHMC board meetings, but Rose

assured Wannell that the costs would be reimbursed, meetings would be minimal, and Wannell could vote by fax. Rose also informed Wannell that although the term of the investment would be 15 years, the parties could unwind the investment in either 5 or 7 years. Wannell made handwritten notes during the call that expressed, in part, his understanding of the worst case scenarios for his offered investment. Under the heading *"worst case"*, Wannell made three entries: "9.5%/yr", which reflected his understanding of the annual dividend he would receive; "no loss of $11,000", which reflected his understanding that he would not lose his investment;[28] and "+ 25% over 5 yrs", which reflected his understanding that his investment would grow 5% each year to the five-year point where Quanex could wind things up.[29]

Wannell accepted Rose's October 20, 1997, offer to invest in QHMC the same day. The terms of Wannell's investment were set by Quanex, without any negotiations between Quanex and Wannell. Wannell viewed the dividend payments as approximately equivalent to consultant fees for his time and the five-year, total $25 per share return on his $100 per share investment as equivalent to what he was earning in his bank account. Wannell understood that QHMC's credit risk was minimal because it was a subsidiary of Quanex.

### H. *D&T's Revised Cashflow Model*

D&T prepared revised cashflow calculations for Quanex for the proposed transactions and gave them to Royce in a document entitled "Cash Flow Model as of 10/21/97" (October 21 calculations). The purpose of these calculations was to model the liabilities QHMC would need to satisfy, the payments QHMC would be obligated to make, and the income QHMC would need to pay the liabilities. The calculations also were needed to set the reported fair market value of QHMC's stock.

Within the October 21 calculations, D&T estimated the present value for the medical costs associated with Quanex's corporate, MS–Arkansas, MS–General Office, and Nitro Steel locations to total $37,320,000, as determined as follows:

---

[28] In contradiction to his notes, Wannell testified that he did not consider the risk to be zero that he would lose his $11,000 investment. We do not find this testimony to be credible, and we decline to rely upon it.

[29] If the class C shares were redeemed after five years for $125 per share, the holders of each share would receive $25 more than the $100 initially paid to purchase the share, which averages to $5 per year or 5% of $100 for each of the five years.

| Location | Grand total of PV | Cashflows 1997 | Employees as of 10/21/97 |
|---|---|---|---|
| Corporate | $3,496,000 | $420,000 | 35 |
| MS–Arkansas | 11,051,000 | 86,000 | 27 |
| MS–Arkansas | 18,421,000 | 470,000 | 112 |
| MS–General Office | 3,062,000 | 457,000 | 120 |
| Nitro Steel Division | 1,290,000 | 128,000 | 30 |
| Total | 37,320,000 | 1,561,000 | 324 |

D&T also projected that for all years of the investment, other than the first year, medical costs would exceed the interest income from the $38 million note receivable but, taking into account the principal repayments, cashflow would be available to equity holders for the first seven years of the investment and NOLs would accumulate in years 2 through 6 of the investment. D&T also projected positive net present value of the cashflows. Relying on these factors and others, D&T projected that the total value of equity for all classes of QHMC stock would equal $76,000, as determined as follows:

| | |
|---|---|
| Total PV of cashflows | $879,000 |
| Plus cash on hand | 65,000 |
| Less uncertainty of future medical costs adjustment | (868,000) |
| Equals total value of equity | 76,000 |

Within the October 21 calculations, D&T also projected liquidation and net return values with respect to QHMC's preferred stock. D&T projected that if the five-year call option was exercised and a five-year cumulative savings of $1,622,959 was assumed, the liquidation value of the class B and class C stocks would be $356,441 and the net return on investment for the underlying shareholders would be $348,566. D&T projected that if the seven-year put option was exercised and a seven-year cumulative savings of $2,430,142 was assumed, the liquidation value of the class B and class C stocks would be $565,998 and the net return on investment for the underlying shareholders would be $560,973. D&T also made cumulative savings projections for 1998 through 2012 as follows (in thousands):

| | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Initial undiscounted MPBs | $2,793 | $3,017 | $3,245 | $3,473 | $3,701 | $3,927 | $4,145 | $4,358 | $4,569 | $4,792 | $5,025 | $5,270 | $5,527 | $5,797 | $6,081 |
| Actual MPBs | 2,514 | 2,715 | 2,921 | 3,126 | 3,331 | 3,534 | 3,731 | 3,922 | 4,112 | 4,312 | 4,523 | 4,743 | 4,975 | 5,217 | 5,473 |
| Yearly savings | 279 | 302 | 325 | 347 | 370 | 393 | 415 | 436 | 457 | 479 | 503 | 527 | 553 | 580 | 608 |
| Aggregate yearly cum. savings | 279 | 581 | 905 | 1,253 | 1,623 | 2,016 | 2,430 | 2,866 | 3,323 | 3,802 | 4,305 | 4,832 | 5,384 | 5,964 | 6,572 |

The projections assumed a 10% variance factor and 324 covered plan participants per year.

D&T also included in its October 21 calculations a section entitled "Analysis of NOL Usage" for 1998 through 2004. D&T included this section to show Quanex the amount of NOLs that QHMC would generate but that the Quanex consolidated group could not use if QHMC were deconsolidated. The NOL projections assumed a 6% risk-free rate and a 40% tax rate and were as follows (in thousands):

| | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|---|---|---|
| NOL generated | -0- | $276 | $622 | $976 | $1,339 | $1,710 | $2,086 |
| NOL carryforward | -0- | 276 | 897 | 1,873 | 3,213 | 4,923 | 7,009 |
| PV of annual NOL tax benefit | -0- | 98 | 209 | 309 | 400 | 482 | 555 |
| Cumulative PV of NOL benefits (as rounded) at the end of year 7 | | | | | | | 2,054 |

At a time not disclosed in the record, Royce reviewed the October 21 calculations. Royce subsequently requested new calculations from both D&T and WW. Royce testified at trial that the October 21 cashflow model used the wrong groups of employees and assigned the wrong numbers of employees to those groups.

## XI. *Executing QHMC Transactions*

### A. *Quanex's October 21–22, 1997, Board Meeting*

On October 21 and 22, 1997, Quanex's board held a regular meeting which addressed, in part, the QHMC transactions. The meeting was attended by Quanex's board members and, among others, Peery, Rose, James Davis, and Michael Conlon. Davis was Quanex's executive vice president and chief operating officer (COO) from 1997 through February 1999 and Quanex's president and COO from March 1999 through December 2000. Conlon was an attorney with Fulbright & Jaworski, LLP (Fulbright).

At the board meeting, Rose explained the venture, which the meeting minutes described as

a proposal to establish one of the Company's subsidiaries as the holder of all rights and obligations of the medical plan benefits for the Company's active salaried employees at its corporate offices in Houston and within the

MacSteel Group * * * and to enter into a relationship with a professional health plan advising firm, * * * [CS], to create incentives to reduce the overall health plan costs to the Company.

Rose provided materials to Quanex's board through which the participants of the meeting discussed the general nature of the proposed transactions and the various resolutions needed to implement them.

Under the proposed resolutions, Quanex would effect the QHMC transactions through a series of steps, each of which was part of a single plan, and all of which Rose considered interrelated. These steps were as follows:

(1) designate QS and QW as restricted subsidiaries under the Quanex $250,000,000 revolving credit and term loan agreement dated July 23, 1996, as amended (revolving credit agreement);[30]

(2) ratify the actions of Quanex's officers in amending the revolving credit agreement to provide for the designation of certain subsidiaries as restricted subsidiaries if Quanex owned an interest in the subsidiary of as little as 60%;

(3) approve, as QW's sole shareholder, QW's plan of recapitalization, which provided for authorization of stock in the form of the class A stock, the class B stock, and the class C stock;

(4) approve and adopt QW's amended and restated certificate of incorporation, by which QW changes its name to "Quanex Health Management Company, Inc." and changes its authorized capital as described in the plan of recapitalization;

(5) approve and acknowledge that as a result of QW's recapitalization, the 1,000 shares of QW common stock that Quanex held would be converted to 500 shares of class A stock and 130 shares of class B stock;

(6) make a $62,000 capital contribution to QW in anticipation of QW's recapitalization;

(7) assign all of its rights, duties, and obligations relating to approximately $37,989,000 of selected MPBs to QS;

---

[30] In this context, a restricted subsidiary is a Quanex subsidiary that guarantees a debt of Quanex and consolidates its funds with those of Quanex in accordance with Quanex's revolving credit agreement. Royce believed that QHMC had to be a restricted subsidiary of Quanex to participate in the transactions. QHMC eventually (on a date not disclosed in the record) guaranteed the obligations of Quanex pursuant to the revolving credit agreement.

(8) transfer $38 million and assign its rights, duties, and obligations relating to all the selected MPBs in exchange for 1 share of common stock and the assumption of the duties and obligations under the MPBs;

(9) enter into an assignment and assumption of liabilities agreement with QS under which rights related to MPBs would be assigned to QS and related duties and obligations would be assumed by QS;

(10) enter into a consulting agreement with CS pursuant to which CS would agree to assist Quanex in evaluating and implementing cost-saving strategies with respect to health care plans for the benefit of certain employees of Quanex for an hourly fee, and Quanex would agree to sell to CS an equity interest in QHMC, with Quanex having the right to purchase from CS the shares representing the equity interest after five years and CS having the right to sell those shares to Quanex or QHMC after seven years at a price calculated on the basis of a formula value but not less than $125 per share;

(11) sell its 130 shares of class B stock that it would hold as a result of the recapitalization of QHMC to CS for a $13,000 cash payment;

(12) enter into a stock purchase agreement between Quanex and CS with respect to its proposed sale of the class B stock to CS;

(13) upon its sale of the class B stock to CS, enter into a shareholders agreement among QHMC, CS, and Quanex providing for restrictions on the disposition of QHMC stock, and agree, as the holder of the class A stock, to provide QHMC with additional capital to pay for any forecasted cash shortfalls, as determined by QHMC's board;

(14) upon issuance of QHMC's class C stock to QS and CS, enter into a first amendment to shareholders agreement to reflect additional stock issuances; and

(15) upon QS' subsequent sale of the class C stock to another investor, enter into an amended and restated shareholders agreement to reflect the additional investor.

Also at the meeting, Rose explained the tax benefits of the transactions to Quanex's board, informing the board that the transactions would generate a large artificial capital loss.[31] On October 22, 1997, Quanex's board unanimously approved

---

[31] Rose knew that the loss was not an actual economic loss.

all of the proposed resolutions. As of that time, Quanex intended to sell the class C stock to Wannell.

B. *October 23, 1997*

1. *QW Recapitalization*

Before October 17, 1997, QW was a Delaware corporation that was an inactive, wholly owned subsidiary of Quanex. QW had assets of $1,000 in cash, no liabilities, and 1,000 outstanding shares of capital stock. On October 17, 1997, Quanex wired $62,000 into QW's account at Comerica Bank in anticipation of QW's recapitalization.

Six days later, on October 23, 1997, Quanex approved QW's plan of recapitalization, and QW was recapitalized. Under that plan of recapitalization, QW was authorized to issue 760 shares of capital stock, of which 500 shares were class A stock, 130 shares were class B stock, and 130 shares were class C stock. All 760 shares had a par value of $100. Under the plan of recapitalization, Quanex, as record holder, was to receive 0.5 share of class A stock and 0.13 share of class B stock for each share of QW common stock that Quanex held before the recapitalization.

Also on October 23, 1997, QW's board unanimously consented to the plan of recapitalization. QW's directors were Rose, Peery, and Vernon Oechsle. Oechsle was Quanex's president and chief executive officer (CEO) from 1997 through February 1999, Quanex's CEO from March 1999 through February 2001, Quanex's vice president from March through July 2001, and Quanex's corporate initiatives executive from August 2001 through May 2002.

2. *Amendment and Restatement of QW's Certificate of Incorporation*

a. *Background*

Also on October 23, 1997, QW was renamed QHMC (incident to the recapitalization) and its certificate of incorporation was amended and restated (certificate) to provide for the three classes of stock. [32] The certificate set forth rights

_____

[32] We hereinafter refer to QW as QHMC with respect to events that occurred after the name change.

on dividends, liquidation preferences, voting, and the right to call or put shares.

b. *Dividend Rights*

Under the certificate, QHMC's board generally could declare dividends on class A stock as it deemed appropriate. As one exception, a dividend could not be declared or paid on the class A stock during any period when QHMC failed to pay a dividend on the class B or class C stock for any preceding quarter. The class B and class C shareholders were entitled to receive from QHMC's surplus or net profits, when and as declared by QHMC's board, cash dividends of $9.50 per share per annum, payable quarterly. The cash dividends for the class B stock were cumulative and payable for the current year and for all previous fiscal years during which any class B stock was outstanding (and applicable quarters thereof). The same was true for the class C stock when any class C stock was outstanding. If QHMC's available funds were insufficient to pay the dividends on the class B or class C stock, then the class B and class C shareholders would share ratably in the amount available for payment in proportion to the full dividend payment to which they were otherwise entitled. The class B and class C shareholders were not entitled to receive any dividends or share of profits, whether payable in cash, stock, or property, in excess of these dividends.

c. *Preferences Upon Liquidation*

If Quanex was liquidated, class A shareholders were entitled, after payment of all liabilities, and subject to the liquidation preferences of the class B and class C stocks, to receive QHMC's assets on the basis of the number of shares held. The liquidation preferences of class B shareholders were as follows:

In the event of liquidation, dissolution, or winding up [collectively, liquidation] of the Company, whether voluntary or involuntary, the holders of the issued and outstanding Class B Voting Preferred Stock shall be entitled to receive out of the assets of the Company legally available for distribution to stockholders and before any distribution to the holders of the Class A Common Stock liquidation distributions in an amount equal to the greater of (i) $125 for each share or (ii) the Formula Value * * * for each share, plus all accrued but unpaid dividends thereon to the date fixed for redemption. After payment of the full amount of the liquidating distributions to

which they are entitled, the holders of shares of Class B * * * Stock will have no right or claim to any of the remaining assets of the Company.

Class C shareholders had the same rights as those provided to class B shareholders.

The certificate defined the formula value (formula value) as the lesser of:

(a) 45% of (i) the sum of the savings or deficiency of the Initial Undiscounted Medical Plan Benefits ("IUMPB" * * *) over the Actual Medical Plan Benefits ("AMPB" * * *) for each completed fiscal year, commencing with the fiscal year ending October 31, 1998, divided by (ii) the total number of outstanding shares of Class B Voting Preferred Stock and Class C Voting Preferred Stock on the applicable date of the event of liquidation, dissolution or winding up of the company, or (b) 50% of the net equity shown on the books and records of the Company as of the calendar month immediately preceding that date (as determined in accordance with generally accepted accounting principles). * * *

The certificate defined "AMPBs" as the actual medical plan benefits paid by QHMC to participants in medical benefit plans that QHMC managed during the applicable fiscal year and "IUMPBs" as the medical plan benefits as computed for purposes of the net present value of the expected cashflows of QHMC as of October 31, 1997, determined in accordance with the cashflow model used by D&T to value QHMC on October 31, 1997.[33] The certificate stated that the savings or deficiency of the IUMPB over the AMPB would be determined for each of QHMC's fiscal years and computed as follows:

(A) The difference between (a) an amount (which may be a positive or a negative number) equal to (i) the IUMPB divided by the number of the assumed covered plan participants, reduced by (ii) the AMPB for the applicable fiscal year divided by the number of the actual covered plan participants for that year, multiplied by (b) the number of actual covered plan participants for that year, and (B) the amount of consulting fees paid or accrued by the Company during the applicable fiscal year. * * *

The certificate also stated that the formula value would be zero if the formula value of the total number of shares of the class B and class C stock was less than zero, or if the date of liquidation occurred before October 31, 1998. The certificate also stated that upon QHMC's liquidation, the class B and class C shareholders would share ratably in any dis-

---

[33] Quanex would bear all medical costs in excess of these benchmark amounts; i.e., the QHMC preferred shareholders would never bear these costs.

tribution of assets in proportion to the full liquidating distributions to which they would otherwise be entitled if QHMC's available assets were insufficient to pay the liquidation distributions on all outstanding shares of class B and class C stock.

d. *Voting Rights*

Under the certificate, each share of QHMC stock entitled the holder to one vote in all proceedings in which action might be taken by the QHMC shareholders. If any share of class B or class C stock was issued and outstanding, class A shareholders had the right to elect six directors of the company, class B shareholders had the right to elect two directors, who would be designated class B directors, and class C shareholders had the right to elect one director, who would be designated a class C director. Class A shareholders had the right to elect all of QHMC's directors if no class B or class C shares were issued and outstanding.

e. *Call Rights*

The certificate did not provide any redemption rights for class A stock. The certificate did provide redemption rights for the class B and the class C stocks, and these rights were the same for both classes. At any time after September 30, 2002, QHMC could redeem any or all shares of class B and class C stocks by paying cash equal to the greater of (i) $125 per share or (ii) the formula value per share, plus an amount equal to all distributions accrued and unpaid thereon to the date fixed for redemption. For this purpose, any reference in the formula value to the "date of liquidation, dissolution or winding up of the Company" would be replaced with a reference to the "Notice Date".

f. *Put Rights*

The certificate did not provide any put rights for class A shareholders. The certificate did provide put rights for the class B and class C stocks, and these rights were the same for both classes. After September 30, 2004, each holder of class B or class C stock could require QHMC to purchase from the holder all or any portion of the shares of class B stock or class C stock at a cash price equal to the greater of (i)

$125 per share or (ii) the formula value per share, plus an amount equal to all distributions accrued and unpaid thereon to the put date. For this purpose, any reference in the formula value to the "date of liquidation, dissolution or winding up of the Company" would be replaced with a reference to the "Put Date".

### 3. *Quanex's Transfer of QW Stock and Cash to QHMC in Exchange for Class A and Class B Stocks and Election of Directors*

On October 23, 1997, Quanex transferred the $62,000 that was previously wired into QW's bank account and 1,000 shares of QW common stock to QHMC in exchange for 500 shares of class A stock and 130 shares of class B stock. Also on October 23, 1997, Quanex, as QHMC's sole class A and class B shareholder, elected Oechsle, Peery, Rose, Parikh, Wannell, and Carolyn Babb[34] as QHMC's class A directors, and Gary Hellner and Bewley as QHMC's class B directors. Also on October 23, 1997, Hellner and Bewley informed QHMC they were resigning effective the same day, doing so through a one-page document that apparently had been typed for each of them simply to sign and to date. The text of each document contained a single sentence which stated: "The undersigned hereby resigns as a Class B director of Quanex Health Management Co., Inc., a Delaware corporation, such resignation to be effective as of the date set forth under my signature below."

### 4. *Quanex's Transfer of Cash and MPB Obligations to QS in Exchange for QS Stock*

QS was incorporated in 1990 as a wholly owned subsidiary of Quanex, and QS remained as such until October 23, 1997. Before October 23, 1997, QS was an inactive corporation and had assets of $1,000 in cash, no liabilities, and 1,000 shares of outstanding capital stock. Under QS' certificate of incorporation, dated August 7, 1990, QS was authorized to issue 10,000 shares of common stock.

---

[34] Babb was Quanex's compensation and benefits manager from 1997 through July 1999, and she was Quanex's compensation and benefits director from August 1999 through the time of trial.

As of October 23, 1997, in exchange for 1 share of QS capital stock, Quanex transferred $38 million to QS and assigned to QS certain obligations relating to certain MPBs. Under an exchange agreement bearing the same date, Quanex and QS agreed to treat the exchange as one described in, and qualifying for nonrecognition treatment under, section 351. Parikh, as Quanex's corporate controller and as QS' vice president and treasurer, signed the Quanex-QS exchange agreement on behalf of both parties.[35]

The transferred MPBs were health care benefits provided under the plan, and they represented the future medical costs of active Quanex employees working in selected groups during the 15-year period beginning November 1, 1997, and ending October 31, 2012. An assignment and assumption of liabilities agreement executed between Quanex and QS on October 23, 1997, and signed by Rose on behalf of both Quanex and QS, described the transferred obligations as "relating to those MPB's computed for purposes of the net present value of the expected cashflows of Assignee [QS] as of October 31, 1997, determined in accordance with the cash flow model which was used by Deloitte & Touche LLP to value the Assignee [QS] on such date".

C. *October 24, 1997*

1. *Consulting Agreement Between Quanex and CS*

Quanex and CS entered into a consulting agreement dated October 24, 1997 (consulting agreement). Under the consulting agreement, CS agreed to review the costs and benefits of the health care plans that Quanex maintained and administered for the benefit of the active salaried employees from Quanex's Corporate, MS–General Office, and MS–Michigan locations, and both active salaried and nonunion hourly employees from MS–Arkansas, and to recommend, among other things, "several * * * potential cost saving strategies ('Strategies') for the Plans, the implementation of which could result in substantial cost savings to Quanex." Quanex and CS also agreed that it would be in their respective best interests to provide CS a means of compensation

---

[35] Approximately four years later, on February 20, 2001, QS' board of directors, consisting solely of Oechsle and Terry M. Murphy, ratified the actions that QS' corporate officers took to execute the exchange agreement and to issue the share of QS stock.

that (1) took into consideration the potential value added by CS' services in the successful implementation of the cost saving strategies, (2) gave CS a voice in QHMC's management, and (3) required CS to maintain a financial risk in QHMC. Under the consulting agreement, Quanex thus agreed to hire CS to assist Quanex

in evaluating and implementing the Strategies, including, but not limited to reviewing, analyzing, and making recommendations regarding the Strategies and other relevant cost-savings measures, advising Quanex regarding the operational, organizational and governance aspects of the Company, serving on the board of directors of the Company, negotiating with third-party administrators, assisting in the request for proposal ("RFP") process with potential outside vendors, claims administration, enrollment, benefits coordination, and any other services as requested from time to time by Quanex during the term of this Agreement.

Pursuant to the consulting agreement, CS was entitled to consulting fees in accordance with CS' benefits consulting fee schedule, but in no case more than $250 per hour, plus reasonable out-of-pocket costs actually incurred. The consulting agreement also entitled CS to buy "more than a 20% limited equity interest" in QHMC from Quanex, QHMC's sole shareholder as of the time of the consulting agreement, subject to CS' entering into a shareholder agreement with Quanex. The consulting agreement further stated that in the event the put or call rights described in the certificate were exercised, the price CS would be paid for the equity interest would equal the greater of $125 per share or the formula value.

Although CS executed a consulting agreement with Quanex,[36] no such agreement was executed between CS and QHMC between 1997 and 2002. Before October 31, 1997, Howard did not receive requests from Quanex for advice on the QHMC project, see any WW reports for the QHMC proposal, or review any assumptions with respect to the proposal.

2. *CS' Transfer of Cash to Quanex in Exchange for Class B Stock*

Before October 23, 1997, Quanex offered CS the opportunity to purchase (1) 130 shares of the class B stock from Quanex for $13,000 and (2) 20 shares of the class C stock

---

[36] CS was still responsible for negotiating Quanex's HMO contracts as of the time of trial.

from QHMC for $2,000. Chapman did not consider the $15,000 cost for the QHMC stock ($13,000 for class B stock plus $2,000 for class C stock) to be a material amount of money for CS.

On October 24, 1997, CS purchased 130 shares of class B stock from Quanex for $13,000, [37] and Quanex and CS signed a stock purchase agreement of the same date. That agreement described the class B stock the same way the class B rights were described in the certificate and included a copy of the certificate as an attachment thereto.

Quanex, QHMC, and CS also entered into a shareholders' agreement dated October 24, 1997 (October 24 shareholders' agreement). Parikh executed the October 24 shareholders' agreement as Quanex's controller and as QHMC's vice president and treasurer. John Micale, who as of the time of trial had been a CS employee for approximately five years, signed the agreement as CS' president and COO.

Under the October 24 shareholders' agreement, Quanex and CS agreed that they would not transfer their QHMC stock or permit it to be transferred without the express written consent of all QHMC shareholders. Quanex also agreed that, as the holder of QHMC's class A stock, it was subject to assessment for capital calls as determined by QHMC's board, and it acknowledged that "The Board shall assess the holders of shares of Class A Common Stock in the event that the Board determines that * * * [QHMC] will have a Forecasted Cash Shortfall for any calendar quarter." The October 24 shareholders' agreement defined a "Forecasted Cash Short-fall" as "the excess, if any, of forecasted cash expenditures (including a reasonable reserve for future expenditures and dividends on the Class B Voting Preferred Stock and Class C Voting Preferred Stock, as determined by the Board) over forecasted cash receipts, determined with respect to any calendar quarter." No such provision was made with respect to class B or class C shareholders.

The October 24, 1997, QHMC stock purchase was the first time CS acquired an equity interest in a client. Chapman believed that CS' participation in the QHMC transactions

---

[37] Because of Singer's concerns regarding deconsolidation, Singer structured the QHMC transactions so that Quanex's interest in QHMC and Quanex's voting power with respect to QHMC would be less than 80%. Accordingly, on October 24, 1997, the date CS purchased the class B stock from Quanex, QHMC ceased to be a member of petitioners' affiliated group for Federal income tax purposes.

would both continue and expand CS' consulting relationship with Quanex and give CS the potential to earn fee-based revenue.

### 3. *Class B Directors*

On October 24, 1997, CS (through Micale) elected Chapman and Micale as QHMC's class B directors.

### D. *October 25, 1997*

#### 1. *CS' Transfer of Cash to QHMC in Exchange for Class C Stock*

As of October 25, 1997 (a Saturday), CS contributed $2,000 to QHMC in exchange for 20 shares of class C stock. CS was not involved in setting the price of the class C stock (or the class B stock). Although CS purchased both class B and class C stocks, it made no difference to CS which class of preferred stock it acquired.

#### 2. *QS' Transfer of Cash and MPBs to QHMC in Exchange for Class C Stock*

Also as of October 25, 1997, QS contributed $38 million to QHMC, and by an assignment and assumption of liabilities agreement dated October 25, 1997 (QS–QHMC assignment and assumption agreement), QS assigned to QHMC the MPBs Quanex had assigned to QS by agreement dated October 23, 1997. Parikh, as vice president and treasurer of each entity, signed the QS–QHMC assignment and assumption agreement on behalf of both QS and QHMC. An October 25, 1997, exchange agreement executed between QHMC and QS described the transferred MPBs as "certain medical plan benefits (MPB's), being those MPB's computed for purposes of the net present value of the expected cash flows of * * * [QHMC] as of October 31, 1997, determined in accordance with the cash flow model * * * which was used by [D&T] * * * to value [QHMC] on such date." Quanex had not deducted the medical costs represented by the MPBs transferred to QHMC. If Quanex had retained the MPBs, the MPBs would have been an expense of Quanex's trade or business; and if Quanex had paid the MPBs as they were incurred,

Quanex could have deducted the payments as ordinary and necessary business expenses.

In return for the cash and MPBs assumption, QS received from QHMC 110 shares of class C stock. Upon becoming a QHMC shareholder, QS signed a first amendment to shareholders' agreement (amended shareholders' agreement), dated October 25, 1997, through which QS agreed to become a party to the October 24 shareholders' agreement. QHMC and QS also agreed to treat this exchange as one qualifying for nonrecognition treatment under section 351. The amended shareholders agreement was signed by Rose on behalf of QS, Quanex, and QHMC, as vice president of each entity, and by Micale as the president and COO of CS.

3. *MPB Selection*

The selected employee groups covered by the MPBs that QHMC transferred were the following active Quanex employees located at petitioners' facilities:

| Location | Group | No. of employees[1] |
|---|---|---|
| Houston | Corporate | 37 |
| Arkansas | MS–Salaried | 117 |
| Arkansas | MS–Nonunion hourly | 249 |
| Michigan | MS–General Office | 31 |
| Michigan | MS–Salaried | 112 |
| Total | | 546 |

[1] This column lists the number of active employees working in the identified groups as of October 1997. The actual number of employees covered by the MPBs could fluctuate during the 15-year period that QHMC assumed the obligation to pay the MPBs.

The identified employee groups were considered a part of Quanex's core businesses and were nonunion when they were selected (although not all of Quanex's nonunion employees were selected). The health benefits of Quanex's union employees were subject to union contracts. Quanex could not unilaterally change the terms of the union contracts, which usually spanned 3 to 4 years, and Quanex's primary opportunity to reduce health care costs subject to those contracts was upon their renewal. Quanex was not so restrained regarding nonunion employees.

Both Royce and Rose were involved in the MPB selection process, [38] and Royce determined which groups' MPBs would be included in QHMC on the basis of WW's June 30, 1997, present value calculation. Peery, Quanex's vice president of human resources, made no recommendation about which groups of employees should have their MPBs transferred to QHMC. Peery also made no specific recommendation regarding which types of health care benefits should be included in the QHMC transactions. Parikh also was not involved in selecting which employee groups would have their MPBs transferred to QHMC. The only Quanex employees who were notified that Quanex had assigned the designated health care benefit obligations to QHMC were the Quanex employees who worked on the QHMC transactions and the accounting therefor.

Wannell, who was invited to participate in the QHMC transactions allegedly because of his experience managing LaSalle's health care costs, also played no part in deciding which MPBs would be transferred to QHMC. No one asked Wannell for any recommendation specific to the MPB obligations either before or after he agreed to invest in QHMC.

4. *Class C Director*

On October 25, 1997, QHMC's class C shareholders elected Davis to be the class C director.

E. *October 28, 1997: QHMC's Transfer of Cash to Piper in Exchange for Promissory Note*

On October 28, 1997, QHMC transferred the $38 million it received from QS to Piper, and Piper issued to QHMC a promissory note (Piper note) in return. [39] Piper promised in the Piper note to pay QHMC "the principal sum of Thirty-Eight million dollars ($38,000,000) together with interest on the unpaid principal balance from time to time remaining outstanding at an interest rate of seven and one-half percent (7 ½%)." The Piper note provided that interest was due and

---

[38] Rose testified that he chose the transferred liabilities and that, rather than making a decision about the amount of the liability Quanex was willing to transfer, he first decided which liabilities would be transferred to QHMC and then had WW assign a value to those liabilities. We do not find Rose's testimony on this point credible, and we decline to rely upon it.

[39] Although Quanex contributed the $38 million to QS, which in turn contributed the $38 million to QHMC, Quanex wanted the use of that money and understood at the time of the contributions that the $38 million would be lent back to Quanex or to its affiliates.

payable quarterly as it accrued and that the outstanding unpaid principal balance was due and payable in full on October 31, 2012, but let Piper prepay all or part of the note at any time without penalty. Rose signed the Piper note as Piper's vice president.

Also on October 28, 1997, QHMC's board unanimously approved the loan to Piper pursuant to the terms and conditions of the Piper note. That loan was the first loan that QHMC ever made, and the interest on the loan was QHMC's only source of income. Piper's board of directors also approved the $38 million loan from QHMC. As of that date, Piper's directors were Oechsle, Peery, and Rose.

Singer understood that Quanex wanted to use the $38 million that was put into QHMC, but the $38 million was transferred to Piper because Piper had a more immediate need for the cash than Quanex. Piper used the funds primarily for plant expansion, equipment purchases, and short-term debt reduction; Piper spent approximately $32.5 million in plant construction during TYE 1998.

F. *October 30, 1997: QS' Transfer of Class C Stock to Wannell in Exchange for Cash*

On October 30, 1997, QS sold 110 shares of class C stock to Wannell for $11,000. Wannell did not negotiate the price of this stock, which according to a stock purchase agreement executed between QS and Wannell on October 30, 1997, retained the rights and attributes described in the certificate. Wannell, QHMC, Quanex, and CS executed an amended and restated shareholders' agreement dated October 30, 1997, to reflect the substitution of Wannell for QS as a QHMC shareholder/investor.

When Wannell purchased the QHMC stock, he understood that as a QHMC director he was expected to attend some QHMC board meetings and to contribute to the business between board meetings as appropriate. He also understood QHMC to be responsible for everything related to the costs of the employee medical expenses in the venture, including paying, managing, and reducing them, but he had only a vague idea of how QHMC would pay those costs. Wannell had no knowledge of QHMC's assets, liabilities, or overall worth, and he did not know why put and call provisions were in his

stock arrangement. He also did not know why he had purchased the stock from QS, rather than directly from QHMC, and why he was offered preferred stock rather than common stock. The only choice Quanex gave Wannell in relation to his QHMC investment was whether to invest. [40]

## XII. *Posttransaction Activities*

### A. *D&T's Draft Opinion*

On April 13, 1998, Singer delivered a 59-page unsigned draft opinion letter (draft opinion) to Quanex that provided D&T's opinion on certain Federal income tax consequences of the QHMC transactions. The draft opinion was prepared under Singer's supervision, and Singer told Quanex the draft was subject to final review although he believed it to be correct. Singer included with the draft a cover letter that similarly stated that he hoped the draft was "the final draft of the opinion letter" but reaffirmed he was "awaiting final review approval from our Washington National Tax partner." The draft opinion was stamped "DRAFT" in large bold letters at the top of each of its 59 pages and was never finalized or signed by D&T.

In the draft opinion, D&T reached the following conclusions:

A. *Deconsolidation*. The sale of the Class B Voting Preferred Stock to Consultant [CS] should cause QHMC to break affiliation with Parent on the date of sale under section 1504.

B. *Tax Basis of Transferor's QHMC Stock*.

1. Parent's [Quanex's] transfer of cash and the assignment of certain MPB's to Transferor [QS] constitutes an exchange governed by section 351. Transferor's transfer of cash to QHMC in exchange for QHMC Class C Voting Preferred Stock plus the assumption by QHMC of the MPB's also constitutes an exchange governed by section 351. Accordingly, no gain or loss should be recognized by either Parent or Transferor on the transfers. Section 351(a).

2. Transferor should have a basis for tax purposes in its QHMC Class C Voting Preferred Stock equal to the cash transferred to QHMC. Section 358(a). Accordingly, the MPB's, which will be assumed by QHMC, should not be taken into account in determining Transferor's basis in the QHMC shares received in the section 351 exchange. Section 357(c)(3).

---

[40] Wannell testified that it was not certain when he purchased his stock in 1997 that he would exercise his redemption rights at the first opportunity. We do not find this testimony to be credible, and we decline to rely upon it.

C. *Deductibility of Medical Payments to QHMC*. The MPB's assumed by QHMC in the section 351 exchanges described above more likely than not will be deductible by QHMC as medical expenses under section 162(a) or as capital expenditures under section 263, as appropriate, when they would otherwise be deductible under QHMC's method of accounting. No income should be recognized by Parent (or any member of Parent's affiliated group) as a result of the payment by QHMC of the MPB's.

D. *Transferor's Loss on Sale of Shares*. To the extent Transferor realized a loss in connection with the taxable sale of its shares of QHMC Class C Voting Preferred Stock to Investor, any such loss should be recognized in the year of sale.

D&T cited various Code sections, revenue rulings, and cases to support its conclusions in the draft. The draft opinion also includes the following section:

**c. Application of section 351(g), added by TRA of 1997.** The Taxpayer Relief Act of 1997 added new section 351(g) which provides that certain preferred stock which is callable or puttable is not to be treated as stock for purposes of section 351(a).[48] The term "preferred stock" for purposes of section 351(g) does not include stock which participates in corporate growth to any significant extent.[49] As discussed above, the Class C Voting Preferred Stock has a liquidation value which is equal to the Formula Value. The Formula Value is equal to forty-five (45%) [sic] of the increase in the equity value of QHMC. Although there is no guidance in the statute or legislative history regarding the extent to which the stock must participate in corporate growth to be considered "significant", we believe the Class C stock should not be treated as "preferred stock" for purposes of section 351(g). It is difficult to argue that 45% is not significant.

[48] Section 351(g)(2).
[49] Section 351(g)(3)(A).

Rose was unaware of a letter of representations that was prepared and provided to D&T, and the record does not establish how D&T obtained the background information it relied on in the draft opinion. In addition, Royce knew that the draft opinion was a draft. Yet Royce never asked anyone at D&T to provide petitioners with a final tax opinion, and petitioners never received a final tax opinion from D&T. Quanex's tax department did not prepare a tax opinion or a memorandum discussing the tax consequences of the QHMC transactions.

B. *1997 Return*

1. *Background*

Petitioners filed their 1997 return on July 14, 1998. Royce decided what to put into the 1997 return regarding the QHMC transactions, and he, upon consultation with Singer, caused Quanex personnel to draft the return in accordance with the draft opinion. Royce reviewed Quanex's work and had Singer cause one of his managers to review the 1997 return. Royce also caused Singer to review the manager's comments and then to look at the return himself. Singer signed the 1997 return on behalf of D&T as the paid preparer.

Parikh signed the return as Quanex's controller, but he did not prepare the return or make decisions on how specific transactions would be reported on the return. Parikh also did not review the return line by line before signing it. Parikh asked Royce if D&T thoroughly reviewed the return and agreed upon how it was prepared, but Parikh did not speak with anyone at D&T about how the QHMC transactions were recorded on the return.

Before signing the return, Parikh knew that an approximately $38 million capital loss was reported on the return. Parikh saw Singer's signature on the return, and he was aware of D&T's draft opinion. Parikh did not read the draft opinion before signing the return.

2. *Income*

On their 1997 return petitioners reported a $37,989,000 short-term capital loss from QS' sale of the 110 shares of class C stock to Wannell and a gain or loss of zero from Quanex's sale of the 130 shares of class B stock to CS. Petitioners reported specifics of those sales as follows:

| Stock | Date acquired | Date sold | Basis | Sale price |
|---|---|---|---|---|
| Class C | 10/25/97 | 10/30/97 | $38,000,000 | $11,000 |
| Class B | 10/23/97 | 10/24/97 | 13,000 | 13,000 |

Petitioners also reported on the 1997 return that they realized a $26,966,201 net capital gain and a $21,374,634 net ordinary gain from the sale of the LaSalle stock and other

business property. [41] Petitioners offset the net capital gain by $26,966,201 of the reported capital loss and carried the remainder of the reported loss, $11,022,799 ($37,989,000 – $26,966,201), to TYE 1998. Petitioners applied the $11,022,799 to TYE 1998 to offset almost all of their $12,090,938 net long-term capital gain primarily from the Tube Group sale. [42]

For financial statement purposes, in or about September 1998 Quanex established a $9,621,000 reserve for taxes due in the future regarding the capital loss claimed on the sale to Wannell. Subsequently, after claiming the $11,022,799 capital loss carryover to TYE 1998, Quanex increased that reserve to $13,479,000.

### 3. *Enclosed Statements*

#### a. *Overview*

Petitioners' 1997 return includes various "Statements" related to the QHMC transactions. These statements include Statement 20, Statement Pursuant to IRC Regulation Section 1.368–3(a); Statement 22, Statement Regarding Tax Free Contribution to Capital Pursuant to Regulation Section 1.351–3(a); Statement 23, Statement Regarding Tax Free Contribution to Capital Pursuant to Regulation Section 1.351–3(a)&(b); and Statement 24, Statement Regarding Tax Free Contribution to Capital Pursuant to Regulation Section 1.351–3(a). Petitioners did not notify any Government agency other than the IRS of the transactions involving the MPBs.

#### b. *Statement 20*

Statement 20 reported the October 23, 1997, amendment and restatement of QW's certificate pursuant to its plan of reorganization to provide for class A, class B, and class C stocks in a tax-free reorganization under section 368(a)(1)(E). This statement also reported QW's name change to "Quanex Health Management Company, Inc." in a tax-free reorganization under section 368(a)(1)(F). [43]

---

[41] As discussed above, petitioners reported a $28,697,957 capital gain and $20,721,360 of ordinary gain from their sale of LaSalle.

[42] As discussed above, petitioners reported on their 1998 return a $12,458,171 capital gain and $8,090,766 of ordinary gain from the Tube Group sale.

[43] Petitioners reported elsewhere in their 1997 return that QW acquired 500 shares of class A stock, acquired and disposed of 130 shares of class B stock, and disposed of 1,000 shares of

c. *Statement 22*

Statement 22 reported Quanex's October 23, 1997, exchange of $62,000 and 1,000 shares of QHMC common stock for 500 shares of class A stock and 130 shares of class B stock as a tax-free contribution by Quanex to QHMC.

d. *Statement 23*

Statement 23 reported Quanex's October 23, 1997, contribution to QS of $38 million in exchange for 1 share of QS common stock and QS' assumption of $37,989,000 of MPBs as a tax-free contribution.

e. *Statement 24*

Statement 24 reported QS' October 25, 1997, contribution to QHMC of $38 million in exchange for 110 shares of class C stock and QHMC's assumption of the $37,989,000 of MPBs as a tax-free contribution.

4. *Deduction of Fees*

On their 1997 return, petitioners deducted fees of $320,692, $29,114, and $2,445 that Quanex paid to D&T, Fulbright, and WW, respectively. The fees Quanex paid to Fulbright and to WW were for services provided to effect the QHMC transactions. The fees Quanex paid D&T were for services D&T performed, as memorialized in invoices listing the following relevant data: [44]

| Date of invoice | Billing period ending | Amount | Hours billed |
|---|---|---|---|
| 7/21/97 | 6/28/97 | $12,775 | 35 |
| 8/20/97 | 7/26/97 | 21,055 | 53 |
| 9/2/97 | 8/9/97 | 41,566 | 99 |
| 9/17/97 | 8/23/97 | [1]65,801 | 205 |
| 10/13/97 | 9/20/97 | 65,140 | 176 |
| 10/28/97 | 10/18/97 | 46,950 | 102 |

common stock. That reporting listed the name of QW as "QUANEX WIRE, INC (QUANEX HEALTH MAN)".

[44] The "amount" and "hours billed" columns show the hours and fees on D&T invoices dated July 21, 1997, through January 5, 1998, that were labeled "Consultations regarding the management of medical liabilities". Although D&T employed both health care consultants and tax consultants, no one from D&T's health care consulting group appeared on the invoices.

| Date of invoice | Billing period ending | Amount | Hours billed |
|---|---|---|---|
| 12/4/97 | 11/15/97 | 50,880 | [2] 130 |
| 1/5/98 | 12/13/97 | 16,525 | 39 |
| Total | | 320,692 | 839 |

[1] While the parties stipulated that this amount is $65,801, the record indicates that the amount should be $65,800. The discrepancy does not affect our resolution of the issues in this case.

[2] While the parties stipulated this amount, the record indicates that this amount should be 131.5. The discrepancy does not affect our resolution of the issues in this case.

D&T's work on the transactions that resulted in petitioners' reporting the $37,989,000 loss was included within the scope of D&T's engagement letter.

C. *WW's 1999 Valuations*

Although petitioners reported a $37,989,000 capital loss on their 1997 return as a result of the MPB transfers and related stock sales and relied on that amount in their workpapers, Quanex continued to request new MPB valuations from WW and D&T through 1999. By email dated January 17, 1999, Ringuette sent Royce a calculation of the present value of active health care benefits as of November 1, 1998, for the groups of employees who had their MPBs transferred to QHMC. That email also provided tables for the "Projected Cashflow of Active Health Care Benefits as of 11/1/98" and the "Development of Average Health Care Cost Per Active Employee". The January 1999 calculation is the earliest valuation document in the record to include only the employee groups whose MPBs were transferred to QHMC. All previous valuation documents (i.e., the WW June 30, 1997, PV Calculations; the WW October 13, 1997, PV Calculations; and the D&T Oct. 21, 1997, cashflow model) used information from either different or additional employee groups. The relevant data from those previous documents is as follows:

| Employee groups incl. in the calc. and No. of employees | WW June 30, 1997, PV calculations | WW Oct. 13, 1997, PV calculations | D&T Oct. 21, 1997, cashflow model |
|---|---|---|---|
| Groups transferred: | | | |
| Corporate | 35 | 35 | 35 |
| MS–General Office | 30 | 30 | 120 |
| MS–Arkansas hourly | 252 | - - - | - - - |
| MS–Arkansas | 120 | 120 | 27 |
| MS–Arkansas | - - - | - - - | 112 |
| MS–Michigan | 112 | 112 | - - - |
| Groups not trans-ferred: | | | |
| Heat Treating | 27 | 27 | - - - |
| Nitro Steel | - - - | 13 | 30 |
| GST | 55 | - - - | - - - |
| GST hourly | 248 | - - - | - - - |
| MST | 66 | - - - | - - - |
| MST hourly | 222 | - - - | - - - |
| Tube Group office | 51 | - - - | - - - |
| MS–Michigan hourly | 165 | - - - | - - - |
| Total | 1,383 | 337 | 324 |

WW relied on the following assumptions to perform its January 1999 calculations on the "Present Value of Active Health Care Benefits as of 11/1/98":

| | |
|---|---|
| Aging ................................................................. | 2% |
| Initial trend rate ................................................. | 8% |
| Ultimate trend rate (2003) ................................. | 4.75% |
| Average cost per employee (1998/1999) ............. | $6,437 |
| Interest rate ....................................................... | 6.75% |
| "Target Present Value" ....................................... | $37,989,000 |

Those calculations were as follows: [45]

| Location | Number of employees today | Average attained age | Estimated through 2008/2009 | Present value through 2009/2010 |
|---|---|---|---|---|
| Corporate | 37 | 46 | $2,771,431 | $3,000,623 |
| MS–Arkansas salaried | 117 | 42 | 8,096,317 | 8,765,867 |
| MS–Arkansas non-union hourly | 249 | 36 | 15,300,295 | 16,565,601 |
| MS–General Office | 31 | 47 | 2,368,451 | 2,564,317 |
| MS–Michigan salaried | 112 | 45 | 8,224,701 | 8,904,868 |
| Total | 546 | 40 | 36,761,195 | 39,801,276 |

[45] We note that the average attained age is actually 43.2. The discrepancy does not affect our analysis.

Quanex requested present value calculations for selected groups of employees from the Corporate, MS–Michigan salaried, MS–Arkansas salaried, MS–Arkansas nonunion hourly, and MS–General Office groups from WW in addition to those provided in the January 17, 1999, email. Sometime after January 17, 1999, in approximately early 1999, Quanex received the additional calculations in an undated letter signed by Ringuette (undated calculations). Ringuette either prepared or supervised the preparation of the undated calculations.

Royce asked Ringuette to determine how many years of cashflows would result in a present value of $37,989,000 for the MPBs. The resultant calculations were as follows: [46]

*Present Value of Active Health Care Benefits as of 11/1/97*

| Location | Number of employees today | Average attained age | Estimated through 2010/2011 | Present value through 2011/2012 |
|---|---|---|---|---|
| Corporate | 37 | 46 | $2,775,851 | $2,952,832 |
| MS–Arkansas salaried | 117 | 42 | 8,109,224 | 8,626,248 |
| MS–Arkansas non-union hourly | 249 | 36 | 15,324,695 | 16,301,759 |
| MS–General Office | 31 | 47 | 2,372,226 | 2,523,473 |
| MS–Michigan salaried | 112 | 45 | 8,237,814 | 8,763,036 |
| Total | 546 | 40 | 36,819,810 | 39,167,348 |

The undated calculations relied on factors and assumptions different from those used in the WW calculations of October 13, 1997, and January 17, 1999. For example, in contrast to the October 13 valuation, WW based the undated calculations on the assumption that the number and average age of employees in each group would remain constant over time. In the undated calculations, WW also projected the value over an approximately 15-year period rather than the approximately 12-year period used in the January 17 valuation and the lifetime calculation in the October 13 valuation. [47] Both of these changes affected how WW measured the present value of the health benefits.

WW also used the following assumptions for the undated calculations:

---

[46] We note that the average attained age is actually 43.2. The discrepancy does not affect our analysis.

[47] Rose chose the length of the period.

| | |
|---|---|
| Aging ................................................................... | 2% |
| Initial trend rate ................................................. | 7% |
| Ultimate trend rate (2003/2004) ......................... | 5% |
| Average cost per employee (1997/1998) ............. | $5,238 |
| Interest rate ....................................................... | 6.75% |
| "Target Present Value" ....................................... | $37,989,000 |

Ringuette believed the assumptions were within a reasonable range, but they differed from those used in the valuations of October 13, 1997, and January 17, 1999. The assumptions WW used for its June 30, 1997, October 13, 1997, January 17, 1999, and undated 1999 present value calculations compare as follows:

| Assumption used | 6/30/97 valuation | 10/13/97 valuation | 1/17/99 valuation | Undated 1999 valuation |
|---|---|---|---|---|
| Aging | 2% | 2% | 2% | 2% |
| Initial trend rate | 9.29% | 8.75% | 8% | 7% |
| Ultimate trend rate | 5.5% (2004) | 5.5% (2004) | 4.75% (2003) | 5% (2003/2004) |
| Interest rate | 7.5% | 7.5% | 6.75% | 6.75% |
| Avg. cost per employee | $3,500 (1997) | $5,877 (1998) | $6,437 (1998/1999) | $5,238 (1997/1998) |

Quanex's 1997 Form 10–K stated with respect to FASB 106 information and assumptions that "The assumed healthcare cost trend rate was 8.8% in 1997, decreasing uniformly to 5.5% in the year 2003 and remaining level thereafter. The assumed discount rate used to measure the accumulated postretirement benefit obligation was 7.5% at October 31, 1997 and October 31, 1996," Quanex's Form 10–K for TYE 1998 stated that "The assumed healthcare cost trend rate was 8% in 1998, decreasing uniformly to 4.75% in the year 2003 and remaining level thereafter. The assumed discount rate used to measure the accumulated postretirement benefit obligation was 6.75% and 7.5% at October 31, 1998 and 1997, respectively." WW chose the 8% health care cost trend rate assumption for 1998, and the rate related back to November 1, 1997. Quanex was not obligated to use the 8% assumption.

Royce was dissatisfied with the initial and ultimate trend inflation rates and the aging assumptions WW used in the October 13, 1997, valuation. Consequently, Royce instructed WW to change the initial trend rate to 7%. Royce also wanted WW to raise the ultimate trend assumption. Royce wanted a 5% rate rather than the 4.75% rate WW used in

its January 17, 1999, calculation. Royce also wanted WW to change the interest rate from the 7.5% WW used in the October 13 calculation to 6.75%. WW agreed to make the changes. When asked at trial "why was it necessary for you to see if it [the target present value] was within the range [of values WW determined for the selected employees MPBs]?", Royce testified: "Because the transaction had already been done, the cash to fund the expected MPBs of $38 million had been transferred. We were trying to transfer the substantial assets equal to the cash contributed."

Royce also instructed WW to include employees in the undated calculations that were different from the October 13 valuation, but the same as those used in the January 17 calculations. Changing the number of employees helped WW target $38 million. The October 13 valuation did not contain a target present value assumption. The January 17, 1999, calculation and the undated calculations used a $37,989,000 target value.

Although numerous changes were made between the October 13, 1997, January 17, 1999, and undated calculations, in each instance WW arrived at approximately the same present value for the MPBs of the employee groups considered. [48] The present value totals were as follows:

| Calculation | Present value of MPBs |
|---|---|
| 10/13/97 | $37,839,705 |
| 1/17/99 | 36,761,195 |
| 1/17/99 | 39,801,276 |
| Undated | 36,819,810 |
| Undated | 39,167,348 |

D. *D&T's 1999 Cashflow Model*

The undated calculations represented WW's final report on the present value of the MPBs, and Royce did not ask WW to prepare any additional revisions or reports on the matter. Royce did ask D&T to prepare calculations on the basis of the undated WW calculations. By letter dated March 25, 1999,

---

[48] At trial, Ringuette did not remember Quanex's expressing any dissatisfaction with the methodology that he used in performing the present value calculations or with the product contained in the calculations.

D&T provided the revised calculations to Royce (March 25 analysis). The letter, which was signed by David Roth of D&T, stated that upon Royce's request D&T "modified and refined the calculations previously made in October 1997 relating to the valuation of * * * [QHMC] for the purpose of closing the transaction" and that D&T understood that QHMC would use the analysis, along with other information, "in establishing cash flows to various classes of its capital stock." D&T also stated in the letter that it had not independently assessed discount rates, cashflows, or other terms relating to the Piper note. D&T provided Quanex with the following table, which calculated the present values of the cashflows of the MPBs transferred to QHMC:

| Location | Grand total of PV | Cashflow | No. of employees today |
|---|---|---|---|
| Corporate | $2,947,000 | $151,000 | 37 |
| MS–Arkansas salaried | 8,610,000 | 429,000 | 117 |
| MS–Arkansas non-union hourly | 16,271,000 | 1,064,000 | 249 |
| MS–General Office | 2,819,000 | 100,000 | 31 |
| MS–Michigan salaried | 8,747,000 | 517,000 | 112 |
| Total | 39,394,000 | [1] 2,262,000 | 546 |

[1] Although the cashflows totaled $2,261,000, the table indicated the total was $2,262,000.

The March 25 analysis also stated that the "total payments to Quanex * * * under QHMC's note receivable" would equal $5.5 million at the conclusion of each of the first 2 years, $4 million at the conclusion of years 3 and 4, $3 million at the conclusion of years 5 through 7, $5 million at the conclusion of years 8 through 14, and $310,000 at the conclusion of year 15, and that the payment schedule indicated a total value of equity for all classes of QHMC stock of $76,000. D&T calculated its present values of cashflows on the basis of the cashflow analysis, and D&T calculated the equity value as follows:

| | |
|---|---|
| Total PV of cashflows ................................................ | $594,000 |
| Plus cash on hand ..................................................... | 65,000 |

Less uncertainty of future medical costs adjust-
    ment ........................................................................    (583,000)

Equals total value of equity ......................................    76,000

Royce used the note payment schedule to anticipate the principal payments on the note throughout 15 years.

In addition to the present value cashflow calculations for the employee groups and the equity determination, D&T's March 25 analysis contained several other projections and calculations, including the following discounted cashflow analysis (in thousands): [49]

| Year | Int. inc. from note | Principal from note | Medical costs | Cashflow avail. to equity holders | Cum. cashflow | Cashflow from operating/ invest. activities | NOL buildup |
|---|---|---|---|---|---|---|---|
| 1998 | $2,850 | $2,650 | ($2,870) | $2,630 | $2,630 | ($20) | ($20) |
| 1999 | 2,651 | 2,849 | (3,071) | 2,429 | 5,059 | (420) | (420) |
| 2000 | 2,438 | 1,562 | (3,274) | 726 | 5,785 | (836) | (1,256) |
| 2001 | 2,320 | 1,680 | (3,479) | 521 | 6,306 | (1,159) | (2,415) |
| 2002 | 2,194 | 806 | (3,685) | (685) | 5,621 | (1,491) | (3,905) |
| 2003 | 2,134 | 866 | (3,892) | (892) | 4,729 | (1,758) | (5,663) |
| 2004 | 2,069 | 931 | (4,097) | (1,097) | 3,632 | (2,028) | -0- |
| 2005 | 1,999 | 3,001 | (4,302) | 698 | 4,331 | (2,302) | -0- |
| 2006 | 1,774 | 3,226 | (4,517) | 483 | 4,814 | (2,742) | -0- |
| 2007 | 1,532 | 3,468 | (4,742) | 258 | 5,072 | (3,210) | -0- |
| 2008 | 1,272 | 3,728 | (4,980) | 20 | 5,092 | (3,707) | -0- |
| 2009 | 993 | 4,007 | (5,229) | (229) | 4,864 | (4,238) | -0- |
| 2010 | 892 | 4,308 | (5,490) | (490) | 4,374 | (4,798) | -0- |
| 2011 | 369 | 4,631 | (5,764) | (764) | 3,609 | (5,395) | -0- |
| 2012 | 22 | 258 | (6,053) | (5,743) | (2,133) | (6,031) | -0- |
| Total | 25,310 | 38,000 | (65,443) | (2,133) | No D&T total | (40,133) | No D&T total |

D&T thus projected for every year that QHMC's medical costs would exceed its interest income from the Piper note and that QHMC's equity holders would have negative cashflow for 7 of the 15 years of the investment.[50] D&T also projected that QHMC would build up NOLs over the first six years, but D&T did not project the NOLs for the remaining nine years. D&T provided specific NOL projections as follows (in thousands):

|  | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|---|---|---|
| NOL generated | -0- | $420 | $838 | $1,159 | $1,491 | $1,758 | $2,028 |
| NOL carryforward | -0- | 420 | 1,258 | 2,415 | 3,905 | 5,663 | 7,691 |

[49] We note some computational errors in the projections. These errors are not material to our analysis.

[50] At trial Royce admitted that if none of the principal on the note was paid off in years 1 through 15, the maximum interest income to QHMC would be the $2,850,000 reflected in the first year of the schedule. In no year were the projected medical expenses less than $2,850,000.

|  | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|---|---|---|
| PV of annual NOL tax benefit | -0- | 149 | 281 | 367 | 446 | 496 | 539 |
| Cumulative PV of NOL benefits at the end of year 7 |  |  |  |  |  |  | [1]2,278 |

[1]D&T assumed a risk-free rate of 6% and a tax rate of 40% for the NOL analysis.

Royce understood the concept of NOLs, and he admitted that on the basis of the information on projected medical expenses provided in the March 25 analysis, which he accepted, QHMC would have an NOL every relevant year. Royce also admitted that as Quanex's in-house tax adviser he would have been aware of existing NOLs and would have considered how to use them.

In its March 25 analysis, D&T also made projections with respect to the formula value. D&T projected that there would be 546 actual and projected covered plan participants each year and calculated the following (in thousands):

| | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Initial undiscounted MPBs | $2,870 | $3,071 | $3,274 | $3,478 | $3,685 | $3,892 | $4,097 | $4,302 | $4,517 | $4,742 | $4,980 | $5,229 | $5,490 | $5,764 | $6,053 |
| Actual MPBs | 2,583 | 2,764 | 2,946 | 3,131 | 3,317 | 3,503 | 3,687 | 3,871 | 4,065 | 4,268 | 4,482 | 4,706 | 4,941 | 5,168 | 5,447 |
| Yearly savings | 287 | 307 | 327 | 348 | 369 | 388 | 410 | 430 | 452 | 474 | 498 | 523 | 549 | 576 | 605 |
| Aggregate yearly cum. savings | 287 | 594 | 922 | 1,269 | 1,638 | 2,027 | 2,437 | 2,867 | 3,319 | 3,793 | 4,291 | 4,814 | 5,363 | 5,939 | 6,544 |

On the basis of these numbers, D&T determined that if the call option was exercised in year 5, the class B and class C shares would have a $360,327 liquidation value and a $352,452 net return, and if the put option were exercised in year 7 (with the call option still outstanding), the liquidation value of the class B and class C shares would equal $567,719 with a net return of $562,694. D&T calculated these liquidation and net return values as follows:

| *Preferred stock called in 5 years* | | *Preferred stock called in 7 years* | |
|---|---|---|---|
| Cum. savings at end of yr. 5 | $1,637,928 | Cum. savings at end of yr. 7 | $2,436,768 |
| Less management consulting fees | (250,000) | Less management consulting fees | (250,000) |
| Net savings | 1,387,928 | Savings | 2,186,768 |
| Performance weighting factor | 45% | Performance weighting factor | 45% |
| Formula value = 45% savings | 624,568 | Formula value = 45% savings | 984,046 |
| No. of B and C shares outstanding | 260 | No. of B and C shares outstanding | 260 |
| Est. max. formula value per share | 2,402 | Est. max. formula value per share | 3,785 |
| No. of CS class B and C shares | 150 | No. of CS class B and C shares | 150 |
| Liquidation value of B and C shares | 360,327 | Liquidation value of B and C shares | 567,719 |
| Total dividends paid | 7,125 | Total dividends paid | 9,975 |
| Total return over 5 years | 367,452 | Total return over 7 years | 577,694 |
| Less initial investment | (15,000) | Less initial investment | (15,000) |
| Net return | 352,452 | Net return | 562,694 |

D&T also projected the following values (in thousands) under the heading "Total Value of All Classes of Stock on Redemption Date":

| Year | Modified cashflow assuming savings | Value at end of year 5 | Value at end of year 7 |
|---|---|---|---|
| 1998 | $2,917 | $3,814 | $4,480 |
| 1999 | 2,736 | 3,439 | 3,919 |
| 2000 | 1,054 | 1,241 | 1,414 |
| 2001 | 869 | 958 | 1,092 |
| 2002 | (317) | (327) | (373) |
| 2003 | (503) | (486) | (554) |
| 2004 | (687) | (823) | (710) |
| 2005 | 1,128 | 959 | 1,092 |
| 2006 | 935 | 744 | 848 |
| 2007 | 732 | 545 | 622 |
| 2008 | 518 | 382 | 412 |
| 2009 | 294 | 193 | 219 |
| 2010 | 59 | 38 | 41 |
| 2011 | (188) | (108) | (123) |
| 2012 | (5,137) | (2,762) | (3,148) |

The record does not contain credible evidence that Quanex's board was informed of WW's and D&T's valuation changes. The meeting minutes for QHMC's board meetings (QHMC board meetings) reflected no discussion of the changes.[51] (QHMC's board meetings are discussed in greater detail below.)

E. *QHMC Operations*

1. *QHMC's Officers and Directors*

From 1997 through the time of trial, QHMC had the following officers and directors:[52]

| | *10/23/97– 10/24/97* | *10/24/97– 10/25/97* | *10/25/97– 4/9/99* | *4/9/99– 4/10/00* | *4/10/00– 4/17/01* | *4/17/01–03 annual meeting* |
|---|---|---|---|---|---|---|
| Oechsle | Dir., pres. | Dir., pres. | Dir., pres. | Dir., pres. | Dir., pres. | - - - |
| Jean | - - - | - - - | - - - | - - - | - - - | Dir., pres. |
| Parikh | Dir., V.P., treas. | Dir., V.P., treas. | Dir., V.P., treas. | Dir., V.P., treas. | Dir., V.P., treas. | Dir., V.P., treas. |
| Rose | Dir., V.P. | Dir., V.P. | Dir., V.P. | Dir., V.P. | - - - | - - - |
| Peery | Dir., V.P. | Dir., V.P. | Dir., V.P. | - - - | - - - | - - - |
| Davis | V.P. | V.P. | Dir., V.P. | Dir., V.P. | Dir., V.P. | V.P. (until 10/1/02) |
| Giddens | - - - | - - - | - - - | Dir., V.P. | Dir., V.P. | Dir., V.P. |
| Murphy | - - - | - - - | - - - | - - - | Dir., V.P. | Dir., V.P. |
| Wannell | Dir. | Dir. | Dir. | Dir. | Dir. | Dir. |
| Babb | Dir. | Dir. | Dir. | Dir. | Dir. | Dir. |
| Hellner | Dir. | - - - | - - - | - - - | - - - | Dir. |
| Bewley | Dir. | - - - | - - - | - - - | - - - | - - - |
| Micale | - - - | Dir. | Dir. | Dir. | Dir. | Dir. |
| Chapman | - - - | Dir. | Dir. | Dir. | Dir. | Dir. |
| Conlon | Sec. | Sec. | Sec. | Sec. | Sec. | Sec. |
| Royce | Asst. sec. | Asst. sec. | Asst. sec. | Asst. sec. | Asst. sec. | Asst. sec. |
| Dockery | Asst. sec. | Asst. sec. | Asst. sec. | Asst. sec. | Asst. sec. | Asst. sec. |

Except for Wannell, each class A director was a Quanex employee as of the date he or she was elected. Except for Conlon and Dockery, both attorneys with Fulbright, each QHMC officer was a Quanex employee as of the date he or she was elected. QHMC did not compensate its directors or its officers.

QHMC had no employees, other than, possibly, some individuals whom the Code deems to be employees for certain purposes such as employment taxes. *See, e.g.*, sec. 3121(d) (providing that the term "employee" includes certain common law employees and corporate officers).

---

[51] Royce testified that both WW's and D&T's new calculations were discussed at QHMC's April 9, 1999, board meeting and that he adequately informed the board of the changes. Because Royce prepared the April 9 board meeting minutes (and all other QHMC meeting minutes), and because he testified that he put the important activities that took place during the meetings in the minutes, we do not find his testimony that the board was informed of the changes credible.

[52] Jean, Giddens, and Dockery are Raymond Jean, Paul Giddens, and Harva Dockery, respectively.

### a. *QHMC's Board Meetings and Shareholders Meetings*

QHMC held board meetings and shareholders meetings on April 9, 1999, April 10, 2000, April 17, 2001, and October 1 and 16, 2001. No board meetings or shareholders meetings were held in 1998.[53]

### b. *Parikh as Director and Officer*

In his capacity as a QHMC board member and a QHMC officer, Parikh participated in QHMC board meetings and discussions relating to health management plans, signed QHMC's tax returns, and reviewed QHMC's financial statements. Parikh had no specific daily activities or responsibilities to perform for QHMC.

### c. *Peery as Director and Officer*

From the time the QHMC transactions were completed until his retirement in April 1998, Peery attended meetings with CS in relation to Quanex matters. Peery was not involved in QHMC's operations.

Following his retirement, Peery attended no meetings with respect to QHMC, and no one called him to discuss any matter related to QHMC. For the first five or six months after he retired, he stayed on with Quanex in a limited advisory role serving at his successor's pleasure and making himself available to answer the successor's questions. The successor did not ask questions related to benefits or the QHMC arrangement, and Peery did not explain the QHMC arrangement to the successor.

### 2. *Bank Accounts*

QHMC has maintained one bank account since October 1997. The account is with Comerica Bank (QHMC's Comerica account),[54] and the monthly bank statements are mailed to QHMC at the address of Quanex's principal office. Petitioners were unable to find the account's bank statements for June

---

[53] On February 19, 1998, a "Quanex Strategic Meeting" was held, and Rose and Chapman testified that the meeting was about starting QHMC operations. However, both the meeting's agenda and a followup letter to the meeting, which was dated February 20, 1998, and addressed to Micale from Babb, made no mention of QHMC and referenced employee groups not covered by QHMC.

[54] Since October 1997 Quanex also has maintained a bank account with Comerica Bank (Quanex's Comerica account).

1, 1998, through December 31, 1999, and respondent undertook no efforts to obtain those statements directly from Comerica Bank.

### 3. *Processing and Paying MPB-Related Expenses*

The processing of claims under Quanex's HMO and indemnity plans was the same before and after October 1997. From October 23, 1997, employees or agents of Quanex processed the claims for the MPBs transferred to QHMC, and personnel at the employees' respective plants input the covered employees' medical enrollment information. The individuals involved and the basic procedures for processing employee claims for the MPBs were generally the same before and after October 23, 1997, and the QHMC-covered employees' claims were not handled any differently from those for employees whose MPBs were not transferred to QHMC. Quanex bore all MPB claims processing costs, and QHMC paid no fees to Quanex for the services Quanex provided in processing claims. The cost to Quanex for processing the claims did not include the actual amounts of the claims.

QHMC also paid no fees for any administrative, management, or other service that Quanex provided in connection with the MPBs. While Quanex's accounting department maintained QHMC's books and records, Quanex's tax department prepared QHMC's tax returns for TYE 1997 through TYE 2002, and Royce prepared the minutes for QHMC's board meetings, QHMC did not reimburse Quanex for these services.

After October 23, 1997, Quanex initially paid the covered employees' actual medical claim costs and the employer's share of HMO premiums for or related to the MPBs. Quanex employees or agents continued to select the HMO insurers and to perform the annual negotiations related to the HMO premiums for the MPBs, and all costs related to those activities were borne by the HMOs and by Quanex (QHMC paid no fees to Quanex for these services). The annual costs for the claims and premiums for 1998 through 2001 were as follows:

| *Fiscal year* [1] | *Medical expenses* [2] |
|---|---|
| TYE 1998 | $2,656,249 |
| TYE 1999 | 3,396,854 |
| TYE 2000 | 3,685,133 |

| Fiscal year [1] | Medical expenses [2] |
|---|---|
| TYE 2001 ................................................................ | 4,390,632 |
| Total ..................................................................... | 14,128,868 |

[1] The parties did not provide the total cost for the covered employees' claims and the employer's share of the covered employees' HMO premiums for years after TYE 2001.

[2] The computation attributed the expenses to Corporate salaried, MS–General Office salaried, MS–Michigan salaried, MS–Arkansas salaried, and MS–Arkansas hourly employees.

Quanex's payments of the medical benefit costs for the covered employees were handled through its treasury department, the same way medical benefit costs were handled for all Quanex employees. The claims were paid out of individual medical accounts that the treasury department set up for each Quanex division so that Quanex was able to identify each division's claims and losses. At the end of each payment period, Quanex determined which expenses were paid for the covered groups of employees.

QHMC eventually reimbursed Quanex for the employees' claims and the employer's share of the HMO premiums that Quanex paid. QHMC's ability to reimburse Quanex was directly related to its receipt of payments on the Piper note. QHMC paid no fees or interest to Quanex for the use of the Quanex funds expended in connection with the payment of the MPBs.

After the QHMC transactions were completed, QHMC's business came solely from Quanex, and the Piper note was QHMC's sole source of income. QHMC could not reimburse Quanex for the MPB expenses until QHMC received payments on the note. Piper did not pay the interest on the note as it came due, and Piper and QHMC initially recorded the respective interest obligations as payables and receivables on their respective books.

QHMC's obligation to reimburse Quanex for claims and premium payments was initially reflected through entries in intercompany accounts, e.g., recorded as a receivable due from QHMC on Quanex's books and as a payable on QHMC's books. On May 12, 2000, $45,156,667 was wired into QHMC's Comerica account from Quanex's Comerica account to pay off the Piper note's $38 million principal and $7,156,667 accrued

interest. QHMC transferred the $7,156,667 back to Quanex the same day to reimburse Quanex for the MPB expenses for the first time.[55] Also on May 12, 2000, QHMC transferred the $38 million to Nichols Aluminum-Golden, Inc. (NAG), another wholly owned Quanex subsidiary, as a loan.

The transfers relating to the Piper note began a pattern whereby QHMC received principal and interest payments from Quanex for loans QHMC had made to certain Quanex subsidiaries, and QHMC immediately thereafter made MPB expense reimbursements to Quanex and loans to other Quanex entities. QHMC made loans to NAG, Temroc Metals (TFP), Imperial Products, Inc. (IFP) and Colonial Craft, Inc. (CCI), all then wholly owned subsidiaries of Quanex, as follows:

| Borrower | Principal amount | Date of note | Wire transfer | Cancellation/ repayment |
|---|---|---|---|---|
| NAG | $38 million | 5/1/00 | 5/12/00 | 4/27/01 |
| TFP | 20 million | 4/1/01 | 4/27/01 | 5/28/02 |
| IFP | 18 million | 4/1/01 | 4/27/01 | 7/31/02 |
| CCI | 20 million | 5/1/02 | 5/28/02 | 7/31/02 |
| CCI | 38 million | 8/1/02 | 7/31/02 | Outstanding at trial |

The wire transfers from QHMC for the TFP and IFP loans were made to Quanex's Comerica account, and the repayments for the NAG, TFP, and IFP notes were wire transfers to QHMC's account from Quanex. Each note was due on December 31, 2012, but could be prepaid in whole or in part at any time without penalty. Similarly, Quanex made interest payments on the NAG, TFP, IFP, and CCI notes by wire transfer from its Comerica account to QHMC's, and QHMC made corresponding reimbursements to Quanex.

The payments made between Quanex and QHMC were as follows:

---

[55] The parties stipulated that QHMC made the first reimbursement payment of $7,156,667 on May 7, 2000. However, the parties also stipulated QHMC's bank account summary of activity for October 1, 1997, through March 31, 2003, which shows that the $7,156,667 payment was made on May 12, 2000, the same date the $45,156,667 transfer from the Quanex account was deposited. Because the bank summary of activity also shows that QHMC had only $61,316.70 in its account immediately before the May 12 transfer from Quanex's account, we find that the $7,156,667 payment could not have been made before that date. *See Cal-Maine Foods, Inc. v. Commissioner*, 93 T.C. 181, 195 (1989) (stating that, where justice requires, the Court may disregard a stipulation which is clearly contrary to the record); *see also* Rules 90(f), 91(e).

|  |  | Interest payments |  | Reimbursement payments |
| --- | --- | --- | --- | --- |
| Loan recipient | Date of wire to QHMC | Interest amount | Date of QHMC wire to Quanex | MPB expense repayment amount |
| Piper | 5/12/00 | $7,156,667.00 | 5/12/00 | $7,156,667.00 |
| NAG | 7/25/00 | 593,222.22 | 7/25/00 | 593,222.22 |
| NAG | 10/25/00 | 902,499.99 | 10/25/00 | 902,499.99 |
| NAG | 1/8/01 | 902,499.99 | 1/8/01 | 902,499.99 |
| NAG | 4/4/01 | 818,055.56 | 4/4/01 | 818,055.56 |
| TFP | 7/27/01 | 500,000.00 | 7/27/01 | 950,000.00 |
| IFP | 7/27/01 | 450,000.00 | - - - | -0- |
| TFP | 10/30/01 | 500,000.00 | 10/30/01 | 950,000.00 |
| IFP | 10/30/01 | 450,000.00 | - - - | -0- |
| TFP | 1/16/02 | 500,000.00 | 1/16/02 | 950,000.00 |
| IFP | 1/16/02 | 450,000.00 | - - - | -0- |
| TFP | 4/16/02 | 500,000.00 | 4/16/02 | 950,000.00 |
| IFP | 4/16/02 | 450,000.00 | - - - | -0- |
| TFP | 5/28/02 | 166,667.00 | 5/28/02 | 166,667.00 |
| CCI | 7/31/02 | 333,000.00 | 7/31/02 | 933,333.00 |
| CCI | 7/31/02 | 600,000.00 | - - - | -0- |
| CCI | 10/24/02 | 800,334.00 | 10/24/02 | 800,334.00 |
| CCI | 1/13/03 | 950,000.00 | 1/13/03 | 950,000.00 |
| Total |  | 17,022,945.76 |  | 17,023,278.76 |

4. *Shareholder Efforts To Manage MPB Obligations*

a. *CS' Efforts*

i. *Background*

Following the QHMC transactions, CS did more work for Quanex than it had before the QHMC transactions, but the nature of CS' work did not change. During the course of a typical year following the fall of 1997, CS negotiated HMO contracts and evaluated medical savings opportunities for QHMC covered employees as part of a broader effort to reduce Quanex's medical expenses. CS attempted to meet with the companies from which the covered employees had been chosen, and it sometimes participated in Quanex's meetings with those companies. CS met annually with QHMC's board to provide updates and to assess savings opportunities for the following contract year.

Both Howard and Chapman attended and made presentations at the QHMC board meetings. Howard was Quanex's main CS contact from 1997 through the time of trial, and Babb was Howard's main Quanex contact both before and after the QHMC transactions. Howard used the QHMC board meetings as a venue to speak to Quanex management about Quanex generally and the health care problems of all of

Quanex's employees. Chapman and Howard also used the meetings as an opportunity to inform Quanex management about the services CS could provide for Quanex as a whole. After the QHMC transactions were consummated, Quanex provided data to CS for all Quanex employees, and CS' presentation materials for the QHMC board meetings included recommendations for both QHMC covered and non-QHMC covered employees. CS provided some of the same materials at both the April 10, 2000, and the April 17, 2001, board meetings.

ii. *PPO Project*

At QHMC's April 17, 2001, board meeting, CS suggested that Quanex replace its indemnity plan with a PPO option as a cost savings strategy.[56] CS believed that establishing a PPO would be valuable to all Quanex employees, and Quanex ultimately agreed. Previously, before October 31, 1997, CS had discussed using PPOs with Quanex, but Quanex did not then act on those discussions.[57] CS helped clients in which it did not have an equity interest implement PPO plans.

Quanex wanted to provide the PPO option to all its non-union employees. CS prepared a "Request for Information Healthcare Management and Administration for Quanex Corporation" (RFI) for the PPO project. The RFI stated that its intent was to partner Quanex with a health care company that could successfully improve Quanex's health care costs by implementing a PPO network access product, and in a portion of the document entitled "COMPANY INTRODUCTION", the RFI gave an overview of Quanex that made no reference to QHMC. The RFI also requested information on medical services provided in locations that did not contain QHMC covered employees. CS also prepared a Request for Proposal (RFP) that was entitled "Request for Proposal Healthcare Management and Administration for Quanex Corporation". The RFP contained a company introduction that did not refer to QHMC.

By letter dated February 21, 2002, CS provided Parikh with a bill for services performed between August 27 and

---

[56] At trial Chapman defined a PPO as "purely a network * * * it's a point of access into a medical delivery system."

[57] CS typically received remuneration with respect to indemnified contracts but not PPO plans. After Quanex's PPO plan was in effect, however, CS received commissions from Quanex because there was a contract to provide insurance coverage.

December 31, 2001, which characterized CS' PPO efforts as work for Quanex generally. The invoice stated that CS created "Quanex specific" RFP and RFI documents, and that CS prepared an analysis of the viable PPO health networks and providers "for every location where Quanex employees and retirees reside" to implement and create the PPO benefit plan. The invoice stated that CS performed a detailed interpretation of the services, quality, and financial benefits among multiple vendors and administrators "for each operating division of Quanex," and that CS identified the vendor best capable of "meeting the current and future needs of Quanex based on given demographic and financial goals of Quanex" as a part of the PPO project.

Effective January 1, 2002, Quanex established a PPO plan to replace its indemnity plan. The change, which was to take place over time, applied to all of Quanex's nonunion employees, including those covered by QHMC. The majority of QHMC covered employees were HMO participants, and all Quanex employees under the HMO program had an opportunity to transfer to a PPO when their policy year expired. Many HMO-covered employees chose not to switch. The same PPO provider, Unicare, was chosen for both QHMC covered and non-QHMC covered employees.[58]

iii. *Union Negotiations*

CS also participated in union negotiations to reduce Quanex's medical expenses. The employees of Quanex's MS–Fort Smith, Arkansas, location unionized in 1999. Although the employees were originally part of the QHMC covered employees group, they were no longer QHMC covered employees after they unionized. Because Quanex wanted to determine which medical benefits to include in the union contract, and the contract involved an Arkansas HMO with which Howard had previously negotiated for Quanex, Quanex asked CS to help devise a strategy for negotiations with the union as to the amount and terms of the medical benefits Quanex would provide. With CS' assistance, Quanex successfully negotiated the inclusion of an employee contribution requirement in the union contract. Before the union contract,

---

[58] Royce testified that CS' efforts on the PPO project resulted in approximately $800,000 of health care cost savings for Quanex by the end of TYE 2002. We do not find this testimony credible, and we decline to rely upon it.

the MS–Fort Smith, Arkansas, employees were not required to contribute to their health care plan. CS did not need the QHMC structure to assist Quanex in the union negotiations. [59]

iv. *CS' Consulting Bills*

By letters dated February 1 and June 24, 1999, February 21, 2002, and March 18, 2003, CS provided Quanex with bills for its services. In each bill CS generally described its work underlying the bill as "consulting services as provided for in our consulting agreement dated October 24, 1997 by and among Quanex Corporation and Chapman Schewe Inc. as part of the Quanex Health Management, Inc. provisions." Each bill provided itemized descriptions of the work performed and stated who performed the work and at what rate.

The February 1999 bill was for services CS performed in 1998 as a part of its efforts to manage Quanex's health plan expense. The bill charged $13,000 for 52 hours of work performed by Chapman, Howard, and Micale at a rate of $250 per hour. Although the bill's itemized work descriptions referred to Quanex by name several times, none of the descriptions made any specific reference to QHMC or to the covered groups. On or about March 24, 1999, Quanex paid CS the invoiced $13,000.

The June 1999 bill was for services CS performed from January 1 to April 30, 1999, and the charges reflected "the initiation of saving solutions strategies and request for proposals from national vendors for the QHMC project." The bill charged $23,100 for 90 hours of work performed by Micale, Chapman, and Howard at a rate of $250 per hour and 12 hours of clerical work at a rate of $50 per hour. This bill's itemized work descriptions made specific references to Quanex but none to QHMC or to the covered employee groups. On or about August 1999 Quanex paid CS the invoiced $23,100.

The February 2002 bill charged as to the PPO project $44,375 for 45 hours of work performed by Micale, Chapman, and Howard at a rate of $250 per hour and for 265 hours of work performed by Betty Speery at a rate of $125 per hour. The itemized work descriptions in this bill made no direct

---

[59] Wannell did not provide any suggestions with respect to the unionization directly to CS, nor did he directly participate in the union negotiations. Wannell's knowledge of what occurred with the negotiations was limited to what Royce told him.

mention of QHMC or of the covered employee groups. The record does not show that Quanex, or anyone else, had paid the $44,375 to CS by the time of trial.

The March 2003 bill was for services CS performed in 2002 "for the benefit of Quanex Corporation and QHMC". CS described most of the billable hours as time spent coordinating and negotiating the renewal of the Unicare PPO plan administration and analyzing the viability of integrating six additional divisions into the plan. The bill stated that CS was responsible for selecting various health care providers and for contracting claims runout services and terminations of vendors servicing five divisions. The bill charged $53,750 for 83 hours of work performed by Micale, Chapman, and Howard at a rate of $250 per hour and 264 hours of work performed by Speery at a rate of $125 per hour. The bill made no specific mention of QHMC or of the covered employee groups in its itemized work descriptions, and the record does not indicate that CS was paid the $53,750 by the time of trial.

b. *Wannell's Efforts*

Wannell had limited involvement with QHMC following the completion of the QHMC transactions. Between October 1997 and April 1999 Wannell did not attend any meetings regarding QHMC business, and he did not receive any calls or written materials from CS or with respect to work CS was doing. On one (and possibly a couple more) occasions, Royce called Wannell to tell him about the state of CS' work and to solicit Wannell's off-the-cuff comments on that work so that Royce could relay those comments to CS. Royce did not provide Wannell with any written material related to the work CS was doing.

Wannell did not attend the QHMC board meetings or shareholder meetings held on April 10, 2000, October 16, 2001, and October 1, 2002, but he did attend the meetings held on April 9, 1999, and April 17, 2001. Wannell was invited to attend all of the meetings, and he typically received advance notice of the topics and documents to be discussed from Royce, his main contact with respect to QHMC. With the exception of the two board meetings that Wannell did attend, his only QHMC contact was with Royce. Other than the ref-

erenced conversations with Royce, Wannell did not participate in any meeting regarding QHMC business in between the board meetings, nor was he asked to participate in any such meeting. QHMC did not institute any of the wellness programs that Wannell had instituted at LaSalle.

5. *Dividend Payments*

On April 21, 1999, QHMC paid a total of $3,088 in dividends to its class B and class C shareholders, which represented the annual dividend of $9.50 per share due for TYE 1998 and a quarterly dividend of $2.375 per share due for the first quarter of TYE 1999. After January 31, 1999, QHMC had no current or accumulated earnings and profits from which to pay dividends for the balance of TYE 1999 or for TYE 2000, TYE 2001, or TYE 2002, and QHMC paid no additional dividends for those years.

6. *Return on Investment Projections*

The minutes of QHMC's October 1, 2002, board meeting contained projections of the amounts CS and Wannell would be entitled to receive if QHMC was dissolved or liquidated. The computations were as follows:

|  | *TYE 1998* | *TYE 1999* | *TYE 2000* | *TYE 2001* |
|---|---|---|---|---|
| Actual medical costs | $2,656,249 | $3,396,854 | $3,685,133 | $4,390,632 |
| Divided by yearend headcount | 564 | 573 | 598 | 595 |
| Actual cost per employee | 4,710 | 5,928 | 6,162 | 7,379 |
| Percent change | - - - | 25.87% | 3.95% | 19.75% |
| Projected cost per employee | 5,257 | 5,625 | 5,996 | 6,372 |
| Projected percentage change | - - - | 7% | 6.6% | 6.27% |
| Difference in projected over actual | 547 | (303) | (166) | (1,007) |
| Times yearend headcount | 564 | 573 | 598 | 595 |
| Current year savings | 308,699 | (173,729) | (99,525) | (599,292) |
| Less consulting fees | -0- | (36,100) | -0- | -0- |
| Net savings | 308,699 | (209,829) | (99,525) | (599,292) |
| Cumulative prior-year savings | -0- | 308,699 | 98,870 | (655) |
| Total cumulative savings | 308,699 | 98,870 | (655) | (599,947) |
| Times 45% | 0.45 | 0.45 | 0.45 | 0.45 |
| Formula value | 138,915 | 44,492 | (295) | (269,976) |
| Less original investment | (26,000) | (26,000) | (26,000) | (26,000) |
| Net return to date | 112,915 | 18,492 | (295) | (269,976) |
| Return on investment | 434% | 71% | - - - | - - - |
| | | | | |
| *CS' portion of investment* | | | | |
| | | | | |
| Formula value | 80,143 | 25,668 | (170) | (155,755) |
| Less original investment | (15,000) | (15,000) | (15,000) | (15,000) |
| | | | | |
| Net return to date | 65,143 | 10,668 | (170) | (155,755) |

|  | TYE 1998 | TYE 1999 | TYE 2000 | TYE 2001 |
|---|---|---|---|---|
| *Wannell's portion of investment* | | | | |
| Formula value | 58,772 | 18,823 | (125) | (114,221) |
| Less original investment | (11,000) | (11,000) | (11,000) | (11,000) |
| Net return to date | 47,772 | 7,823 | (125) | (114,221) |

The record contains another set of projections of the amounts QHMC preferred shareholders would be entitled to receive in the event of liquidation or dissolution of QHMC. These computations were pursuant to the liquidation preferences described in QHMC's certificate, and projected, in part, as follows:

|  | 10/31/98 | 10/31/99 | 10/31/00 | 10/31/01 |
|---|---|---|---|---|
| Actual medical costs | $2,656,249 | $3,396,854 | $3,685,133 | $4,390,632 |
| (a) MPBs savings | 138,915 | 44,492 | -0- | -0- |
| (b) 50% of net equity | 19,055,451 | 18,875,986 | 18,725,324 | 18,480,107 |
| Formula value—lesser of (a) or (b) | 138,915 | 44,492 | -0- | -0- |
| Fixed payout rate per share | 125 | 125 | 125 | 125 |
| No. of preferred shares | 260 | 260 | 260 | 260 |
| Fixed payout | 32,500 | 32,500 | 32,500 | 32,500 |
| Greater of formula or fixed payout | 138,915 | 44,492 | 32,500 | 32,500 |
| Less original investment | 26,000 | 26,000 | 26,000 | 26,000 |
| Net return to date | 112,915 | 18,492 | 6,500 | 6,500 |
| Cumulative return on investment | 434% | 71% | 25% | 25% |
| Annual return on investment | 434% | 36% | 8% | 6% |
| CS return | 65,143 | 10,668 | 3,750 | 3,750 |
| Wannell return | 47,772 | 7,823 | 2,750 | 2,750 |

The record does not reflect that CS or Wannell received any payments from QHMC other than the dividend payments described above.

### 7. *QHMC's Tax Returns*

QHMC ceased to be a member of petitioners' affiliated group as of October 24, 1997, and QHMC filed a separate Federal income tax return for the short period October 24 through 31, 1997, and for each of its taxable years TYE 1998 through TYE 2001. QHMC reported the following on those returns:

|  | 10/31/97 | 10/31/98 | 10/31/99 | 10/31/00 | 10/31/01 |
|---|---|---|---|---|---|
| *Taxable income* | | | | | |
| Interest income | $31,667 | $2,850,000 | $2,850,000 | $3,221,555 | $3,636,390 |
| E'ee insurance & benefits | -0- | (2,776,666) | (3,200,059) | (3,761,512) | (4,390,632) |
| Legal & audit costs | -0- | (152,543) | -0- | -0- | -0- |
| Travel costs | -0- | -0- | (596) | -0- | (714) |
| Net income/(loss) | 331,667 | (79,209) | (350,655) | (539,957) | (754,956) |
| NOL carryover | -0- | 47,542 | 398,197 | 938,154 | 1,693,110 |

|  | *10/31/97* | *10/31/98* | *10/31/99* | *10/31/00* | *10/31/01* |
|---|---|---|---|---|---|
| *Schedule L balance sheet* | | | | | |
| Cash | 65,000 | 65,000 | 61,316 | 61,317 | 61,317 |
| Notes receivable | -0- | -0- | -0- | -0- | 38,316,667 |
| Total assets | 65,000 | 65,000 | 61,316 | 61,317 | 8,377,984 |
| Accounts payable | -0- | -0- | -0- | -0- | 1,437,295 |
| Accrued Fed. inc. tax | (11,083) | 21,390 | 144,119 | 20,175 | (19,523) |
| Intercompany liabilities | 38,031,667 | 37,946,241 | 37,596,182 | 37,369,153 | -0- |
| Total liabilities | 38,020,584 | 37,967,631 | 37,740,301 | 37,389,328 | 1,417,772 |
| Common stock | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 |
| Paid-in capital | 38,015,000 | 38,015,000 | 38,015,000 | 38,015,000 | 38,015,000 |
| Total stock | 38,065,000 | 38,065,000 | 38,065,000 | 38,065,000 | 38,065,000 |
| Retained earnings | 20,584 | (32,369) | (263,383) | (614,355) | (1,104,788) |
| S/H's equity (SE) | 38,085,584 | 38,032,631 | 37,801,617 | 37,450,645 | 36,960,212 |
| Total liabilities & SE | 65,000 | 65,000 | 61,316 | 61,317 | 38,377,984 |
| Distributions | -0- | -0- | 3,088 | -0- | -0- |

QHMC's 1997 return (for the short period) included three statements entitled "Statement Regarding Tax Free Contribution to Capital Pursuant to Regulation Section 1.351–3(b)". On the first statement, QHMC reported Quanex's October 23, 1997, contribution to QHMC of $62,000 and 1,000 shares of QHMC common stock in return for 500 shares of class A stock and 130 shares of class B stock. On the second statement, QHMC reported QS' October 25, 1997, contribution to QHMC of $38 million and $37,989,000 of MPBs in return for 110 shares of class C stock. On the third statement, QHMC reported CS' October 25, 1997, contribution to QHMC of $2,000 in return for 20 shares of class C stock.

8. *Financial Statements*

On its financial statements, QHMC reported net income (loss) of $19,116, $26,785, ($355,842), ($301,325), and ($490,433) for TYE 1997 through TYE 2001, respectively. In addition, QHMC reported equity of $38,084,116, $38,110,901, $37,751,972, $37,450,647, and $36,960,214 as of the end of each of those respective years. As discussed *infra*, QHMC's financial statements did not take into account QHMC's assumption of the transferred MPBs.

F. *Notice of Deficiency*

On or about November 20, 2000, respondent contacted Royce to inform petitioners that the IRS would be conducting

an examination of Quanex's 1997 return.[60] Approximately eight months later, on July 13, 2001, respondent hand-delivered and mailed to petitioners a notice of deficiency (notice) for TYE 1997. Respondent explained in the notice that he disallowed petitioners' claimed $37,989,000 short-term capital loss and that he correspondingly increased petitioners' capital gain income by $26,966,201. Respondent explained that he disallowed the loss because petitioners failed to establish that Quanex's basis in the stock exceeded $11,000; the loss arose from transactions "that have no economic substance or business purpose, were entered into solely for tax avoidance, and were prearranged and predetermined"; and petitioners failed to establish that the loss otherwise met the deduction requirements under the Code.

Respondent further explained, as an alternative to the reasons previously stated, that he had disallowed the loss because either (1) the "purported nonrecognition transaction" did not meet the requirements of section 351, including but not limited to the business purpose requirement, so that Quanex's basis was determined by section 1001 (as opposed to a carryover basis); (2) QHMC's assumption of the MPBs reduced the basis of the stock received in the exchange pursuant to section 358(d)(1) because the MPBs obligation is not a liability excluded under section 357(c)(3); or (3) the principal purpose of the transfer of the MPBs was not a bona fide business purpose such that section 357(b) applied, the assumption of the liability was a distribution of money, and Quanex's basis was reduced by $37,989,000. Respondent further explained, as yet another alternative, that he had dis-

---

[60] The parties stipulated that respondent's revenue agents interviewed Rose on March 23, 2001, and that one of the agents stated during the interview that

we (IRS) recognize Quanex's business purpose for needing better management and control over its medical costs. It was explained that we (IRS) are concerned only with the tax consequences of the transaction and that we do not try to tell taxpayers how to run their business. It was explained to Mr. Rose that our concern was that Quanex had converted a contingent liability into a short-term capital loss.

Respondent reserved an objection to the admissibility of this stipulation on the ground of relevance. Although we deferred ruling on the admissibility of this stipulation at trial, the comments of a revenue agent during an audit are generally not relevant, and we shall sustain respondent's objection to the admissibility of this stipulation. *See Greenberg's Express, Inc. v. Commissioner*, 62 T.C. 324, 327–328 (1974) (holding that the Court decides deficiency cases on a de novo basis and that events during an audit, with limited exceptions none of which is applicable here, are irrelevant to our de novo review); *see also Rountree Cotton Co. v. Commissioner*, 113 T.C. 422, 426 (1999), *aff'd*, 12 Fed. Appx. 641 (10th Cir. 2001); *Barnes v. Commissioner*, T.C. Memo. 2004–266.

allowed the loss because (1) the loss is disallowed under section 1.1502–20, Income Tax Regs., (2) petitioners deconsolidated QHMC with the intent to avoid section 1.1502–20, Income Tax Regs., (3) QHMC was not treated as holding a member security as of the time of the sale, and (4) petitioners transferred an asset within two years by direct or indirect disposition, or a deconsolidation of stock, with a view to avoid the disallowance of a loss on the disposition, or a basis reduction on the deconsolidation of stock of a subsidiary, or the recognition of unrealized gain.

Respondent also stated in the notice that the deficiency resulted from petitioners' improperly deducting expenses. To that end, respondent stated, he disallowed $323,137 of outside consultant expenses and $29,114 of legal and audit expenses that petitioners deducted with respect to the "reorganization/recapitalization and sale of the stock" of QHMC because these expenses were not ordinary and necessary.

With respect to the accuracy-related penalty under section 6662, respondent determined that the 40% accuracy-related penalty of section 6662(a) and (h) (or alternatively the 20% accuracy-related penalty under section 6662(a) and (b)(1) (or alternatively (b)(2))) applied to the portion of the underpayment attributable to a gross valuation misstatement (or alternatively negligence or disregard of rules or regulations (or alternatively a substantial understatement of income tax)) with respect to the class C stock. Respondent also determined that petitioners were liable for the 20% accuracy-related penalty under section 6662(a) and (b)(1) (or alternatively (b)(2)) to the extent of the underpayment attributable to the erroneous deductions. In none of those cases, respondent stated, had petitioners shown that they had reasonable cause for the underpayment and had acted in good faith.

OPINION

## I. *Burden of Proof*

Taxpayers generally bear the burden of proof in this Court. Rule 142(a)(1). However, if a taxpayer produces credible evidence with respect to one or more factual issues relevant to ascertaining the taxpayer's Federal income, estate, or gift tax

liability, the burden of proof may shift to the Secretary as to that issue (or those issues). *See* sec. 7491(a)(1). Section 7491(a)(1) applies to court proceedings arising in connection with examinations that the Commissioner commences after July 22, 1998. *See Williams v. Commissioner*, 123 T.C. 144, 146 n.3 (2004); *Nis Family Trust v. Commissioner*, 115 T.C. 523, 537 (2000). Section 7491(a)(1) applies to this proceeding because respondent informed Royce in late 2000 that the IRS would be conducting an examination of petitioners' 1997 return.

For the burden of proof to shift to respondent under section 7491(a)(1), petitioners must prove that they met the following requirements of section 7491(a)(2): (1) petitioners substantiated any item as required by the Code, (2) petitioners maintained all records required by the Code, and (3) petitioners cooperated with respondent's reasonable requests for witnesses, information, documents, meetings, and interviews. Section 7491(a)(2)(C) also requires that in order to shift the burden of proof, a taxpayer that is a partnership, a corporation, or a trust (other than a qualified revocable trust as defined in section 645(b)(1)) must meet the requirements of section 7430(c)(4)(A)(ii) (which in turn references the net worth requirements of 28 U.S.C. sec. 2412(d)(2)).

Petitioners do not argue that section 7491(a)(1) shifts the burden of proof to respondent in this case. In addition, petitioners have not established (nor do we find) that they satisfied the requirements of section 7491(a)(2). We hold that section 7491(a)(1) does not shift the burden of proof to respondent. *See Goosen v. Commissioner*, 136 T.C. 547, 558 (2011); *Stipe v. Commissioner*, T.C. Memo. 2011–92.

## II. *Witness Testimony*

### A. *Background*

We observe the candor, sincerity, and demeanor of each witness in order to evaluate his or her testimony and assign it weight for the primary purpose of finding disputed facts. We determine the credibility of each witness, weigh each piece of evidence, draw appropriate inferences, and choose between conflicting inferences in finding the facts of a case. The mere fact that one party presents unopposed testimony on that party's behalf does not necessarily mean that the

elicited testimony will result in a finding of fact. We will not accept the testimony of witnesses at face value if we find that the outward appearance of the facts in their totality conveys an impression contrary to the spoken word. *See Neonatology Assocs., P.A. v. Commissioner*, 115 T.C. 43, 84 (2000), *aff'd*, 299 F.3d 221 (3d Cir. 2002); *cf. Gallick v. Balt. & Ohio R.R. Co.*, 372 U.S. 108, 114–115 (1963); *Boehm v. Commissioner*, 326 U.S. 287, 293 (1945); *Wilmington Trust Co. v. Helvering*, 316 U.S. 164, 167–168 (1942).

B. *Fact Witnesses*

Petitioners and respondent called six and four witnesses, respectively, to testify as to the facts of this case. Petitioners' fact witnesses were Wannell, Peery, Rose, Singer, Chapman, and Royce. Respondent's fact witnesses were Schneider, Parikh, Ringuette, and Howard. To the extent we disregarded or discounted any of the testimony of these witnesses, we generally perceived the witnesses giving that testimony to be untrustworthy during that testimony or considered the testimony self-serving, vague, elusive, uncorroborated, and/or inconsistent with documentary or other reliable evidence. We are not required to rely on testimony that we consider to be untrustworthy and/or unreliable, and we do not rely on any such testimony given in these cases to support either our findings of fact or our decisions with respect to the issues at hand.[61] *See Neonatology Assocs., P.A. v. Commissioner*, 115 T.C. at 84–87; *see also Tokarski v. Commissioner*, 87 T.C. 74, 77 (1986).

C. *Expert Witnesses*

1. *Background*

a. *Overview*

On direct examination, each party called one witness to testify as an expert. Petitioners' witness was Bruce A. Strombom, Ph.D. Respondent's witness was David J. Ross. Petitioners also called David M. Eisenstadt, Ph.D., to testify as an expert in rebuttal of some of Ross' testimony.

---

[61] We have noted in our findings of fact some examples of the testimony of the fact witnesses that we have decided not to rely upon.

Respondent recalled Ross to testify as an expert in rebuttal of some of Strombom's testimony.

b. *Strombom*

Strombom has a B.A. in economics and a Ph.D. in economics. He is employed as the vice president of an international economic, financial, and consulting firm, and most of his work involves the health care industry. He has published various articles in the area of his practice.

Strombom concluded that the QHMC transactions have economic substance and a business purpose.

c. *Ross*

Ross has a B.A. in economics and an M.B.A. He works as the senior vice president of a consulting firm that specializes in applying economics to legal and regulatory issues, and he specializes (and has published articles) in financial economics and the economics of corporate law. He has previously testified as an expert in this and other courts.

Ross concluded that it was virtually certain that either QHMC or its preferred shareholders, if each acted rationally, would exercise their redemption rights by October 2004. Ross also concluded that the preferred stock is limited and preferred as to dividends and does not participate in corporate growth in any meaningful way. Ross also concluded that the QHMC transactions were not necessary to provide incentives to CS and Wannell and that petitioners effectively retained their economic interest in the assets and liabilities transferred to QHMC.

d. *Eisenstadt*

Eisenstadt has a B.S. in economics, an M.S. in economics, and a Ph.D. in economics. He works as an economist and a principal of a consulting and research firm. He has published various articles in the area of his practice.

Eisenstadt concluded that Ross concluded incorrectly that it was virtually certain that either QHMC or its preferred shareholders, if each acted rationally, would exercise their redemption rights by October 2004. Eisenstadt also concluded that Ross concluded incorrectly that the preferred stock is limited and preferred as to dividends and does not

participate in corporate growth in any meaningful way. Eisenstadt did not opine as to any of Ross' other conclusions.

2. *Analysis*

The Court recognized each of the proffered expert witnesses as an expert on his proffered area of expertise. Each expert then testified on direct examination primarily through his expert report, *see* Rule 143(g)(1), which the Court accepted into evidence. Each expert then testified on cross-examination, redirect examination, and re-cross-examination, through the typical question and answer process.

We may accept or reject the findings and conclusions of these experts, according to our own judgment. *See Parker v. Commissioner*, 86 T.C. 547, 561–562 (1986). In addition, we may be selective in deciding what parts (if any) of their opinions to accept. *See id.* As discussed herein, we generally found Ross' conclusions to be more persuasive than those of the other two experts.

III. *Net Short-Term Capital Loss*

A. *Overview*

We now decide whether petitioners may deduct their claimed short-term capital loss from the sale of the class C stock. The parties agree that petitioners may not deduct the claimed loss if we decide any of the following six subissues in favor of respondent:

1. whether the class C stock participates in corporate growth to any significant extent for purposes of section 351(g);

2. whether QHMC's assumption of the MPB obligations constituted "other property" received by QS, within the meaning of section 358(a)(1)(A)(i);

3. whether, for purposes of section 358(d), payment of the MPB obligations "would give rise to a deduction" within the meaning of section 357(c)(3)(A)(i), or if not, whether the incurrence of the MPB obligations "resulted in the creation of, or an increase in, the basis of any property" within the meaning of section 357(c)(3)(B);

4. whether petitioners' principal purpose with respect to QHMC's assumption of the MPB obligations was a bona fide business purpose under section 357(b)(1)(B);

5. whether the QHMC transactions lacked sufficient business purpose or economic substance or effect to be recognized for Federal income tax purposes; and

6. whether the step transaction doctrine applies to recharacterize petitioners' sale of the class C stock to Wannell as QHMC's issuance of the stock to Wannell.

We proceed to address these subissues to the extent necessary.

### B. *Section 351(g)*

The parties dispute whether the class C stock was "preferred stock" within the meaning of section 351(g)(3)(A), and they agree that the resolution of this dispute turns on whether the class C stock, as of the time it was issued, "participate[d] in corporate growth to any significant extent" within the meaning of section 351(g)(3)(A). Petitioners argue that the class C stock was not such preferred stock because, they state, the class C stock participated significantly in QHMC's corporate growth through the formula value. Respondent argues that the class C stock was such preferred stock because, he states, the class C stock did not participate significantly in QHMC's corporate growth. If the class C stock participated in QHMC's corporate growth to a significant extent, then the parties agree that the class C stock is not "preferred stock" (and thus is not nonqualified preferred stock (NQPS)) for purposes of section 351(g). If the class C stock did not so participate, then the parties agree that the class C stock is "preferred stock" (and further that the class C stock is NQPS) for purposes of section 351(g). We agree with respondent that the class C stock is "preferred stock" within the meaning of section 351(g)(3)(A) and, hence, that the stock is NQPS.

Section 1001 requires that a taxpayer recognize any gain or loss realized on the sale or exchange of property, absent a contrary provision in subtitle A of the Code. One such contrary provision is section 351(a), which generally provides that no gain or loss is recognized where one or more persons transfer property to a corporation solely in exchange for stock of the corporation if the transferor(s) control the corporation immediately after the exchange. Where a transferor in such an exchange receives only stock, the transferor's basis in the

stock is the same as the transferor's basis in the transferred property, *see* sec. 358(a)(1), such that the transferor, upon sale of the stock, will generally then recognize any unrecognized gain or loss that inhered in the transferred property as of the time of its transfer. Where, however, the transferee corporation assumes a liability of the transferor incident to receiving the transferred property, then the transferor's basis in the received stock is reduced by the amount of the assumed liability, unless (in relevant part) the payment of the assumed liability "would give rise to a deduction". *See* sec. 358(a)(1), (d); *see also* sec. 357(c)(3).

Section 351(a) does not apply to the extent that the transferee's stock received in the exchange is NQPS. *See* sec. 351(g)(1). Section 351(b) requires that a transferor recognize any inherent gain in property transferred to a corporation in a section 351 exchange, to the extent of the amount of money and the fair market value of "other property" received in return, and NQPS is "other property" for that purpose. *See* sec. 351(g)(1)(B). If the only stock received by the transferor(s) in the exchange is NQPS, then the transfer is completely outside the nonrecognition rule of section 351(a). *See* sec. 351(g)(1). The parties agree that, if the class C stock is NQPS, then the basis in the class C stock sold to Wannell was $11,000 as of the time of that sale (rather than the claimed basis of $38 million) and, accordingly, that the sale did not result in the claimed loss.

Section 351(g) was added to the Code as part of the Taxpayer Relief Act of 1997, Pub. L. No. 105–34, sec. 1014(a), 111 Stat. at 919, generally effective for transactions after June 8, 1997. The special rule for NQPS was included in section 351 to remove from that nonrecognition provision "certain exchange transactions" where an "investor has * * * obtained a more secure form of investment" in the form of "preferred stock". *See* H.R. Rept. No. 105–148, at 472 (1997), 1997–4 C.B. (Vol. 1) 319, 794. For this purpose, "preferred stock" is "stock which is limited and preferred as to dividends and does not participate in corporate growth to any significant extent." *See* sec. 351(g)(3)(A). With limited exceptions, none of which is applicable here, this preferred stock is then "nonqualified" (and thus NQPS) if the preferred stock meets any of the following four conditions: (1) the holder of the stock may require the issuer or a related person to

redeem or purchase the stock, (2) the issuer or a related person must redeem or purchase the stock, (3) the issuer or a related person may redeem or purchase the stock and, as of the issue date, it is more likely than not that this right will be exercised, or (4) the dividend rate on the stock varies in whole or in part (directly or indirectly) with reference to interest rates, commodity prices, or other similar indices. *See* sec. 351(g)(2)(A); *see also* sec. 351(g)(2)(B) and (C).

Neither the statute, the regulations, nor the legislative history of section 351(g) defines the phrase "participate in corporate growth to any significant extent" for purposes of section 351(g)(3)(A). However, the regulations under section 305, which detail the tax consequences of certain distributions of stock and stock rights, use the same phrase to define the term "preferred stock" for purposes of section 305. Both parties rely upon those regulations under section 305 to interpret the phrase "participate in corporate growth to any significant extent" for purposes of section 351(g)(3)(A). So do we. *See also* 2 Martin D. Ginsburg & Jack S. Levin, Mergers, Acquisitions, and Buyouts, par. 604.3.1.1, at 6–87 (2012); 11 Jacob Mertens, Law of Federal Income Taxation, sec. 43.8 (2011). We also note that the definition of the term "preferred stock" as set forth in section 351(g)(3)(A) mirrors the text of section 1504(a)(4)(B), which is part of the description of preferred stock that is deemed not to be stock for purposes of determining the members of an affiliated group. We understand the principle there to be that "stock" described in section 1504(a)(4) has a limited claim on the earnings and equity of the issuer and, thus, is more akin to debt than to equity.

Section 1.305–5(a), Income Tax Regs., contains regulations under section 305 that are relevant to our analysis.[62] Those

---

[62] Sec. 1.305–5(a), Income Tax Regs., states in relevant part:

The term "preferred stock" generally refers to stock which, in relation to other classes of stock outstanding, enjoys certain limited rights and privileges (generally associated with specified dividend and liquidation priorities) but does not participate in corporate growth to any significant extent. The distinguishing feature of "preferred stock" for the purposes of section 305(b)(4) is not its privileged position as such, but that such privileged position is limited and that such stock does not participate in corporate growth to any significant extent. However, a right to participate which lacks substance will not prevent a class of stock from being treated as preferred stock. Thus, stock which enjoys a priority as to dividends and on liquidation but which is entitled to participate, over and above such priority, with another less privileged class of stock in earnings and profits and upon liquidation, may nevertheless be treated as preferred stock for purposes of section 305 if, taking into account all the facts and circumstances, it is reasonable

Continued

regulations describe corporate growth for purposes of section 305(b)(4) with reference to the corporation's earnings and rights upon liquidation and indicate that the substance of a stock's right to participate in corporate growth controls over mere written declarations that the stock is allowed to so participate. The regulations also indicate that in order for stock not to be characterized as "preferred stock", the attributes of the stock, when considered in the setting of the surrounding facts as of the time the stock is issued, must establish that it is reasonably likely that the stock will meaningfully participate in corporate earnings and growth beyond the stock's preferred limited interests.[63] For this purpose, a corporation's earnings and growth are best evidenced through the corporation's payment of dividends and an increase in the corporation's equity (e.g., through a retention of earnings, asset appreciation, or contributions), and the ability of a class of stock to participate in its issuer's earnings and growth is best evidenced through the extent to which the stock is entitled to receive dividends and liquidation (including by way of the stock's redemption) proceeds representing the corporation's increased equity. Preferred stock is generally more akin to a secure form of debt than it is to a less secure form of equity in that preferred stock characteristically is entitled to receive without regard to corporate profits a set share of corporate earnings and/or liquidation proceeds (if not redeemed earlier). "Preferred stock" for purposes of sections 305 and 351(g) follows this characterization in that it enjoys limited rights and privileges with regard to dividends and liquidation proceeds and does not meaningfully participate in corporate growth beyond this amount.

---

to anticipate at the time a distribution is made (or is deemed to have been made) with respect to such stock that there is little or no likelihood of such stock actually participating in current and anticipated earnings and upon liquidation beyond its preferred interest. Among the facts and circumstances to be considered are the prior and anticipated earnings per share, the cash dividends per share, the book value per share, the extent of preference and of participation of each class, both absolutely and relative to each other, and any other facts which indicate whether or not the stock has a real and meaningful probability of actually participating in the earnings and growth of the corporation. * * *

[63] Petitioners gauge this reasonableness through the eyes of the class C shareholders, namely, CS and Wannell. We do not do the same. The answer to the question of whether stock participates in corporate growth under sec. 351(g) or sec. 1.305–5(a), Income Tax Regs., turns on a consideration of the attributes of that stock in the setting at hand, and a shareholder's subjective expectations in buying the stock carry no weight in deciding that answer.

The class C stock fits squarely within the section 351(g)(3)(A) definition of "preferred stock" as gleaned from its text (and the text of section 1504(a)(4)), from the legislative history under section 351(g), and from the referenced regulations under section 305. In relation to QHMC's common stock (i.e., the class A stock), the class C stock enjoys set preestablished limited rights and privileges as to dividends and liquidation proceeds and does not participate in QHMC's growth to a significant extent. In lieu of giving its holders a significant interest in QHMC's corporate growth, the class C stock gives its holders a guaranteed fixed annual income preference in the form of a set, cumulative dividend and, upon that stock's redemption (including incident to QHMC's liquidation), a fixed payout that is unrelated to QHMC's corporate growth (and, as of the time the stock was issued, was most likely to be $125 per share). While the class C stock by its terms states that its holders are entitled to receive redemption payments determined on the basis of cost savings or net equity, if those amounts are greater than $125 per share, this entitlement is meaningless in that the redemption provisions merely allow the class C shareholders to potentially share in the MPB cost savings, an allowance which under the facts herein is not akin to sharing in QHMC's corporate growth. Moreover, this entitlement is unlikely to occur. Instead, as we find, the expected return on each share of the class C stock, when viewed as of the time the class C stock was issued, was capped at, and was intended and understood to be, 9.5% annually and $125 upon its redemption in five to seven years.

The parties do not dispute the fact that the class C stock's right to receive QHMC's earnings annually is preferred, fixed, and limited. The class C stock, which QHMC specifically designated and labeled as preferred stock (as opposed to common stock), entitles its holders to receive from QHMC's surplus or net profits, when and as declared by QHMC's board, annual dividends of $9.50 per share, and these dividends are cumulative and payable for the current year and for all previous years before any dividend may be paid on QHMC's common stock. The class C shareholders may not participate in or receive any dividends or share of profits, whether payable in cash, stock, or property, in excess of these dividends. The class C shareholders' ability to partici-

pate significantly in corporate growth, therefore, rests on their redemption rights. [64]

Respondent argues that the class C stock's redemption rights do not give the class C shareholders a meaningful interest in QHMC's corporate growth. We agree. Any participation rights formally set forth in the redemption provisions applicable to the class C stock are illusory in that the class C shareholders, upon redemption of their stock, are reasonably foreseen, as of the time that the class C stock was issued, to be entitled to receive only a preferred and limited amount of QHMC's assets equal to $125 a share. Contrary to petitioners' position, the formula value will not operate to allow those shareholders to receive more than that set amount. The formula value is simply a clever facade disguising the fact that the class C shareholders have no meaningful rights to the liquidation proceeds of QHMC beyond the $125-per-share preferred amount. While the formula value on its face was carefully and artfully tailored to appear to allow for the possibility of a larger payout upon the class C stock's redemption, the formula value also was carefully and artfully tailored so that the possibility of a larger payout lacks any meaningful substance in that "it is reasonable to anticipate at the time a distribution is made (or is deemed to have been made) with respect to such stock that there is little or no likelihood of such stock actually participating in current and anticipated earnings and upon liquidation beyond its preferred interest." Sec. 1.305–5(a), Income Tax Regs. In fact, as we conclude from the record at hand, when the class C stock was issued, the reasonable likelihood was that the stock would fail to meaningfully participate in corporate earnings at all, given that QHMC had no accumulated earnings when the class C stock was issued and that QHMC was reasonably expected to have little to no earnings before the class C stock was most likely to be redeemed.

Petitioners rely heavily upon the "cumulative net savings" prong of the formula value to argue that the class C shareholders have an opportunity to participate in QHMCs' growth and earnings beyond their preferred interest. As petitioners see it, the class C shareholders participate in QHMC's growth

---

[64] We use the term "redemption rights" to include the class C shareholders' rights upon QHMC's liquidation or upon QHMC's earlier redemption of those shares.

on the basis of cost savings produced in managing the MPB obligations. In other words, they state, the greater the amount of savings, the more the QHMC class shareholders may participate in QHMC's growth. We see things differently.

The redemption provisions apply when QHMC is liquidated, if QHMC exercises its call option after September 30, 2002, or if a class C shareholder exercises the shareholder's put option after September 30, 2004. When one of those events occurs, a class C shareholder is entitled to receive the greater of $125 per share or the formula value. The formula value is stated to be the amount that is the lesser of: (1) 45% of the cumulative cost savings as to the MPBs or (2) 50% of the net equity (i.e., assets minus liabilities) as of the time of redemption, as shown on QHMC's books and records through the application of Generally Accepted Accounting Principles.

Thus, under the redemption provisions, when $125 is greater than or equal to the formula value, class C shareholders are entitled to receive no more than $125 for each of their shares. In that circumstance, the class C shareholders' right to participate in liquidation proceeds is capped at $125 per share, and class C shareholders may not participate in QHMC's liquidation proceeds beyond the stock's limited preference.

If, on the other hand, $125 is less than the formula value, then the class C shareholders are entitled to receive the amount of the formula value. In that case, Ross tells us (and we agree), any redemption payment to the preferred shareholders would depend solely on cumulative cost savings, not on the amount of net equity, no matter how much QHMC may realistically grow. Such is so, Ross explains, because 50% of net equity will under the facts herein always exceed 45% of the MPB cash savings, and the net equity component of the formula value will therefore never control the formula value. This is partly because QHMC's net equity as of the start of the QHMC transactions was artificially high because the MPB obligations transferred to QHMC were neither reportable nor reported as a liability under Generally Accepted Accounting Principles, and QHMC's net equity was anticipated to remain artificially high through the end of TYE 2011. [65] The "lesser

---

[65] All three experts agreed that the net equity component of the formula value would not be triggered through at least the end of TYE 2011. While Strombom and Eisenstadt concluded that

Continued

of" provision in the formula value, therefore, eliminated any realistic possibility that the class C stock would participate in QHMC's net equity.

As to the formula value's cost savings provision, this provision does not amount to a participation in corporate growth. The redemption provisions gave the preferred shareholders an interest in reducing the amount of the MPB obligations assumed by QHMC, as opposed to participating in QHMC's corporate growth, and reducing those obligations will not necessarily generate earnings for QHMC or otherwise cause QHMC to grow following the issuance of the class C stock. QHMC's sole source of income was interest, and under each of D&T's cashflow models, QHMC's interest income for 1998 through 2012 was projected to be substantially less than the projected MPB costs. MPB costs would have to be reduced by an amount significantly higher than petitioners' projections for QHMC to have earnings; and we are not persuaded that, when the class C stock was issued, it was probable that those costs would be so reduced in the relevant future. In addition, even if QHMC were to have grown as of the time of the class C stock's redemption (e.g., it invested its assets profitably), the class C shareholders would receive none of that growth if there were no cost savings. Instead, the benefit of the growth in that case would go only to Quanex, as the holder of QHMC's common stock.[66] We conclude that the cost savings component of the formula value does not allow the class C stock to participate in QHMC's corporate growth.

the net equity component could be operative in TYE 2012, Ross has persuaded us that their conclusion is wrong because, when the class C stock was issued, the preferred stock was reasonably foreseen to be redeemed before TYE 2012. As Ross noted, QHMC's preferred stock had a five- and seven-year redemption right, and it was virtually certain that the class B and class C stocks, if the shareholders and QHMC acted reasonably, would be redeemed by October 2004. Such is so because by that time, (1) the value that QHMC would have to pay the preferred shareholders upon exercise would be less than the value QHMC would have to pay the shareholders in the absence of exercise (namely, future dividends and other amounts resulting from the stock's redemption) or (2) the shareholders' exercise price would be greater than the value QHMC would have to pay them in the absence of exercise. Thus, Ross noted (and we agree), as of the time that the preferred stock was issued, either QHMC or the preferred shareholders would consider it economical to redeem the preferred shares at their earliest opportunity; i.e., no later than October 2004. Ross also opined persuasively that Quanex had an economic incentive to redeem the preferred stock as soon as it could (October 1, 2002) because, if it did, then Quanex could deduct all of the MPB expenses incurred, which amount was most likely going to be larger than the corresponding interest expense Quanex deducted.

[66] Further, QHMC's reduction of costs did not necessarily mean that QHMC would grow, e.g., any cost reduction could be accompanied by a decline in the value of QHMC's assets. Yet if the cost savings exceeded the $125 threshold, the additional cost savings would increase the redemption price without a corresponding growth of QHMC.

In sum, we find that the class C stock vis-a-vis QHMC's common stock enjoys certain limited and preferred rights and privileges associated with dividend and liquidation priorities and that the class C stock, as of the time the stock was issued, did not actually allow the holders thereof to participate in QHMC's corporate growth to a significant extent. We hold that the class C stock is NQPS. Given the parties' agreement that such a holding means that petitioners are not entitled to deduct the short-term capital loss, we reach the same conclusion.

### C. *Economic Substance Doctrine*

#### 1. *Overview*

Given our just-stated holding, we need not decide any of the parties' other disputes as to the claimed loss. We bear in mind, however, that respondent maintains that the QHMC transactions are disregarded for Federal income tax purposes under the economic substance doctrine and that two Courts of Appeals have discussed this doctrine in the setting of similarly structured transactions. *See Coltec Indus., Inc. v. United States*, 454 F.3d 1340 (Fed. Cir. 2006); *Black & Decker Corp. v. United States*, 436 F.3d 431 (4th Cir. 2006).[67] We also note that respondent determined that the fees incurred to effect the QHMC transactions were not ordinary and necessary business expenses and clarifies in his brief that such is so because those transactions lacked economic substance. We consider it necessary to decide whether the QHMC transactions had economic substance, and we proceed to do so.

---

[67] In *Black & Decker Corp. v. United States*, 436 F.3d 431, 433 (4th Cir. 2006), a taxpayer transferred $561 million to a controlled subsidiary in exchange for stock in the subsidiary and the subsidiary's assumption of $560 million in contingent medical liabilities. The taxpayer claimed that its basis in the subsidiary's stock was $561 million and that it realized a $560 million capital loss when it sold the stock for $1 million. *Id.* at 434–438. The taxpayer claimed that the liabilities were excluded under sec. 357(c)(3) and that, under sec. 358(d)(2), the taxpayer did not need to reduce its basis in the subsidiary stock by the liabilities assumed by the subsidiary. *Id.* at 434. In *Coltec Indus., Inc. v. United States*, 454 F.3d 1340, 1344 (Fed. Cir. 2006), the taxpayer transferred $375 million to one of its subsidiaries in exchange for stock in the subsidiary and the subsidiary's assumption of contingent asbestos-related liabilities against the taxpayer. The taxpayer claimed that the liabilities were excluded under sec. 357(c)(3) and, under sec. 358(d)(2), did not reduce its basis in the subsidiary stock. *Id.* at 1345–1346. The taxpayer asserted a $379.2 million basis in the subsidiary stock and claimed a $378.7 million loss when it sold the stock for $500,000. *Id.*

## 2. *Standard of Analysis*

D&T and Quanex structured the QHMC transactions as an elaborate and devious multistep transaction, each individual step of which D&T promoted as meeting a literal reading of the Code, the regulations thereunder, and various judicial and administrative interpretations. The essence of the transactions, however, was simply to create an artificial multi-million-dollar tax loss that petitioners could report as an offset to their unrelated capital gains of a similar amount. Although taxpayers may structure their business transactions in a manner that produces the least amount of tax, *see Boulware v. United States*, 552 U.S. 421, 430 n.7 (2008) (citing *Gregory v. Helvering*, 293 U.S. 465, 469 (1935)); *Compaq Computer Corp. v. Commissioner*, 277 F.3d 778, 781 (5th Cir. 2001), *rev'g* 113 T.C. 214 (1999), the economic substance doctrine requires that a court disregard a transaction that a taxpayer enters into without a valid business purpose in order to claim tax benefits not contemplated by a reasonable application of the language and the purpose of the Code or the regulations thereunder,[68] *see, e.g.*, *ACM P'ship v. Commissioner*, 157 F.3d 231, 248 (3d Cir. 1998), *aff'g in part, rev'g in part* T.C. Memo. 1997–115; *Rice's Toyota World, Inc. v. Commissioner*, 752 F.2d 89, 91–92 (4th Cir. 1985), *aff'g in part, rev'g in part* 81 T.C. 184 (1983); *New Phoenix Sunrise Corp. & Subs. v. Commissioner*, 132 T.C. 161 (2009), *aff'd*, 408 Fed. Appx. 908 (6th Cir. 2010); *Blum v. Commissioner*, T.C. Memo. 2012–16; *Palm Canyon X Invs., LLC v. Commissioner*, T.C. Memo. 2009–288. Such a transaction is disregarded even though it may otherwise comply with the literal terms of the Code and the regulations thereunder. *See, e.g.*, *Coltec Indus., Inc.*, 454 F.3d at 1351–1355.

While the origin of the economic substance doctrine is generally traced to the Supreme Court's holding in *Gregory v. Helvering*,[69] 293 U.S. 465, current application of the doctrine

---

[68] Congress codified the economic substance doctrine mostly as articulated by the U.S. Court of Appeals for the Third Circuit in *ACM P'ship v. Commissioner*, 157 F.3d 231, 247–248 (3d Cir. 1998), *aff'g in part, rev'g in part* T.C. Memo. 1997–115. *See* sec. 7701(o) (as added to the Code by the Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111–152, sec. 1409, 124 Stat. at 1067; *see also* H.R. Rept. No. 111–443(I), at 291–299 (2010), 2010 U.S.C.C.A.N. 123, 222–231. The codified doctrine does not apply here, pursuant to its effective date.

[69] In *Gregory v. Helvering*, 293 U.S. 465, 469–470 (1935), the Supreme Court held that a reorganization complying with formal statutory requirements was disregarded for tax purposes because the creation and immediate liquidation of the transferee corporation was an attempt to

stems primarily from the Supreme Court's decision in *Frank Lyon Co. v. United States*, 435 U.S. 561 (1978). In *Frank Lyon Co.*, 435 U.S. at 566–568, the taxpayer borrowed $7.1 million from one bank, bought a building from another bank for $7.6 million, and leased the building back to the same bank which had sold the property for rent equal to the taxpayer's payments of principal and interest on the $7.1 million loan. The taxpayer claimed depreciation deductions on the building and interest deductions on the loan and reported the payments from the bank as income from rent. *Id.* at 573. The United States argued that the transaction should be disregarded because it was merely an elaborate financing scheme designed to manufacture tax deductions. *Id.* The Court disagreed, holding that the transaction was not a sham. *Id.* at 583–584. The Court set forth the following standard for determining when a transaction should be respected for tax purposes:

[W]here, as here, there is a genuine multiple-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached, the Government should honor the allocation of rights and duties effectuated by the parties. * * * [*Id.*]

The Courts of Appeals have construed the quoted language as creating an economic substance doctrine with the following two prongs: (1) whether the transaction had economic substance beyond tax benefits (objective prong), and (2) whether the taxpayer had a nontax business purpose for entering the disputed transaction (subjective prong). *See, e.g.*, *ACM P'ship v. Commissioner*, 157 F.3d at 247–248; *Bail Bonds by Marvin Nelson, Inc. v. Commissioner*, 820 F.2d 1543, 1549 (9th Cir. 1987), *aff'g* T.C. Memo. 1986–23; *Rice's Toyota World, Inc. v. Commissioner*, 752 F.2d at 91–92. The Courts of Appeals are split on the proper weight to be given to these prongs in deciding whether to respect a transaction

---

convert ordinary income into capital gain. The Court recognized the right of a taxpayer to avoid the payment of tax through legal means but noted that "the question for determination is whether what was done, apart from the tax motive, was the thing which the statute intended." *Id.* at 469. The Court examined the applicable statutory text and held that the taxpayer had not formed a corporation within the intended meaning of the statute. *Id.* at 470. The Court stated that the undertaking was "in fact an elaborate and devious form of conveyance masquerading as a corporate reorganization, and nothing else" and "upon its face lies outside the plain intent of the statute." *Id.*

under the economic substance doctrine, and alternative approaches have emerged. Some Courts of Appeals apply a disjunctive analysis, under which a transaction is valid if it has economic substance or a business purpose. *See, e.g.*, *Horn v. Commissioner*, 968 F.2d 1229, 1236–1238 (D.C. Cir. 1992), *rev'g Fox v. Commissioner*, T.C. Memo. 1988–570; *Rice's Toyota World, Inc. v. Commissioner*, 752 F.2d at 91. Other Courts of Appeals apply a conjunctive analysis, under which a transaction is valid only if the transaction has economic substance beyond tax objectives and the taxpayer had a nontax business purpose for entering into the transaction. *See Dow Chem. Co. v. United States*, 435 F.3d 594, 599 (6th Cir. 2006); *Winn-Dixie Stores, Inc. v. Commissioner*, 254 F.3d 1313, 1316 (11th Cir. 2001), *aff'g* 113 T.C. 254 (1999); *United Parcel Serv. of Am., Inc. v. Commissioner*, 254 F.3d 1014, 1018 (11th Cir. 2001), *rev'g* T.C. Memo. 1999–268. Still other Courts of Appeals adhere to the view that a lack of economic substance is sufficient to invalidate the transaction regardless of whether the taxpayer has motives other than tax avoidance. *See, e.g.*, *Coltec Indus., Inc.*, 454 F.3d at 1355. And still other Courts of Appeals treat the objective and subjective prongs merely as factors to consider in determining whether a transaction has any practical economic effects beyond tax benefits. *See, e.g.*, *ACM P'ship v. Commissioner*, 157 F.3d at 248.

Under *Golsen v. Commissioner*, 54 T.C. at 757, we follow a holding of a court to which appeal lies that is squarely on point. The Court of Appeals for the Fifth Circuit, to which this case is appealable absent a stipulation to the contrary, has interpreted the economic substance test delineated in *Frank Lyon Co.*, 435 U.S. 561, as "a multi-factor test". *See Klamath Strategic Inv. Fund, LLC v. United States*, 568 F.3d 537, 544 (5th Cir. 2009).[70] In *Klamath Strategic Inv. Fund, LLC*, 568 F.3d at 544, the Court of Appeals for the Fifth Circuit stated that the relevant factors include whether the transaction (1) has economic substance compelled by busi-

---

[70] At the time of the original and supplemental briefings in this case, the Court of Appeals for the Fifth Circuit had not decided how it would apply the economic substance test. *See, e.g.*, *Compaq Computer Corp. v. Commissioner*, 277 F.3d 778, 781 (5th Cir. 2001) (declining to adopt a particular approach and finding that a transaction had both economic substance and a legitimate business purpose and stating that the transaction had economic substance under any approach), *rev'g* 113 T.C. 214 (1999). The Court of Appeals later decided *Klamath Strategic Inv. Fund, LLC v. United States*, 568 F.3d 537 (5th Cir. 2009), on which we rely in this Opinion.

ness or regulatory realities, (2) is imbued with tax-independent considerations, and (3) is not shaped totally by tax-avoidance features. The court stressed that in *Frank Lyon Co.*, 435 U.S. at 583–584, the Supreme Court phrased the factors in the conjunctive. *See Klamath Strategic Inv. Fund, LLC*, 568 F.3d at 544. The court concluded that a taxpayer's failure to meet any one of these three factors renders the transaction void for tax purposes. *Id.* The court noted that "if a transaction lacks economic substance compelled by business or regulatory realities, the transaction must be disregarded even if the taxpayers profess a genuine business purpose without tax-avoidance motivations." *Id.*

### 3. *QHMC Transactions*

#### a. *Objective Economic Substance*

##### i. *Background*

Petitioners point to several factors supporting their argument that the QHMC transactions had objective economic substance. According to petitioners, QHMC engaged in numerous bona fide economically based transactions in managing the MPB obligations. QHMC assumed liability for the health care claims of a large portion of Quanex's employees, took on the role of managing health care costs, and developed health care cost containment strategies that Quanex implemented and which resulted in demonstratable cost savings. Petitioners also argue that the QHMC transactions affected petitioners' net economic position, their legal relations, and their nontax business interests. Petitioners contend that while the transactions presented a reasonable possibility of controlling health care costs that would otherwise be borne by petitioners, the transactions were attended by a real risk that the objective of controlling health care costs would not be achieved.

In further support of their argument for objective economic substance, petitioners assert that they projected that the QHMC transactions could result in a substantial pretax profit and a substantial yield on petitioners' cash investment. Strombom concluded that there was a reasonable expectation that the nontax benefits from the QHMC transactions would be at least commensurate with the transaction costs.

Strombom compared the present value of the savings under various assumptions regarding QHMC's ability to generate medical cost savings and the time when QHMC repurchases its preferred shares.[71] Strombom's calculations show that petitioners would realize nontax benefits with a present value of over $600,000 if medical benefits costs were 10% less than projected and QHMC repurchased the preferred shares after seven years. Petitioners point to the track record of successes by CS and Wannell in reducing petitioners' health care costs to justify their expectation that QHMC could obtain additional future savings. Expected values of incremental savings in the range of 5% to 15% were also shown to be reasonable given the recent success of other businesses, and of petitioners themselves, in reducing health care spending. Petitioners conclude that these factors demonstrate that there was a reasonable possibility of earning a pretax profit as a result of the QHMC transactions.

The record does not support petitioners' contention that the QHMC transactions had objective economic substance. To the contrary, the record establishes that the QHMC transactions were structured (from a generic product D&T promoted to petitioners) and implemented to manufacture an approximately $38 million artificial tax loss and without serious regard to Quanex's desire to reduce its medical benefit costs. We base our holding on our analysis of the factors discussed in the following parts ii. and iii.

ii. *Lack of Substantive Changes as a Result of QHMC Transactions*

Although as early as 1996 or 1997 Quanex and CS had general discussions regarding a possible joint venture as a long-term approach to controlling Quanex's health care costs, QHMC did not become that joint venture. Despite petitioners' assertions, QHMC did not serve any meaningful purpose and

---

[71] Strombom calculated petitioners' net present value from pursuing the QHMC transactions under the assumption that the transactions had no tax implications. In measuring the net present value of the transactions, Strombom determined the timing of the incremental cashflows that would result from the transactions. The incremental cashflows included: the parties' initial investments in QHMC, any medical savings realized by QHMC relative to the benchmark, dividends, consulting fees, and the cashflows to the parties when QHMC repurchased the preferred stock. For purposes of these calculations, Strombom also assumed that petitioners incurred $352,251 of transaction costs.

nothing of substance changed as a result of the QHMC transactions.

The record contains no evidence that QHMC conducted any type of business operations. QHMC had no employees of its own. Except for Wannell, each class A director was a Quanex employee when he or she was elected. Except for two Fulbright attorneys, each QHMC officer was a Quanex employee when he or she was elected. Parikh, who served as a QHMC board member, vice president, and treasurer, testified that he had no specific daily activities or responsibilities to perform for QHMC. Peery, who also was a QHMC board member and vice president from October 23, 1997, through April 9, 1999, testified that he was not involved in QHMC's operations and that he did not know he was a QHMC officer. As class C shareholders, CS performed the same consulting work it had provided for Quanex in the past and Wannell played virtually no role in developing or implementing any cost savings strategies.

In addition, petitioners carried on the administration of the transferred MPB obligations as if QHMC did not exist. Petitioners continued after the QHMC transactions to process the claims for the MPBs transferred to QHMC in the same manner as before the QHMC transactions, and the QHMC-covered employees' claims were not handled differently from other employees' claims that were not transferred to QHMC. Petitioners paid for all the costs associated with processing the MPB claims, and QHMC paid no fees to petitioners for these services. Petitioners also initially paid the medical claims costs and the employer's share of HMO premiums for or related to the transferred MPBs. Petitioners handled these payments through their treasury department in the same manner that such costs were handled for all of their employees. While QHMC subsequently reimbursed petitioners for the employees' claims and the employer's share of the HMO premiums that petitioners paid, QHMC's reimbursement was tied directly to its receipt of payments on the Piper note and other loans to various subsidiaries of petitioners. These notes represented QHMC's sole source of income, as QHMC's business came solely from petitioners. Petitioners fail to explain why QHMC made these loans, and we find them to be an arrangement by which petitioners could continue to pay

for the costs of the MPBs, despite QHMC's assumption of the MPB obligations.

### iii. *Lack of Reasonable Expectation of Nontax Benefits on Petitioners' Part*

We are not persuaded by Strombom's projections that the QHMC transactions would result in any meaningful nontax benefit for petitioners. To the contrary, the economic consequences of the transactions were inconsequential when compared with the tax benefits to be received. As Ross persuasively observes, Strombom's conclusion that the QHMC transactions had a reasonable possibility of nontax benefits is flawed because he failed to take into account the probability of petitioners' attaining any cost savings at all, let alone the probability of achieving any particular magnitude of cost savings. Petitioners provide no support for the probability that the assumed cost savings would occur.

Even more significantly, as Ross points out, Strombom's calculations are flawed because he considers any medical savings realized by QHMC to be incremental cashflows attributable to the QHMC transactions. In other words, Strombom assumes that any cost savings achieved by QHMC (or, more accurately, CS) are the result of the formation of QHMC and its management of the assumed MPB obligations. However, only medical savings realized by QHMC that petitioners would not have obtained in the absence of the QHMC transactions should constitute incremental cashflows in Strombom's analysis. Petitioners and CS were achieving cost savings before the QHMC transactions through their prior consulting arrangement. Because Strombom does not factor in the medical savings that petitioners would have obtained without the QHMC transactions or demonstrate that the cost savings are linked to the formation of QHMC, his projections as to the cost savings produced by the QHMC transactions are inherently flawed.[72] We reject petitioners' argument that the QHMC transactions had a reasonable expectation of nontax benefits.

---

[72] We also note that Strombom failed to consider potentially perverse incentives resulting from the QHMC transactions, which might result in cost increases instead of cost savings. For example, because the preferred shareholders would share the benefits of any cumulative cost savings with Quanex, but Quanex alone would bear the burden of any cost increase, the preferred shareholders have an incentive to engage in high-risk strategies that have some potential to result in large cost savings but which in fact result in large cost increases.

b. *Subjective Business Purpose*

i. *Background*

Petitioners argue that they entered into the QHMC transactions for the business purpose of making a profit and not for the sole purpose of obtaining tax benefits. Petitioners assert that they hoped to achieve cost savings through isolating and controlling contingent liabilities for Quanex's health care costs. According to petitioners, because Quanex spent millions of dollars every year on its employee health benefits, controlling the growth of these costs represented an important and useful business purpose. Petitioners claim that they conducted an extensive pretax and aftertax analysis that evaluated the risks of engaging in the deal and concluded that the transactions would be profitable. Petitioners argue that they sold the class C stock to CS and to Wannell to allow them to retain a portion of the net health care savings they produced, thus providing an incentive to lower the cost of QHMC's medical benefits. CS and Wannell, petitioners argue, were not accommodating a tax shelter scheme but had special expertise in the management of health care costs and had valid business reasons for entering the transactions. Petitioners contend that the transactions were rationally related to a useful nontax purpose that addressed petitioners' economic concerns over rising health care costs.

On the basis of our analysis of petitioners' motives for entering the QHMC transactions, we find that petitioners have failed to establish a business purpose for the QHMC transactions. While petitioners make general statements about cutting health care costs, they offer little explanation as to how the QHMC transactions furthered that goal. Accordingly, we decline to conclude that petitioners have met their burden of proving that they entered into the QHMC transactions for the purpose of reducing their health care costs. Rather, the record and reasonable inferences drawn therefrom support a conclusion that petitioners' purported business purpose was merely window dressing conceived in an attempt to satisfy Federal tax law while manufacturing high basis stock that they preplanned to sell to generate a large artificial tax loss. We base our holding on our analysis of the

following four factors, discussed in the following parts ii., iii., iv., and v.

ii. *Petitioners' Entering Into QHMC Transactions Solely as Means To Generate Artificial Capital Loss To Offset Capital Gains*

Petitioners did not implement the QHMC transactions for a nontax business reason. To the contrary, the QHMC transactions stemmed from a turnkey tax shelter that was designed and promoted by D&T and was quickly implemented with prearranged steps designed to generate an artificial multimillion-dollar tax loss to offset petitioners' unrelated multimillion-dollar capital gains. Singer, on behalf of D&T, initially introduced petitioners to the idea of using the QHMC transactions as a method of achieving tax avoidance. Singer sought out petitioners for a contingent liability transaction because of their foreseen capital gains, not because of any desire to reduce their health care costs, and petitioners retained D&T for tax advice on the transaction, including a proposed course of action to effect that advice. Singer and Schneider, the two D&T professionals who were most connected with the implementation of the QHMC transactions, specialized in tax advice; the record does not establish, nor do we find, that either of them also was a competent adviser on the legitimate savings of health care costs.

The QHMC transactions were consummated after the planting of that initial seed; i.e., the claim that a significant noneconomic loss could be artificially generated on the basis of a literal reading of the Code and the regulations and administrative rulings thereunder, sufficient to offset petitioners' anticipated capital gains. The use of D&T's tax shelter promotion drove the planning and the consummation of the QHMC transactions, with each step of the transaction prearranged and with the intended goal of tax avoidance in sight, and was specifically designed to mask the QHMC transactions with an appearance of legitimacy. Petitioners' recruitment of Chapman and Wannell as necessary participants in the transactions was then done without negotiations over the terms of the transactions, but with Quanex's offer of an essentially guaranteed and risk-free return. Quanex was in such a hurry to implement the QHMC transactions to gen-

erate the desired loss for TYE 1997 that its board in a single sitting approved each step of the transactions at or shortly after the time that the board was first asked to consider them. The fact that the QHMC transactions were designed to accomplish the single objective of tax savings is further seen by the short time in which all of the prearranged steps were taken.

The approximately $38 million loss generated by the QHMC transactions was prearranged, artificial, and intentional. Singer represented to petitioners that the revenue ruling made tax benefits available to them through a contingent liability transaction. Singer based his representation on knowledge he obtained from the DDCL, which stated that through the proper structuring of a series of transactions that revolved around the use of an environmental management company and the sale of some of its stock outside the group at a loss, a taxpayer may be allowed immediately to deduct a capital loss equal to the amount of the environmental reserve and to deduct an additional amount when an expenditure was actually made to satisfy the accrued liability. Relying on the DDCL and the revenue ruling, D&T and petitioners discussed the possibility of placing some of Quanex's liabilities in a separate entity through a similar series of transactions so as to generate a significant reportable artificial loss. Singer initially proposed structuring the transaction using environmental liabilities, but Rose opted for medical liabilities.[73]

Singer and petitioners intended to use the contingent liability transaction as a means to generate a substantial capital loss that could be used to offset the capital gains resulting from the impending sales of LaSalle and the Tube Group. While developing the QHMC transactions, petitioners were finalizing the LaSalle and Tube Group sales that would result in millions of dollars in capital gains to petitioners. Rose and Singer both knew of the LaSalle deal when Singer introduced the idea of the QHMC transactions, and Rose also knew that petitioners were trying to sell the Tube Group when Singer and petitioners discussed using a joint venture to manage the MPB obligations. Singer worked on the LaSalle

─────────────

[73] Petitioners already had the escrow account to cover their potential exposure to the environmental liabilities.

sale during the time he worked on the QHMC transactions, and Singer knew that petitioners expected a large capital gain on the sale.

Importantly, petitioners arranged the QHMC transactions so that the amount of liabilities transferred to QHMC, and thus the amount of capital loss, would be enough to offset the anticipated gains from the LaSalle and Tube Group sales.[74] Before the QHMC transactions closed, Singer and Royce discussed the hypothetical amount of capital gain on the LaSalle sale. In a footnote appearing in several outlines of the proposed QHMC transactions, D&T references the assumed gains resulting from the LaSalle and Tube Group sales with regard to the amount of liabilities to be transferred. The amount of liabilities transferred to QHMC thus was determined by anticipated tax benefits and not by any purported business purpose.

With respect to the footnote in the August 6 outline, Singer, Royce, and Rose testified that the footnote referred to the amount of contingent liabilities D&T mistakenly expected LaSalle and MST to contribute to QHMC. Singer testified that the footnote was in error because LaSalle and MST were sold or in the process of being sold as of the date of the August 6 letter. Singer further testified that the footnote was erroneous because Quanex intended to use liabilities from core businesses, and LaSalle and MST were not core businesses. Royce testified that the names of the entities contributing the liabilities were not relevant as of August 6, 1997, and that only the structure of the transactions was relevant at that time, so that if D&T operated under the assumption that LaSalle was contributing MPBs, that would not necessarily lead Quanex to the wrong conclusions. Rose testified that he did not instruct D&T or Singer that the amount of the liability that was going to be transferred to QS in the planning of the transactions should be related to the amount of gain on the sales of LaSalle and MST.

We reject the testimony of Singer, Royce, and Rose on this point as not credible. No version of the D&T proposal ever mentioned any cash or MPB contributions from LaSalle, MST, or GST. The LaSalle sale closed on April 18, 1997, almost four

---

[74] The predetermined loss to be recognized as part of the QHMC transactions was $37,989,000, while the capital gain ultimately recognized by petitioners on the sale of its interests in LaSalle and the Tube Group was $41,156,128.

months before the August 6 letter, and as of August 6, 1997, Quanex, which was guiding the QHMC transactions' revision process through Royce, knew LaSalle would not be available to provide MPBs because it had been sold. Singer, who helped prepare and review the August 6 outline, worked on the LaSalle sale and knew LaSalle had been sold by that time.

In our finding that the footnote addressed the gains on the assets sales rather than the MPBs that LaSalle and the Tube Group would contribute, we give weight to the Mooney memorandum. The Mooney memorandum addressed various items that Mooney believed were incorrect in the August 6 outline, and it did not state that the footnote in the August 6 outline was in error or otherwise address the footnote. The Mooney memorandum also did not indicate that anyone had commented on the footnote or had questioned why LaSalle and the Tube Group, which Quanex had sold or was in the process of selling, would contribute MPBs to QHMC. Also, Schneider testified that he understood the phrase "$36 million pertains to LaSalle" to refer to the anticipated gain on the LaSalle sale. Although Schneider also testified that Singer should be relied on to interpret a difference of opinion as to the meaning of something in the August 6 outline because only Singer signed the letter, we find Schneider's testimony on this issue more credible. Accordingly, we find, on the basis of the evidence in the record as a whole, that the footnote referred to the amounts of anticipated gains on the LaSalle and the Tube Group sales.

### iii. *Petitioners' Selection of Transferred MPBs Without Regard to Effective Medical Cost Management*

The manner in which petitioners selected the pool of medical liabilities to be assumed by QHMC also demonstrates that petitioners lacked a valid business purpose for entering into the QHMC transactions. Petitioners, after estimating the amount of their anticipated capital gains, selected the necessary amount of MPB obligations to transfer to QHMC to achieve the desired capital loss. Petitioners offer no rationale as to why they selected the particular MPB obligations transferred, and the record lacks any evidence suggesting that the selection of the MPB obligations related to managing the MPB obligations in an effective and cost-efficient manner. In addi-

tion, while Royce and Rose, Quanex's tax director and CFO, respectively, played active roles in choosing which MPB obligations were to be transferred, Peery, Quanex's vice president of human resources, who was in charge of employee benefits and the most knowledgeable source for Quanex's employee health benefits problems, made no recommendation about the groups of employees or the types of health care benefits to be included in the QHMC transactions. Additionally, Wannell and CS, on whose expertise petitioners had purportedly planned to capitalize in the QHMC transactions, were not consulted regarding the medical liabilities transferred to QHMC and did not participate in any decisions concerning liability selection.

iv. *Equity Interest in QHMC Granted to CS and Wannell as Meaningless Incentive To Reduce Health Care Costs*

Although petitioners proffer a potentially valid purpose of offering equity incentives to Wannell and CS, the formation of QHMC as a healthcare management company was meaningless given that CS managed Quanex's healthcare costs in the same manner both before and after the QHMC transactions. While CS did a greater amount of work for Quanex after the formation of QHMC, the nature of CS' work did not change. Petitioners continued to provide data to CS for all Quanex employees, and CS advanced potential medical savings strategies for all Quanex employees, not just those whose medical benefit obligations petitioners assigned to QHMC.[75] Additionally, CS continued to bill petitioners in the same manner it had before the QHMC transactions, failing to make any specific reference to QHMC or to the covered groups. CS thus maintained essentially the same business relationship with Quanex before and after the QHMC transactions, continuing to give its best effort in performing the exact same consulting services it had before the transactions. The argument that the QHMC transactions encouraged CS to provide better services because of its new shareholder status does not conform with the evidence in the record.

The record also does not support petitioners' argument that petitioners wanted Wannell to own class C stock as an

---

[75] For example, CS worked extensively on implementing a PPO plan for all Quanex employees as a cost savings strategy.

incentive. Wannell's involvement with QHMC was extremely limited. Wannell attended just two board meetings, and he did not participate in any other aspect of QHMC's business. Quanex's health care benefits personnel never discussed benefits issues with Wannell, and his only contact was with Royce, Quanex's tax director. Because of Wannell's extremely limited involvement with the MPB obligations and in QHMC, we do not find credible petitioners' assertion that Wannell was allowed to purchase an equity interest as an incentive to achieve cost savings on QHMC's behalf. Instead, as we find, petitioners selected Wannell (and CS) to serve as trusted and loyal facilitators for the QHMC transactions. Petitioners set the costs of Wannell's and CS' equity interests at relatively low amounts ($11,000 and $15,000, respectively) and lowered those costs even further by effectively quickly returning a portion of the initial cash outlays to Wannell and CS in the form of the first five quarterly dividends. In addition, petitioners structured the QHMC transactions so that the money Wannell and CS devoted to the transactions was guaranteed to be returned to them, both as to principal and with a reasonable premium, and allowed Wannell and CS to accomplish their desired results (i.e., for Wannell, a guaranteed return at least commensurate with his other opportunities and for CS, an opportunity to increase its business with petitioners).

v. *Unnecessary Assumption of MPB Obligations by QHMC*

Petitioners also do not sufficiently explain the reason for QHMC's assumption of the MPB obligations. While petitioners contend that QHMC assumed the MPB liabilities to "isolate costs within QHMC, in order to facilitate controlling such costs", the transfer of the liabilities in exchange for $38 million is separate and distinct from the alleged purpose behind QHMC's formation—to assume a managerial role in reducing the cost of health care and making a profit. The cost-reducing benefits of QHMC, as alleged by petitioners, resulted from the creation of a separate entity and the alleged ability of its new shareholders to manage and reduce health care costs, and not from QHMC's assumption of the MPB obligations themselves. Simply put, QHMC did not need to assume the MPB obligations for petitioners to reduce health care costs. CS

effectively managed Quanex's health care costs in the same manner before and after the creation of QHMC; whether petitioners or QHMC was responsible for the ultimate payment of the MPB obligations is irrelevant.

Nor do petitioners explain why the class C stock had to detour briefly through QS. QS' ownership lasted less than a week, and its sale of stock to Wannell had been preplanned at the outset of the QHMC transactions. Diverting an equity interest presumably intended for Wannell through QS was a key element in reaping the claimed tax benefits of the QHMC transactions: Under D&T's (and petitioners') reading of the Code and interpretations thereunder, the issuance of stock to QS allowed QS to obtain a high basis in the QHMC stock, and the subsequent sale to Wannell allowed QS to realize and recognize the purported loss.

### c. *Conclusion*

On the basis of our analysis of the QHMC transactions, we conclude and hold that the QHMC transactions lacked both objective economic substance and a subjective business purpose. *See Klamath Strategic Inv. Fund, LLC*, 568 F.3d at 544. We therefore disregard the effects of the transactions that gave rise to petitioners' $38 million basis in the class C stock. Consequently, given the parties' agreement that our holding means that petitioners are not entitled to deduct the short-term capital loss, we reach the same conclusion.

### IV. *Fees Incurred in Furtherance of QHMC Transactions*

Deductions are strictly a matter of legislative grace, and taxpayers bear the burden of producing sufficient evidence to substantiate any deduction that would otherwise be allowed by the Code. Sec. 6001; Rule 142(a)(1); *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992). While section 162(a) generally lets a corporate taxpayer deduct the ordinary and necessary expenses of its trade or business, expenditures made in an attempt to obtain abusive tax shelter benefits are not ordinary and necessary business expenses or otherwise deductible under section 162(a). *See Klamath Strategic Inv. Fund, LLC*, 568 F.3d at 549; *see also Karr v. Commissioner*, 924 F.2d 1018, 1023–1025 (11th Cir. 1991) (expenses arising from transactions lacking economic substance were not

deductible), *aff'g Smith v. Commissioner*, 91 T.C. 733 (1988); *Kirchman v. Commissioner*, 862 F.2d 1486, 1490 (11th Cir. 1989) (if a transaction lacks economic substance, "then expenses or losses incurred in connection with the transaction are not deductible"), *aff'g Glass v. Commissioner*, 87 T.C. 1087 (1986); *Winn-Dixie Stores, Inc. v. Commissioner*, 113 T.C. at 294 (administrative fees were not deductible because they were "incurred in connection with, and were an integral part of, a sham transaction").

On their 1997 return, petitioners claimed deductions of $320,692 for consulting fees paid to D&T, $29,114 for legal fees paid to Fulbright, and $2,445 for appraisal fees paid to Watson Wyatt. Petitioners paid all of these fees in furtherance of implementing the QHMC transactions. Because we hold that the QHMC transactions lacked economic substance, we affirm respondent's determination that petitioners may not deduct these transaction costs on their 1997 return.

## V. *Accuracy-Related Penalties*

### A. *Background*

Respondent determined that petitioners' reporting an inflated basis of $38 million in the class C stock constituted a gross valuation misstatement and that petitioners were liable for a 40% penalty under section 6662(a) and (h) to the extent of any underpayment of tax attributable to the claimed capital loss. In the alternative, respondent determined that petitioners were liable under section 6662(a) and (b)(1) (or alternatively (b)(2)) for a 20% accuracy-related penalty as to that portion of any underpayment, finding that the underpayment resulting from the disallowance of the short-term capital loss was attributable to negligence or disregard of rules and regulations (or alternatively resulted in a substantial understatement of income tax). Respondent also determined that the 20% accuracy-related penalty under section 6662(a) and (b)(1) (or alternatively (b)(2)) applied to the extent of the underpayment of tax attributable to the disallowed deduction for the transaction fees.

### B. *Gross Valuation Misstatement*

Respondent determined that the 40% accuracy-related penalty applies to any underpayment of tax resulting from the

disallowed capital loss deduction. To that end, respondent notes, petitioners claimed a $38 million basis in the class C stock sold to Wannell, and the basis in that stock is actually $11,000 through our application of section 351(g) or zero through our application of the economic substance doctrine.

Section 6662(a) and (b)(3) imposes an accuracy-related penalty of 20% on the portion of an underpayment attributable to any "substantial valuation misstatement". A substantial valuation misstatement exists "if the value of any property (or the adjusted basis of any property) claimed * * * is 200 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis". Sec. 6662(e)(1). The penalty imposed by section 6662(a) increases from 20% to 40% if the underpayment is attributable to a "gross valuation misstatement". Sec. 6662(h). A gross valuation misstatement occurs if the value of any property, or the adjusted basis of any property, reported by the taxpayer is 400% or more of the amount determined to be the correct amount of such valuation or adjusted basis. Sec. 6662(h)(2)(A). In the case of a corporation, the substantial or gross valuation misstatement penalty may only apply where the portion of the underpayment for the taxable year attributable to the substantial valuation misstatement exceeds $10,000. Sec. 6662(e)(2).

Petitioners contend that respondent wrongly determined that the gross valuation misstatement penalty applies to the portion of an underpayment attributable to the disallowed capital loss. As petitioners see it, that portion of the underpayment did not involve a valuation misstatement because it is attributable to our finding that petitioners' claimed capital loss deduction was improper. Petitioners cite *Heasley v. Commissioner*, 902 F.2d 380, and *Todd v. Commissioner*, 862 F.2d 540, for the proposition that the Commissioner may not penalize a taxpayer for a valuation overstatement where the Commissioner totally disallows a deduction, because the underpayment from the disallowance is attributable to the claiming of an improper deduction, not to a valuation overstatement. In those cases, the taxpayers made valuation overstatements of certain property and claimed depreciation deductions and/or investment tax credits on the basis of the overstated values. *See Heasley v. Commissioner*, 902 F.2d at 381; *Todd v. Commissioner*, 862 F.2d at 541. The Commis-

sioner disallowed the claimed deductions and investment tax credits and determined that the taxpayers were liable for valuation overstatement penalties. *See Heasley v. Commissioner*, 902 F.2d at 382; *Todd v. Commissioner*, 862 F.2d at 541. The Court of Appeals for the Fifth Circuit held that the disallowances did not result from a misstatement of the assets' values or bases but from the claiming of an improper deduction. *See Heasley v. Commissioner*, 902 F.2d at 383; *Todd v. Commissioner*, 862 F.2d at 543–545. Under these cases, the portion of a tax underpayment that is attributable to a valuation overstatement is determined after taking into account any other proper adjustment to tax liability. *Todd v. Commissioner*, 862 F.2d at 542–543.

We have found and have held that the capital loss deduction was improper because the relevant contributions did not qualify for nonrecognition treatment under section 351(a) and, alternatively, the QHMC transactions lacked economic substance. This case is appealable to the Court of Appeals for the Fifth Circuit, absent a stipulation to the contrary. The view of that court is that a valuation misstatement penalty does not apply when a transaction is disregarded, or when a deduction is otherwise disallowed for a reason unrelated to valuation. That view is contrary to the view of various other Courts of Appeals. *See Merino v. Commissioner*, 196 F.3d 147, 155 (3d Cir. 1999) ("[W]henever a taxpayer knowingly invests in a tax avoidance entity which the taxpayer should know has no economic substance, the valuation overstatement penalty is applied as a matter of course."), *aff'g* T.C. Memo. 1997–385; *Zfass v. Commissioner*, 118 F.3d 184, 191 (4th Cir. 1997) (the valuation overstatement penalty applied because the value overstatement was a primary reason for the disallowance of the claimed tax benefits), *aff'g* T.C. Memo. 1996–167; *Illes v. Commissioner*, 982 F.2d 163, 167 (6th Cir. 1992) (the entire artifice of the tax shelter at issue was constructed on the foundation of the overvaluation of its assets), *aff'g* T.C. Memo. 1991–449; *Gilman v. Commissioner*, 933 F.2d 143, 151 (2d Cir. 1991) ("The lack of economic substance was due in part to the overvaluation, and thus the underpayment was attributable to the valuation overstatement."), *aff'g* T.C. Memo. 1989–684 as supplemented by T.C. Memo. 1990–205; *Massengill v. Commissioner*, 876 F.2d 616, 619–620 (8th Cir. 1989) ("When an underpayment stems

from disallowed depreciation deductions or investment credit due to lack of economic substance, the deficiency is attributable to overstatement of value[.]"), *aff'g* T.C. Memo. 1988–427; *see also Fid. Int'l Currency Advisor A Fund v. United States*, 661 F.3d 667 (1st Cir. 2011). The Court of Appeals for the Fifth Circuit's view also is contrary to the view of this and other courts. *See, e.g.*, *Santa Monica Pictures, LLC v. Commissioner*, T.C. Memo. 2005–104; *Jade Trading, LLC v. United States*, 80 Fed. Cl. 11, 54 (2007).

Under *Golsen v. Commissioner*, 54 T.C. at 757, we follow a holding of the court to which an appeal lies if that holding is squarely on point. We believe that the court's holdings in *Heasley v. Commissioner*, 902 F.2d 380, and *Todd v. Commissioner*, 862 F.2d 540, meet that standard in that the grounds underlying our disallowance of the capital loss deduction are not directly related to petitioners' valuation of the class C stock or to petitioners' reporting of the proper basis therein, a basis that flows from the applicability or nonapplicability of section 351(a). The cases of *Heasley* and *Todd*, therefore, require us to hold in this case that any overvaluation of the stock or basis was subsumed in the disallowance of the capital loss deduction and that any resulting underpayment is attributable not to an overvaluation of stock or basis, but to the disallowance of the capital loss deduction on account of the inapplicability of section 351(a). *Accord Klamath Strategic Inv. Fund, LLC v. United States*, 472 F. Supp. 2d 885, 899–900 (E.D. Tex. 2007) (noting that the Court of Appeals for the Fifth Circuit's view on the applicability of the valuation misstatement penalty is contrary to the views of other Courts of Appeals, but holding that the court must follow the law of the Fifth Circuit), *aff'd in part, vacated in part, and remanded*, 568 F.3d 537 (5th Cir. 2009); *NPR Invs., LLC v. United States*, 105 A.F.T.R.2d (RIA) 2010–1082, 2010–1 U.S. Tax Cas. para. 50,251 (E.D. Tex. 2010) (same). Accordingly, on the basis of *Heasley v. Commissioner*, 902 F.2d 380, and *Todd v. Commissioner*, 862 F.2d 540, we hold that the valuation misstatement penalty does not apply to this case.

C. *Negligence*

Section 6662(a) and (b)(1) imposes an accuracy-related penalty of 20% on any portion of an underpayment of tax attrib-

utable to "[n]egligence or disregard of rules or regulations." For purposes of section 6662, the term "negligence" includes any failure to make a reasonable attempt to comply with Code provisions. Sec. 6662(c). Negligence is determined by testing a taxpayer's conduct against that of a reasonable, prudent person. *See Sandvall v. Commissioner*, 898 F.2d 455, 458–459 (5th Cir. 1990), *aff'g* T.C. Memo. 1989–189, *and aff'g* T.C. Memo. 1989–56. "Rules or regulations" include the provisions of the Code, temporary or final regulations issued under the Code, and revenue rulings or notices issued by the IRS. Sec. 1.6662–3(b)(2), Income Tax Regs. A return position that has a reasonable basis is not attributable to negligence. Sec. 1.6662–3(b)(1), Income Tax Regs. A reasonable basis connotes significantly more than not being frivolous or patently improper. Sec. 1.6662–3(b)(3), Income Tax Regs. The reasonable basis standard is not satisfied by a return position that is merely arguable or colorable. *Id.*

Respondent determined that the negligence penalty applied to the underpayment attributable to the disallowed deductions for transaction costs. Respondent also determined that the negligence penalty applied to the underpayment attributable to the capital loss adjustment. Petitioners contend that they made a reasonable attempt to comply with the provisions of the Code and that they did not carelessly, recklessly, or intentionally disregard rules or regulations. According to petitioners, their 1997 return was prepared through a careful and deliberate process in conformity with the advice of qualified tax professionals, including Royce, Parikh, and Singer. Petitioners also contend that they had a reasonable basis for the position they took on their 1997 return with respect to both disallowed items. Petitioners lastly argue that the negligence penalty is inappropriate because the issues surrounding the QHMC transactions involved complex legal determinations on issues that were reasonably debatable or on which there could be honest differences of opinion. Petitioners primarily cite the case of *Kantor v. Commissioner*, 998 F.2d 1514, 1522–1523 (9th Cir. 1993) (involving allocation and deduction of research and experimentation expenses to and by taxpayer partnership's limited partners), *aff'g in part, rev'g in part* T.C. Memo. 1990–380, in support of this last argument.

The record does not support petitioners' arguments. To the contrary, we find that petitioners did not make a reasonable attempt to comply with existing tax laws and that they failed to exercise ordinary and reasonable care in the preparation of their 1997 return. Rose, Royce, Parikh, and Singer were well-educated tax professionals with extensive tax experience. [76] On the basis of their knowledge and experience, they should have known (and in fact probably knew) that formal compliance with statutory provisions, even if present, is insufficient to sustain transactions that have no economic substance and are mere contrivances designed solely to obtain tax benefits. [77] They also should have known (and in fact probably knew) that the class C stock, as of the time of it issuance, was limited and was most likely not going to include a share of any QHMC growth to a significant extent. We cannot agree with petitioners' contention that the QHMC transactions had a reasonable basis or that the complexity of the transactions concerns issues that are reasonably debatable. The QHMC transactions were part of an economic sham designed to generate a substantial tax loss. Petitioners have not presented an alternative view to which we can affix a reasonable interpretation of the transactions. [78] We sustain respondent's determination that negligence penalties are appropriate in this case.

D. *Substantial Understatement*

Section 6662(a) and (b)(2) imposes an accuracy-related penalty of 20% on the portion of an underpayment attributable to any substantial understatement of income tax. An understatement is defined as the excess of the amount of tax required to be shown on the return for a taxable year over the amount of tax imposed that is shown on the return,

---

[76] Rose, Royce, and Parikh were C.P.A.s, and Singer was a C.P.A. and a tax attorney.

[77] In fact, given the scale of their efforts to disguise the QHMC transactions as a legitimate transaction, we can only presume that Rose, Royce, Parikh, and Singer each knew quite well that a transaction without economic substance is invalid.

[78] Petitioners also argue that it is inappropriate to impose the negligence penalty against them because, they state, this case is a "close case" and the Government lost *Black & Decker Corp. v. United States*, 340 F. Supp. 2d 621 (D. Md. 2004), *aff'd in part, rev'd in part and remanded*, 436 F.3d 431 (4th Cir. 2006), and *Coltec Indus., Inc. v. United States*, 62 Fed. Cl. 716 (2004), *vacated and remanded*, 454 F.3d 1340 (Fed. Cir. 2006), two cases which involve similar facts and legal issues. We disagree with this argument. We do not consider the issues here to present a "close case". In addition, the two cases which petitioners rely upon were decided after petitioners filed their 1997 return. Further, neither trial court's view of the economic substance doctrine was accepted by the Court of Appeals upon appeal of those judgments.

reduced by any rebate. Sec. 6662(d)(2)(A). For corporations, an understatement of income tax is substantial if the understatement exceeds the greater of 10% of the tax required to be shown on the return for the taxable year, or $10,000. Sec. 6662(d)(1)(A) and (B).

Any understatement is reduced to the extent it is attributable to an item: (1) for which there is or was substantial authority for the taxpayer's treatment for such item, or (2) with respect to which the relevant facts affecting the item's tax treatment are adequately disclosed in the return or in a statement attached to the return and there is a reasonable basis for the tax treatment of the item by the taxpayer. Sec. 6662(d)(2)(B). The exceptions for understatements supported by substantial authority or by adequate disclosure are not available for any item that is attributable to a "tax shelter" of a corporation. Sec. 6662(d)(2)(C)(ii). In that context, a "tax shelter" is: (1) a partnership or other entity, (2) any investment plan or arrangement, or (3) any other plan or arrangement, if a significant purpose of such partnership, entity, plan, or arrangement is the avoidance or evasion of Federal income tax. Sec. 6662(d)(2)(C)(iii).

Respondent determined as an alternative to the applicability of the accuracy-related penalty for negligence that the underpayment resulting from the disallowed capital loss and the disallowed deduction of the transaction fees results in a substantial understatement of income tax warranting a 20% penalty under section 6662. Additionally, respondent contends that the QHMC transactions constitute a "tax shelter" under section 6662(d)(2)(C)(iii) and, consequently, the substantial authority and adequate disclosure exceptions to the substantial understatement penalty are unavailable to petitioners.

Petitioners do not dispute that the understatement of income tax resulting from the items is substantial. Petitioners argue that their position on the 1997 return was supported by both substantial authority and adequate disclosure, reducing the understatement to zero under section 6662(d)(2)(B). In support of this argument, petitioners assert that respondent conceded the issue of whether the understatement is attributable to a tax shelter. Petitioners contend that the following statement in the notice indicated to petitioners that they could demonstrate substantial authority or

adequate disclosure to defeat the substantial understatement penalty: "the underpayment is attributable to a substantial understatement of income tax and you have not shown that you had substantial authority for the way you reported the items and you did not make any disclosures explaining the adjusted items." Additionally, petitioners claim that respondent failed to raise the tax shelter issue in the notice, in any of the pleadings, or at trial, and as a result, petitioners would suffer substantial detriment because they were not able to address the specific elements relating to section 6662(d)(2)(C). Petitioners conclude that the question of whether the QHMC transactions are a tax shelter for section 6662(d) purposes is a new issue that should not be heard by the Court.

Petitioners' argument is baseless. Respondent did not concede the tax shelter issue by merely asserting that petitioners failed to meet the substantial authority and adequate disclosure defenses to the substantial understatement penalty. Petitioners bear the burden of proving that respondent's determination to assess the substantial understatement penalty is inappropriate.[79] *See* Rule 142(a)(1). Accordingly, petitioners must demonstrate that the QHMC transactions were not a tax shelter item and, if that is the case, that substantial authority and/or adequate disclosure are present. Given respondent's argument that the QHMC transactions lacked economic substance, petitioners were on notice of the possibility that the transactions could be found to be a tax shelter under section 6662(d)(2)(C)(iii). *See, e.g.*, *Palm Canyon X Invs., LLC v. Commissioner*, T.C. Memo. 2009–288; *Santa Monica Pictures, LLC v. Commissioner*, T.C. Memo. 2005–104.

Because we hold that the QHMC transactions had no economic substance and that their only purpose was to manufacture high-basis stock to generate a tax loss, we find that the multistep contingent liability transaction in which petitioners engaged was a tax shelter for purposes of section 6662. Tax avoidance was clearly a significant (if not the sole) purpose of the QHMC transactions. Petitioners are therefore unable to

---

[79] While sec. 7491(c) places a burden of production upon the Commissioner with respect to an individual's liability for an accuracy-related penalty under sec. 6662, sec. 7491(c) has no applicability where, as here, the taxpayer is a corporation. *See NT, Inc. v. Commissioner*, 126 T.C. 191, 194–195 (2006).

claim that the underpayment resulting from the improperly claimed tax loss should be reduced because of substantial authority or adequate disclosure. We sustain respondent's alternative determination that the substantial understatement penalty is appropriate in this case. We note, however, that only one section 6662 accuracy-related penalty may be imposed with respect to a given portion of an underpayment, even if that portion is attributable to more than one of the types of conduct listed in section 6662(b). *See New Phoenix Sunrise Corp. v. Commissioner*, 132 T.C. at 187; sec. 1.6662–2(c), Income Tax Regs.

E. *Section 6664(c) Reasonable Cause Exception*

1. *Overview*

The accuracy-related penalty imposed under section 6662 does not apply with respect to any portion of an underpayment to which the taxpayer can demonstrate reasonable cause and good faith. Sec. 6664(c). Reasonable cause requires that the taxpayer have exercised ordinary business care and prudence as to the disputed item. *See Neonatology Assocs., P.A. v. Commissioner*, 115 T.C. at 98. The determination of whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances. Sec. 1.6664–4(b)(1), Income Tax Regs. The most important factor is generally the extent of the taxpayer's effort to assess the taxpayer's proper tax liability. *Id.* Circumstances that may indicate reasonable cause and good faith include an honest misunderstanding of fact or law that is reasonable in light of all the facts and circumstances, including the experience, knowledge, and education of the taxpayer. *Id.*

A taxpayer may demonstrate reasonable cause through reliance on the advice of a professional tax adviser as to the proper treatment of an item. *Id.*; *see also Neonatology Assocs., P.A. v. Commissioner*, 115 T.C. at 98. The taxpayer must demonstrate that reliance on the professional's advice was reasonable and that the taxpayer acted in good faith. Sec. 1.6664–4(b)(1), Income Tax Regs. All facts and circumstances are taken into account in determining whether a taxpayer has reasonably relied in good faith on professional tax advice as to the treatment of the plan or arrangement

under Federal tax law. Sec. 1.6664–4(c)(1), Income Tax Regs. The professional's advice must be based upon all pertinent facts and circumstances and the law as it relates to those facts and circumstances. Sec. 1.6664–4(c)(1)(i), Income Tax Regs. The advice must take into account the taxpayer's purposes for entering a transaction and for structuring a transaction in a particular manner. *Id.* The advice must not be rendered on the basis of unreasonable factual or legal assumptions and must not unreasonably rely on the representations, statements, findings, or agreements of the taxpayer or any other person. [80] Sec. 1.6664–4(c)(1)(ii), Income Tax Regs. Reliance is generally unreasonable where it is placed upon insiders or promoters (or their offering materials) or when the person relied upon has an inherent conflict of interest that the taxpayer knew or should have known about. *See Neonatology Assocs., P.A. v. Commissioner*, 115 T.C. at 98.

For purposes of the substantial understatement penalty under section 6662(b)(2), a taxpayer must meet a more stringent reasonable cause exception when the understatement is attributable to a tax shelter. Sec. 1.6664–4(e)(1), Income Tax Regs. We determine whether a corporation acted with reasonable cause and in good faith in its treatment of a tax shelter item on the basis of all pertinent facts and circumstances. *Id.* A corporation's "legal justification" [81] for the transaction may be taken into account, as appropriate, in establishing that the corporation acted with reasonable cause and in good faith in its treatment of a tax shelter item. Sec. 1.6664–4(e)(2)(i), Income Tax Regs. However, a corporation's legal justification may be taken into account only if the corporation satisfies both the authority and belief requirements described in section 1.6662–4(e), Income Tax Regs. Satisfaction of those requirements is not necessarily dispositive, but it is an important factor to consider in determining whether a corporate taxpayer acted with reasonable cause and in good

---

[80] For example, the advice must not be based upon a representation or assumption which the taxpayer knows, or has reason to know, is unlikely to be true, such as an inaccurate representation or assumption as to the taxpayer's purposes for entering into a transaction or for structuring a transaction in a particular manner. Sec. 1.6664–4(c)(1)(ii), Income Tax Regs.

[81] Legal justification includes "any justification relating to the treatment or characterization under the Federal tax law of the tax shelter item or of the entity, plan, or arrangement that gave rise to the item." Sec. 1.6664–4(e)(2)(ii), Income Tax Regs. Accordingly, a taxpayer's belief as to the merits of the taxpayer's underlying position is a legal justification. *Id.*

faith. Sec. 1.6664–4(e)(3), Income Tax Regs. Facts and circumstances other than a corporation's legal justification may be taken into account in determining whether the corporation acted with reasonable cause and in good faith with respect to a tax shelter item, regardless of whether the minimum requirements are satisfied. Sec. 1.6664–4(e)(4), Income Tax Regs.

The authority requirement is satisfied if there is substantial authority for the tax treatment of the item, as defined in section 1.6662–4(d), Income Tax Regs. [82] *See* sec. 1.6664–4(e)(2)(i)(A), Income Tax Regs. The belief requirement is satisfied only if, on the basis of all facts and circumstances, the corporation reasonably believed, when the return was filed, that the tax treatment of the item was more likely than not the proper treatment. *See* sec. 1.6664–4(e)(2)(i)(B), Income Tax Regs. A corporation is considered reasonably to believe that the tax treatment of an item is more likely than not the proper tax treatment if:

(*1*) The corporation analyzes the pertinent facts and authorities in the manner described in § 1.6662–4(d)(3)(ii), and in reliance upon that analysis, reasonably concludes in good faith that there is a greater than 50-percent likelihood that the tax treatment of the item will be upheld if challenged by the Internal Revenue Service; or

(*2*) the corporation reasonably relies in good faith on the opinion of a professional tax advisor, if the opinion is based on the tax advisor's analysis of the pertinent facts and authorities in the manner described in § 1.6662–4(d)(3)(ii) and unambiguously states that the tax advisor concludes that there is a greater than 50-percent likelihood that the tax treatment of the item will be upheld if challenged by the Internal Revenue Service.
* * *

[Sec. 1.6664–4(e)(2)(i)(B)(*1*) and (*2*), Income Tax Regs.]

### 2. *Analysis*

Petitioners bear the burden of proof in establishing their reasonable cause defense. *See Higbee v. Commissioner*, 116 T.C. 438 (2001). Petitioners argue that an accuracy-related

---

[82] Whether substantial authority exists is determined by an objective standard involving an analysis of the law and an application of the law to relevant facts. Sec. 1.6662–4(d)(2), Income Tax Regs. The taxpayer's belief that there is substantial authority for the tax treatment of an item is thus not relevant in determining whether there is substantial authority for that treatment. Sec. 1.6662–4(d)(3)(i), Income Tax Regs. Substantial authority is present for the tax treatment of an item only if the weight of the authorities supporting the treatment is substantial in relation to the weight of authorities supporting contrary treatment. *Id.* The weight accorded an authority depends on its relevance and persuasiveness, as well as the type of document providing the authority. Sec. 1.6662–4(d)(3)(ii), Income Tax Regs.

penalty under section 6662(a) does not apply because, under section 6664(c), petitioners had reasonable cause and acted in good faith with respect to the underpayment resulting from both the disallowed capital loss and the disallowed deduction of the transaction fees. Petitioners' primary defense is that they reasonably relied in good faith on the opinion of their professional tax adviser, Singer. Petitioners assert that Singer provided petitioners with comprehensive and detailed advice in D&T's draft opinion, which was prepared under Singer's supervision and reflected advice given by Singer and other specialists at D&T regarding the tax treatment of the QHMC transactions and the claimed capital loss. The ultimate conclusion of Singer's tax advice was that petitioners' tax treatment of the QHMC transactions would more likely than not be sustained. Petitioners argue that they followed Singer's tax advice in the preparation of the 1997 return and that Singer signed the return on behalf of D&T as the paid return preparer. Petitioners conclude that none of the section 6662 accuracy-related penalties determined by respondent is appropriate because petitioners relied in good faith on professional tax advice regarding complex tax issues.

On the basis of our examination of the facts and circumstances surrounding the QHMC transactions, we do not find that petitioners had reasonable cause and acted in good faith. Petitioners conducted no independent investigation of the tax consequences of the QHMC transactions, and Quanex's tax department did not prepare any internal written tax opinion or memorandum discussing the tax consequences of the QHMC transactions. Further, none of Quanex's officers testified that he or she analyzed the facts or authorities necessary to make a good-faith conclusion regarding the tax treatment of the transactions. Rose understood that the transactions generated a significant artificial capital loss, but he conducted no independent investigation. Parikh knew that the QHMC transactions generated a significant artificial capital loss, but he did not speak with anyone at D&T about the QHMC transactions or read the draft opinion before signing petitioners' 1997 return. Royce, Quanex's tax director, knew that the QHMC transactions generated a significant artificial capital loss, but he prepared no tax opinion on the subject and he did not obtain a tax opinion from an independent professional tax adviser.

We also do not find that petitioners' reliance on the tax advice of Singer was reasonable or in good faith. Neither Singer nor D&T was an independent adviser on the tax consequences of the QHMC transactions. Singer (on behalf of D&T) promoted to Quanex a generic contingent liability transaction that could be molded to meet Quanex's desire to shelter the upcoming gains, and Quanex's officers worked closely with Singer to develop the QHMC transactions to shelter the impending capital gains resulting from the sales of LaSalle and the Tube Group. When Singer introduced the contingent liability transaction to petitioners, Rose agreed to structure the transaction as a joint venture to manage medical liabilities in a more cost-efficient manner. At the same time, however, Rose knew that the QHMC transactions served no meaningful purpose outside of tax benefits. The primary officers involved in implementing the QHMC transactions, Rose, Parikh, and Royce, were sophisticated professionals with significant tax experience. Yet none of them ever consulted Quanex's own health care benefits experts, Peery and Howard, regarding the structure of the QHMC transactions. The named officers merely caused Quanex to transfer the amount of liabilities needed to shelter the capital gains. Given the significant tax loss generated from a transaction devoid of economic substance, the officers should have conducted a more extensive analysis with respect to the propriety of the transaction. *See, e.g.*, *Nicole Rose Corp. v. Commissioner*, 320 F.3d 282, 285 (2d Cir. 2002) (taxpayer's "scheme was sufficiently blatant that the participation of experts cannot convert its actions into a 'reasonable attempt to comply with the provisions' of the tax code"), *aff'g* 117 T.C. 328 (2001); *Neonatology Assocs., P.A. v. Commissioner*, 299 F.3d at 234 ("As highly educated professionals, the * * * taxpayers should have recognized that it was not likely that by complex manipulation they could obtain large deductions for their corporations[.]"). Such is especially so, given that D&T was promoting an engagement whereby petitioners could pay D&T $400,000 to structure a transaction that would let petitioners deduct an approximately $38 million tax loss on the sale of $11,000 in securities which had just recently been purchased for the same amount, and that this result, to a savvy, experienced businessman such as Rose, Parikh, or

Royce, would clearly appear to be too good to be true. [83] *Neonatology Assocs., P.A. v. Commissioner*, 299 F.3d at 234 ("When, as here, a taxpayer is presented with what would appear to be a fabulous opportunity to avoid tax obligations, he should recognize that he proceeds at his own peril."); *New Phoenix Sunrise Corp. & Subs. v. Commissioner*, 132 T.C. at 195; *Blum v. Commissioner*, T.C. Memo. 2012–16.

We also reject petitioners' contention that petitioners' reliance on D&T's draft opinion was reasonable because (1) D&T never finalized the opinion, [84] and (2) even if the opinion had been issued by D&T, Singer based his conclusion in the opinion on the incorrect assumption that petitioners entered into the QHMC transactions for a valid business purpose, to manage their medical liabilities in a more cost-efficient manner, that petitioners knew was incorrect. *See* sec. 1.6664–4(c)(1)(ii), Income Tax Regs. Thus, while the D&T draft opinion cites various Code sections, revenue rulings, and court cases to support Singer's conclusion as to the Federal income tax consequences of the QHMC transactions, [85] petitioners cannot in good faith rely on the tax opinion because petitioners knew that the only purpose of the transactions was to achieve a tax loss. We also note that the draft opinion was authored by the same firm that promoted the QHMC transactions (initially in a generic form) to Quanex, and which helped Quanex then fine tune and implement the generic transaction to Quanex's situation, and that the draft opinion was given to Quanex as part of the overall purchase price of that promotion. D&T is a "promoter" in the setting of this case, *see 106 Ltd. v. Commissioner*, 136 T.C. 67, 79–80 (2011), *aff'd*, 684 F.3d 84 (D.C. Cir. 2012); *Blum v. Commissioner*, T.C. Memo. 2012–16, and petitioners could not reasonably rely on the advice of D&T to support its pro-

---

[83] We also note the specific terms of D&T's compensation as to the QHMC transactions. The engagement letter informed petitioners that D&T would be compensated on the basis of its standard hourly rates if the QHMC transactions were not ultimately consummated. However, the letter stated, if the transactions were consummated, D&T would be paid (in lieu of the hourly rates) a set fee of $400,000 plus out-of-pocket expenses estimated to total $10,000.

[84] Petitioners claim that the draft opinion actually was D&T's "final advice" on the subject. The record does not establish that point, and we decline to find it as a fact.

[85] The draft opinion, however, provided little meaningful analysis as to sec. 351(g). The draft opinion merely misstated as a fact that the liquidation value of the class C stock equaled 45% of the increase in QHMC's equity value and concluded that the class C stock should not be treated as preferred stock for purposes of sec. 351(g) because "[i]t is difficult to argue that 45% is not significant."

motion given the obvious conflict of interest, *see, e.g.*, *Blum v. Commissioner*, T.C. Memo. 2012–16.

Accordingly, we reject petitioners' contention that they meet the reasonable cause exception under section 6664(c), and we sustain respondent's determination that petitioners are liable for the 20% accuracy-related penalty. On the basis of this holding, we logically also hold that petitioners fail to meet the more stringent requirements needed to establish reasonable cause when the substantial understatement penalty is attributable to a tax shelter. *See* sec. 1.6664–4(e), Income Tax Regs. Consequently, whether petitioners meet the authority and belief requirements of section 1.6664–4(e), Income Tax Regs., is irrelevant.

## VI. *Conclusion*

Respondent properly disallowed the short-term capital loss deduction petitioners claimed from the sale of the class C stock to Wannell. Further, petitioners improperly deducted the fees incurred to implement the QHMC transactions. Further, on the basis of our *Golsen* rule, we do not sustain respondent's determination as to the 40% gross valuation misstatement penalty imposed under section 6662(h) with respect to the disallowed capital loss. We do, however, sustain respondent's determination that petitioners are liable for the 20% accuracy-related penalty attributable to negligence and to a substantial understatement of income tax. *See* sec. 6662(a) and (b)(1) and (2). We also hold that petitioners failed to establish that they met the reasonable cause exception of section 6664(c).

---

We have considered all arguments that the parties made, and to the extent not discussed above, conclude those argu-

ments are irrelevant, moot, or without merit. To reflect the foregoing,

*Decision will be entered under Rule 155.*